IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re Apollo Group Inc. Securities Litigation, | Master File No. CV 04-2147-PHX-JAT (LEAD) |
| | CV 04-2204-PHX-EHC (Consolidated) |
| | CV 04-2334-PHX- RCB(Consolidated) |
| This Document Relates To: All Actions | CLASS ACTION |
| | **ORDER** |

Pending before the Court is Defendants' Motion to Dismiss (Doc. # 71); Defendants' Request for Judicial Notice (Doc. # 73) and Lead Plaintiff's opposition to the request for judicial notice in the form of an objection and Motion to Strike Portions of the Motion to Dismiss (Doc. # 80). Lead Plaintiff also opposed the motion to dismiss (Doc. # 79) and Defendants replied (Doc. # 84).

This is a consolidated class action proceeding. Lead Plaintiff claims that Defendants violated § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10(b)-5 thereunder when they failed to publicly disclose a report from the Department of Education that seriously criticized the University of Phoenix's ("UOP") compensation system for its enrollment recruiters. Defendants were aware of and possessed the report as early as February 2004 but did not publicly disclose the report until September 2004.

Lead Plaintiff seeks to represent a class of plaintiffs who purchased Apollo stock between February 27, 2004 and September 14, 2004, inclusive (the "Class Period"). Lead Plaintiff claims that Defendants kept Apollo's stock price artificially high during the Class

Period by failing to disclose the DOE Report and by reassuring the investing public that nothing untoward had been found during the DOE's investigation.  Pursuant to the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(a), two related cases were consolidated and The Policemen's Annuity and Benefit Fund of Chicago was appointed Lead Plaintiff.  Defendants move to dismiss the action based on Lead Plaintiff's alleged failure to plead fraud with particularity as required by Fed. R. Civ. P. 9(b) and for failing to meet the heightened pleading requirements of the PSLRA.

## I.   LEGAL STANDARD

Pursuant to the PSLRA, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  The complaint must also "state with particularity facts giving rise to a strong inference that defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  In the Ninth Circuit, a plaintiff must show that the defendant "acted with intentionality or deliberate recklessness or, where the challenged act is a forward looking statement, with actual knowledge . . . that the statement was false or misleading." *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001)(internal quotations and citations omitted).  In addition, the plaintiff must plead the existence of a duty to disclose.  *Basic, Inc. v. Levinson*, 485 U.S. 224, 239 n. 17 (1988)("[s]ilence, absent a duty to disclose is not misleading under Rule 10b-5.)

In short, a securities fraud plaintiff must plead duty to disclose, falsity or misrepresentation and scienter.  On a motion to dismiss, the Court must "take as true all allegations of material fact stated in the complaint and construe them in the light most favorable to the nonmoving party." *Warshaw v. Xoma Corporation*, 74 F.3d 955, 957 (9th Cir. 1996).  A complaint "should not be dismissed unless it appears beyond a doubt that the plaintiff cannot prove any set of facts in support of the claim that would entitle him or her to relief." *No 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 931 (9th Cir. 2003).  Further, the Court must consider

1   allegations in the complaint in their entirety to determine whether there is a strong inference

2   that defendants acted with the requisite scienter in making false or misleading statements to

3   investors. *Ronconi*, 253 F.3d at 429.

4        In order to meet the requirements of Rule 9(b), a complaint must adequately allege the

5   "circumstances constituting fraud." *In re GlenFed, Inc., Sec. Litig.*, 42 F.3d 1541, 1548 (9tj

6   Cir. 1995)(en banc). "In a securities fraud action, a pleading is sufficient under Rule 9(b) if

7   it identifies the circumstances of the alleged fraud so that the defendant can prepare an

8   adequate answer." *Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir. 1994). This requires

9   allegations of "time, place and nature of the alleged fraudulent activities." *Walling v. Beverly*

10  *Enters.*, 476 F.2d 393, 397 (9th Cir. 1973). Additionally, a pleading must include an

11  "explanation as to what is false or misleading about the statement." *Warshaw*, 74 F.3d at

12  960.

13  **II.    ALLEGATIONS IN THE COMPLAINT**[1]

14       UOP accounts for approximately 95% of Apollo's revenues. (Compl. ¶ 2). A material

15  portion of Apollo's revenue is derived from federal financial aid programs - Title IV funding

16  - in which Apollo's students participated to receive tuition assistance. (Compl. ¶ 3). Because

17  its students receive financial aid from the federal government, such aid accounting for

18  approximately 62% of UOP's revenue , the Company was subject to extensive regulation by

19  governmental agencies. (Compl. ¶ 4). In particular, the Higher Education Act of 1965, as

20  amended ("HEA") and the regulations issued thereunder by the DOE, prohibits institutions

21  that receive federal financial aid from basing the compensation for enrollment recruiters

22  solely on the number of student enrollments. (Compl. ¶ 4).

23      **A.   The DOE Report**

24       Commencing in late summer 2003, investigators from the DOE undertook an audit

25  and investigation pursuant to a Program Review at several campuses of UOP. (Compl. ¶ 37).

26  The program review involved examination of "pertinent forms, policies and procedures and

27  _____

28  [1]The Court will quote directly from Plaintiff's complaint.

personnel documentation at UOP." (Compl. ¶ 37).  DOE staff visited UOP campuses in Phoenix, Oakland, San Jose, San Francisco, Pleasanton and Livermore, as well as UOP's online campus. (Compl. ¶ 38).  In addition, DOE staff interviewed more than 60 then current or former UOP enrollment counselors regarding UOP's compensation practices. (Compl. ¶ 38).

As a consequence of its audit and investigation, on February 5, 2004, the DOE rendered a written "Program Review Report" (DOE Report) addressed to defendant Nelson respecting its finding and conclusions. (Compl. ¶ 39).  Summarizing the DOE Report was a February 5, 2004 cover letter to defendant Nelson stating in pertinent part:

> This report contains a serious finding regarding the school's substantial breach of its fiduciary duty; specifically that the University of Phoenix (UOP) systemically engages in actions designed to mislead the Department of Education and to evade detection of its improper incentive compensation system for those involved in recruiting activities.  The finding of noncompliance is referenced to the applicable regulations, and specifies the action required to comply with the regulations and statutes.

(Compl. ¶ 39).  The DOE Report concluded as follows:

> The actions of UOP and the system it has established cultivates and maintains a corporate culture in defiance of UOP's fiduciary duty.  UOP has created an environment that pits the strong motivation of individual gain against its fiduciary duty to the Department.  It is one that flaunts the Department's regulations and the prohibition against incentive compensation based on enrollments.

(Compl. ¶ 39).

In concluding its Report, the DOE also found that UOP:

• "hires its recruiters with the promise of lucrative compensation for success in securing enrollments;"

• "maintains a recruiter evaluation and salary system that provides incentive payments based both directly and indirectly on success in securing enrollments;"

• "provides substantive incentives to its staff to recruit unqualified students and students who cannot benefit from the training offered;"

• "systematically and intentionally operates in a duplicitous manner so as to violate the Department's prohibition against incentive compensation while evading detection"

(Compl. ¶ 40).  The DOE Report constituted a serious, adverse and material event as did its scathing findings and conclusions of rampant violations of the law.  Its conclusions are supported by considerable relevant evidence and factual findings. (Compl. ¶ 41).

**B.    Statements Made During the Class Period**

**1.    Dismissal of the *qui tam* action** (Compl. ¶¶ 95-98).

On February 27, 2004, Apollo issued a press release over the Business Wire announcing that a *qui tam* lawsuit brought against the Company by 2 employees had been dismissed.  According to the release, the action alleged that Apollo improperly compensated its recruitment officers.  The Company stated, in relevant part, as follows:

> Apollo Group Inc. learned today that on Feb. 19, 2004, the U.S. District Court for the Eastern District of California granted our motion to dismiss the previously disclosed qui tam action.
>
> The qui tam action was brought by two of our current employees on behalf of themselves and the federal government and alleged that we improperly compensate our employees who are involved in the recruitment of new students.  The government declined to intervene in the lawsuit.
>
> . . . Although we had expected the dismissal of the qui tam lawsuit, we were very pleased to obtain this ruling.

This news caused the price of Apollo common stock to rise $3.44 per share or 4.5% from its closing price of $76.23 the day before to close at $76.97 on March 1, 2004.

Apollo's February 27, 2004 press release announcing the dismissal of the *qui tam* lawsuit was deceptive and materially misleading in all respects.  While it was true that a *qui tam* lawsuit brought by 2 employees of UOP had been dismissed, defendants' portrayal of that dismissal was highly inaccurate and falsely conveyed a message that the *qui tam* lawsuit's allegations of improper compensation of employees respecting the recruitment of new students was without merit.  In fact, the dismissal was based solely on the grounds that the False Claims Act violation asserted therein could not be brought because such a claim requires that a false certification of compliance be filed and the DOE does not require such a certification.  While the description of the qui tam lawsuit was itself false and misleading, what was even more misleading was defendants' failure to refer to or disclose in any manner the DOE's investigation of Apollo and most importantly, the DOE Report received just 3 weeks earlier on February 5, 2004, after the DOE's intensive audit and investigation, that found and concluded that the Company was in flagrant violation of the law with respect to Title IV funding and the related ban on incentive compensation respecting student

enrollments, as more fully discussed above, and as was factually alleged in the *qui tam* action.

Defendants' statement that the government declined to intervene in the *qui tam* suit, while technically accurate, was also, of course, completely misleading.  As defendants already knew, the DOE - an agency of the U.S. government - had vigorously stepped in and conducted a thorough audit and investigation, pursuant to a Program Review, of UOP employee whistleblower complaints that UOP was violating the law, including the ban on incentive compensation.

**2.  March 12, 2004 financial statements and conference call** (Compl. ¶¶ 99-102).

On March 12, 2004, Apollo, via defendants Nelson and Gonzales, held a conference call with analysts to discuss its second quarter of fiscal 2004 results.  During the call, defendant Nelson coyly mentioned a DOE Program Review, but without ever disclosing the serious nature of the review or the fact that the DOE had already issued a scathing written report on February 5, 2004, of its material and adverse findings and conclusions, as a product of its thorough review and investigation, that Apollo's UOP was continuously and systemically violating the ban on incentive compensation respecting student enrollments among other unlawful and unethical practices.  Instead, Nelson downplayed and minimized the Program Review and concealed the DOE's Report and its adverse findings issued February 5, 2004, in his discussions with analysts who were eager to know more about the review, as follows:

TODD NELSON:...The next area would be U.S. DOE approval.  This area usually gets a lot of attention because of the visibility.  Their involvement usually comes in the form of a program review and (indiscernible) audit.  These types of reviews are a normal part of doing business and it is their responsibility to actually [sic] these types of reviews.  Over the years, we have had many of these kind of reviews.  For example, as most of you know, we currently have an OIG audit involving IPD that has been ongoing for several years.  We also have an ongoing program review at The University of Phoenix.

Over the years, although these reviews are complex and time-consuming, they have never resulted in a material impact on Apollo.  Our experience with the process is that, first, there is a visit, then a preliminary draft – or preliminary report or a draft report is issued.  It has also been our experience that it is not unusual that these reports may contain some negative comments.  Following the initial reports, though, the institution then has an

1   opportunity to research the issues in question and draft a response.  This information is then
2   considered by the department, and a final report is issued.  It is usually at this point that we
    realize if there is an issue and normally disclose that matter if it involved any type of material
3   consequences for the school.

4        GREG CAPELLI: One final one for Todd.  Todd, we have been getting more
    questions recently just about the Department of Ed. and the processes that they go through
5   during the year.  You mentioned the programming view (ph).  How common is it, actually,
    for you to have a program review?  I'm sure you have had them, as you have mentioned, over
6   the past 10 years.  And then any more color on specifically what, in this case, we are looking
    for?

7        TODD NELSON: Well, the bottom line is, in my history with the company, especially
8   over the last 10 years, I don't know that there has ever been a time when there hasn't been
    either a program review or an OIG audit going on.  So it's a very common thing for us . . .
9   And so basically, I guess, an answer to your question, we have these things, I guess,
    happening on a regular basis.  And I would say the good news is our track record has shown
10  that although during the process, I guess from our point of view, your first draft reports or
    your first indication based on the initial visit is they usually have some questions.  And, in
11  some cases, a very negative reaction to things, in some cases, a very positive reaction.

12       But the end result, which you have been able to see, has been very positive – I
13  shouldn't say positive for us, but it has been immaterial to us in a sense that these are things
    that are, again, interpretation of regulations versus any intent to do anything wrong.

14       The types of things that I think are the hot button that they certainly look at us, and
    I think with everybody in particular . . . The other area is incentive compensation.  Again,
15  that's an area that I think all of us have been very interested in how they are interpreting that.
    . . .

16       Unfortunately, again, you have got some period of time before and how those things
17  are interpreted and what that actually means.  The good news from our point of view, is that
    as we have looked at this and looked very carefully at what we do, the types of things that
18  we would be subject to would be saying, well, you need to change this.  There may be some
    sort of a nominal fine type thing, but short of that we are very comfortable that – nothing
19  would be material for us.  So we feel very good about that.

20       RICHARD CLOSE, ANALYST JEFFRIES: Congratulations as well.  Todd, maybe
    hitting on that last point, do you have any sort of timetable when you think the program
21  review will be completed or when any type of report will be issued?

22       TODD NELSON: Well, it's, you know, again, tough to say.  Much like with the OIG
    audit that IPD is involved in, from our point of view, once we have had a chance to respond
23  to any issues, that's when we would, again, feel if there's a problem or not.  And we had an
    opportunity to do that in both cases, and we feel very good about that response.

24       Unfortunately, the next step sometime takes months or years.  And in this particular
25  case, our feeling is that if you just look at the pure, I guess, calendar involved, we would
    hope that they would both be resolved soon and that if any others start in the meantime, that
26  they would also go through quickly.  And again, I only say that because honestly can't
    remember a time in the last at least 10 to 12 years that we have not had either one or the other
27  or both going on.  And I just want to point out again that that's a normal process.  They are
    doing their job by doing these kinds of reviews.

28

1   I think the type of thing that obviously causes most people concern would be,
2   obviously, because of some of the things right now that are in the press with some of the
    other education companies right now, would be how those things are – if they escalate to
3   another level.  And we are very comfortable that, certainly, as you can see from our track
    record, that has not ever happened with us.  But again, it's something that we just take very
4   seriously.  And we have an infrastructure in place to make sure that we deal with those things
    on a very proactive basis.

5   RICHARD CLOSE: And then, on a different note, there is the positive news, I guess,
6   on the whistle blower.  Is that completely over now, or what exactly – where do you stand
    on that?

7   TODD NELSON: Well, the good news is that we are early in the process, and the first
8   was that it was dismissed, which was good.  Unfortunately, as you know, that doesn't
    necessarily mean it's over.  The opposing counsel always has a chance to amend that or
9   appeal that, and we expect that is happening.  And so, again, the good news is, at least
    through the first round, we are exactly where we thought we would be.

10  So other than that, we will respond.  And the old saying, and the truth shall set you
11  free.  We're just very grateful that we know what it is we're doing and we feel very
    comfortable about it.

12  KELLY FLYNN, ANALYST, UBS: The question relates to the program review,
13  again.  I'm sorry to beat a dead horse here.  But I'm hoping, Todd, you can just help to
    manage expectations a little bit more here.  How many have you had? And then what are the
14  circumstances that can bring them about? I know some are just regular, and sometimes some
    event brings them about.

15  And then finally, what do you consider normal frequency, that we should expect down
16  the road?  If you could speak to that?

17  TODD NELSON: First off, as far as the amount, I can't really give you off the top of
    my head.  I would say approximately, probably – I don't know, because they take several
18  years to happen.  But I would say, probably in the neighborhood of a half dozen or so.

19  As far as why – they can be brought about for a lot of different reasons.  We have
    found that the most frequent reason from our point of view would be – and this is when they
20  come in, you ask them, is there reason why you are here? And typically, the normal response
    is no.  This is just a known review – you are a very large school.  You receive a lot of Title
21  IV dollars.  And this is part of the process. . . .

22  Defendant Nelson's failure to disclose the February 5, 2004 DOE Report and its
23  findings was purposeful and designed to hide from the investment community an adverse
24  event and facts that Nelson himself acknowledged in a letter to the DOE dated March 1,
25  2004, would cause "great harm" if disclosed to Apollo's shareholders.  Indeed, Nelson's
26  statements not only concealed the existence of the DOE Report, it also deceptively misled
27  the market into believing that nothing adverse had occurred, that no adverse report had been

28

rendered and that the DOE review in question was simply a normal or routine event, thereby comforting investors.  (Compl. ¶ 101).

These deceptive and misleading statements caused the price of Apollo's stock to increase from $77.75 at the close of trading on March 11, 2004, to close at $80.44 on March 12, 2004 and higher still to close at $81.57 on March 15, 1004, the next trading day. (Compl. ¶ 102).

### 3.   April 13, 2004 Form 10-Q (Compl. ¶¶ 103-106)

On April 13, 2004, the Company filed its second quarter report with the SEC on a form 10-Q signed by defendants Nelson, Gonzales and Bachus, reiterating its previously announced results.  In addition, the Company reported that, in connection with an audit of a small subsidiary, IPD and certain of its client institutions' administration of federal student aid programs, the DOE's Office of the Inspector General found that IPD's client institutions improperly paid a percentage of its tuition revenues to IPD for recruiting students, and that IPD's compensation of its employees was based on enrollment figures, in violation of statutory provision prohibiting the use of such incentive payments.  According to the Form 10-Q, the OIG recommended to the DOE that the Company repay any loans disbursed pursuant to the program.  In response to the audit relating not to Apollo's UOP operations but to the much smaller IPD portion of its business, the Company said loan repayments were "not appropriate" and that the audit would be resolved without any recourse to the Company:

> The U.S. Department of Education Office of the Inspector General ("OIG") audited the administration of the federal student financial assistance programs in connection with educational programs provided pursuant to contractual agreements between IPD and certain of its client institutions.  In audit reports issued to eight client institutions, the OIG asserted that the client institutions violated the statutory prohibition on the use of incentive payments for recruiting by paying IPD a percentage of tuition revenue.  The report further suggests that IPD paid its employees in a manner that included incentive-based compensation even though IPD based its compensation plans for recruiters on factors or qualities that were not solely related to the success in securing enrollments.  Additionally, the audit reports question the client institutions' interpretation of the '12-hour rule.'  Although both IPD and the client institutions believe that the matters in question do not relate to student program or institutional eligibility, and, therefore, believe a repayment of federal funds is not appropriate, the OIG has recommended to the U.S.   Department of Education that the client institutions be required to return to lenders all loan funds disbursed.  IPD is currently in active negotiations with the U.S. Department of Education to eliminate or settle the issues raised in the audit reports.  Although the Company believes that the OIG's

- 9 -

audits of certain IPD clients institutions will be resolved without any material effect on its financial position, results of operations, or cash flows, and without any material change in IPD's business strategy, as with any program review or audit, no assurance can be given as to the final outcome as the matters are not yet resolved.

Once again, and despite mentioning the audit of a very small Apollo controlled subsidiary – IPD – and findings of the DOE's Office of the Inspector General that IPD's client institutions improperly paid a percentage of its tuition revenues to IPD for recruiting students, defendants still purposefully failed to disclose the DOE Report of February 5, 2004 or its findings or that UOP – which accounted for about 95% of Apollo's revenue compared to IPD, which accounted for a fraction of the remaining 5% – was violating the ban on incentive compensation respecting enrollments, a material event to the Company and investors.

Defendants' false, deceptive and misleading statements, caused the price of Apollo's shares to rise from $76.23 per share at the close of trading on February 27, 2004, the commencement of the Class Period, to as high as $98.01 during trading on June 8, 2004, when it settled into its Class Period high at the close of trading of $97.93, an increase of over 28%.

**4.   Market call with analysts on June 24, 2004, after release of financial results** (Compl. ¶¶ 111-113).

Thereafter, in a follow-up call with analysts that same day, defendant Nelson further buoyed investor confidence and generated renewed market enthusiasm for purchasing Apollo stock in representations and responses to analysts as follows:

TODD NELSON: We appreciate you joining us this morning. We're very pleased to report third quarter results with an EPS number for Apollo of 56 cents versus a consensus of 51 cents and UOPX EPS number of 48 cents versus a consensus of 41 cents. We're also very pleased to report strong enrollment. With growth of over 239,000 students which despite being over 200,000 students it was a 27.6% increase.

That's very strong lead growth in both our online and onground campuses. So that's very encouraging for further growth. We are sorry that despite what we feel are very good results that some of the bad news in the space has put a cloud over today, which would have otherwise been a very good day. So it looks like maybe a good buying opportunity for both APOL and UOPX. I have just two last comments before I turn the time over to Kenda.

MARK MAROSTICA: I'm wondering if you could update us on the status of any program reviews taking place throughout Apollo at this point?

- 10 -

TODD NELSON: The program review at the University of Phoenix continues to go from our point of view very smoothly. There's been a request of information back from us. We obviously have conducted the research and gathered the information and it looks great.

An so our hope is that, you know, three to six-month time frame that we'll have that resolved. Again, as you know for us, it's a normal course of business. Certainly nothing that we feel that the data that we produced will create any problems for us.

KELLY FLYNN: Greg just asked about the regulatory environment. You clearly emphasized your goal of to grow in a measured fashion. Is there anything you've seen in the past couple of months, you know, from within the states in general. I mean, any practices that you think have changed things or that . . . other companies might be doing that might, you know, bring about more regulatory scrutiny? I don't certainly mean it's only in the public university. But just within the whole university probably.

TODD NELSON: Well, I mean, I think that the comment that I made earlier is not aimed at any other company. Because I do think that there are some excellent companies out there . . . But I don't think that in an of itself is going to bring more scrutiny.

. . . As far as some of the other practices that some of the other companies are involved in, you know what?

It probably wouldn't be fair for me to comment on that. All I can say is I know most of them very well and they're really fine companies. And I think they're doing – trying to do things the right way. And with the exception of, again, you have as like your company and the other industries, you know, disgruntled employees or former employees.

Unfortunately, they can get an audience. And that's a bad situation for any company, not just the education companies. And I honestly think that is having more of an impact on the stuff that you are seeing going on as far as regulatory scrutiny than any real substantive problem.

The first thing out of their mouth has been when they talked to us is that, 'this is a routine audit.' And you are one of the largest recipients of Title 4 funds, therefore, you know, we need to come look at you . . . On the program review side, my experience has been it's usually triggered by something.

Again, it can be something significant. It can be something minor. My opinion of the last program review probably has something to do with the Qui Tam lawsuit and some of the accusations being made. And it's probably one of the reasons why they came in.

But in our case, it's routine because again when you're growing rapidly and when you are our size, there are always a lot of different sides . . . . So these things cause and trigger that. So in answer to you question yet it is. It doesn't necessarily have to be a negative thing.

Defendant Nelson's remarks were false, deceptive and misleading. In truth, UOP was flagrantly, systemically and consistently violating the law with respect to student enrollments and related Title IV funding as discussed above. The DOE had already issued a scathing report noting such findings and Apollo's illegal duplicitous conduct. Whistleblower claims

1   that UOP was incentivizing student enrollment counselors in violation of the law were true

2   and the Company was at risk of a substantial penalty.  Indeed, defendants purposely failed

3   to reveal the negative DOE Report knowing, as defendant Nelson conceded in his March 1,

4   2004 letter to the DOE, that doing so would cause great harm.  Nor was the Program review

5   simply "routine."  Meanwhile, the DOE Program Review as already beginning to have a

6   material adverse impact on Apollo.  As it prepared to deal with anticipated declining

7   enrollment and consequent declines in the growth rate of revenue and net income resulting

8   from being forced to operate within the law, Apollo revoked its historic ban on enrolling

9   students as young as 18 years old – thus expanding its potential student base.  Ultimately,

10  sequential year-to-year quarter growth rates in enrollments, revenue and net income would

11  slow as illustrated below in ¶¶ 124, 125 and 126, and would have slowed or declined even

12  more significantly had UOP strictly and immediately adhered to the letter of the law.

13          Defendants' strategy was successful.  The above-mentioned false, deceptive and

14  misleading June 24, 2004 statements during the Apollo third quarter of fiscal 2004

15  conference call, and Apollo's earnings announcement proceeding that call, halted the further

16  decline in the trading price of Apollo stock and caused the price of its shares to increase from

17  $85.85 on June 24, 2004 to as high as $88.70 on June 25, 2004, and further still as high as

18  $89.75 in June 28, 2004, the next trading day.

19          **5.    August 25, 2004 Conference Call with Analysts Following Press Release on
            Business Outlook.** (Compl. ¶¶ 117-119).

20

21          In a follow-on conference call with the investment community on August 25, 2004,

    hosted by defendants Nelson and Gonzales, the following was stated:
22

            BRIAN, ANALYST, UBS: I was wondering if you could give us a little bit of color
23  around the current status of the program review?

            TODD NELSON: Sure.  As you know, this – the program review he's refers [sic] to
24  is the one that started last year that was a result of the [qui tam] lawsuit and in there they
    were talking about compensation.  And so we've been going back and forth with the
25  department to, you know, to reach a resolution on it.  The good news is, from our point of
    view, that we still feel very comfortable that the outcome will end up not having any impact
26  on our ability to grow on our students or employees or anything of that nature.  But as with
    any regulatory issue, I mean it is not over until it is over.  And so, you know, we hope to see
27  it resolved within the next, hopefully within the next few months.  And we find that – think
    that the end result will be, as I said, not have any material impact on the company in any
28  way.

1    The defendants' August 25, 2004 statements in Apollo's Press Release and follow-on

2    conference call sparked significant investor enthusiasm and caused the trading price of

3    Apollo's shares to climb from a close of $73.34 per share on August 25, 2004 to as high as

4    $80.47 and closing at $79.42 on August 26, 2004 on volume of 10,603,700 shares.

5    The statements contained in ¶¶ 95-117 were materially false and misleading when

6    made because defendants failed to disclose or indicate the following:

7    a.    the DOE issued a written report on February 5, 2004 following an intensive

8    investigation finding and concluding that Apollo's UOP division was in violation of the law

9    banning incentive compensation respecting student enrollment and Title IV funding:

10    b.    that the Company improperly based recruiter's compensation on enrollment

11    figures in violation of U.S. regulations that forbid schools whose students receive federal

12    financial aid from tying pay directly or indirectly to enrollments;

13    c.    that as a consequence of the foregoing, defendants were able to demonstrate

14    dazzling growth at schools such as UOP, and materially inflate the Company's earning and

15    net income at all relevant times;

16    d.    that as a consequence, Apollo's financial statements were false, deceptive and

17    misleading by virtue of their failure to disclose the true nature and quality of a material

18    portion of its consolidated revenues and earnings so that investors would be fairly and fully

19    informed; and

20    e.    that Apollo's financial performance and would be materially impacted as a

21    consequence of yielding, albeit slowly or belatedly, to DOE pressure to fully bring its

22    operations within the ambit of the law.

23    **6.    Disclosure of the DOE Report on September 7, 2004** (Compl. ¶¶ 120-123)

24    Then, on September 7, 2004, just after Labor Day holiday weekend, defendants for

25    the first time revealed any information relating to any report from the DOE, disclosing that

26    the DOE had asserted a negatively toned report respecting UOP's compensation scheme and

27    imposed a $9.8 million fine.  Defendants attempted to downplay the significance of the DOE

28    Report and penalty and continued to actively conceal the whole truth from investors.  In a

conference call with the financial community on September 7, 2004, defendant Nelson stated in pertinent part, with regard to the DOE Investigation of its compensation policy, the following:

> [Given] the, I think, recent attention that regulatory issues in the education industry are receiving, we though it would be helpful to at least provide an opportunity to take a few questions.

> The University of Phoenix program review . . . is . . . centered around the same issue of incentive comp.  And just a little history of that – the conclusion of the actual fieldwork and ex (ph) interview, we felt positive about the progress of the review, although earlier this year, we then received an interim report, and we were surprised to see the negative tone of the report.

> We decided to settle this issue now rather than later for $9.8 million and put it behind us. . . .

> Back in June, we introduced a new comp plan that actually had been being worked on for about a year that is just more transparent.

> The old comp plan was not that clear.  The new one is – again, it's much more transparent, I guess, for someone to come in and take a look at.

Defendants' partial disclosure caused the trading price of Apollo's stock to materially decline on September 7, 2004 and thereafter as the market absorbed the knowledge that UOP was fined $9.8 million by the DOE as a product of a negatively toned Program Review, falling from $83.74 a share at the close of the prior trading day on September 3, 2004, to $80.43 per share by the close of trading on September 10, 2004 on unusual trading volumes greatly exceeding their daily average.

Defendants' disclosure about the DOE report was inadequate, failing to provide investors with any of the detail that the DOE Report referenced and its clear conclusions, as discussed above, respecting UOP's illegal conduct and deceptive practices betraying the integrity of Apollo's for-profit educational operations.

And each of defendants' representations discussed above, that the DOE's Program Review, or, later, representations on September 7, 2004 that the DOE action and consequent fine would not have any material adverse impact on Apollo were false, deceptive and misleading.  In truth, the $9.8 million fine that Apollo was required to pay represented the largest DOE fine in history and itself was material.  Beyond this, the pressure on Apollo to

1    clean up UOP's illegal and unethical sales and student enrollment practices has materially

2    and adversely impacted growth rates in enrollments, revenue and net income, when

3    comparing Q1 2004 and Q2 2004 to Q1 2005 and Q2 2005 (ending November 30 and

4    February 28, respectively), reported after the close of the Class Period, as illustrated below.

5    **III.   ANALYSIS**

6           **A.   Duty to disclose**

7           Defendants argue that Apollo had no duty to disclose the DOE Report because

8    companies do not "have an absolute duty to disclose all information material to stock prices

9    as soon as news comes into their possession." [MTD at 27].  Defendants cite to cases where

10   courts found no liability for failing to disclose the existence of negative reports issued during

11   a government review process. *See Acito v. Imcera Group, Inc.*, 47 F.3d 47 (2nd Cir.

12   1995)(dismissing securities fraud lawsuit for failure to state a claim where company failed

13   to disclose negative FDA reports) and *Anderson v. Abbott Labs*, 140 F.Supp.2d 894 (N.D.Ill.

14   2001)(dismissing lawsuit where company failed to disclose warning letter from FDA).

15          The Court, however, finds the Ninth Circuit's analysis in the *Warshaw* and *America*

16   *West* cases more instructive.  In *Warshaw*, Xoma Corporation, a biotech company, knew that

17   its financial success depended on FDA approval of a drug it had been researching and

18   developing.   74 F.3d at 957.   During the class period in that case, Xoma made repeated

19   assurances that FDA approval of the drug was imminent.   *Id.*  Plaintiffs in that case alleged

20   that the assurances were made even after serious doubts were raised about the drug's

21   effectiveness and chances for prompt FDA approval.  *Id.*  In fact, an analyst reported that

22   there was little hope the drug would be approved.  *Id.*  Xoma responded to the negative report

23   over the Dow Jones News Wire, stating that with respect to the FDA approval, "everything

24   is going fine."  *Id.*  The company then issued a press release stating that the FDA had rejected

25   the first study of the drug, but on the same day issued statements that assured the investing

26   public that issues would be resolved.  *Id.* at 957-58.  The market responded favorably to the

27   assurances.  *Id.* at 958.  Ultimately, the drug was not approved.  *Id.*

28

1    Investors subsequently filed an action alleging that Xoma knew that there was no

2    chance for timely FDA approval of the drug and that Xoma's statements and failure to inform

3    the public of the problems were part of an intentional and fraudulent omission of material

4    information.  *Id.*  The district court dismissed the complaint, finding that Plaintiffs had failed

5    to allege that Xoma had made false or misleading statements.  *Id.* at 959.

6    The Ninth Circuit reversed, stating that "if we construe the facts alleged in the

7    Complaint in the light most favorable to plaintiffs, . . . the Complaint survives a 12(b)(6)

8    motion."  *Id.*  The Court noted that, similar to the case here, "the Complaint alleges that

9    Xoma's optimistic statements about [the drug], when taken in context, were designed to

10   prevent shareholder flight in the aftermath of a damaging report regarding the possible

11   hazards of [the drug] and the unlikelihood of FDA approval.  These optimistic statements

12   allegedly contravened the unflattering facts in Xoma's possession.  On these facts, we believe

13   the Complaint alleged a sufficient basis for a claim under section 10(b) and rule 10b-5."  *Id.*

14   at 959-60.

15   Similarly, in *America West*, the Ninth Circuit held that a reasonable investor would

16   find significant a possible sanction stemming from a Federal Aviation Administration

17   investigation, in addition to other problems with plane maintenance, and that such

18   information would "significantly alter the 'total mix' of information made available."

19   *America West*, 320 F.3d at 935 (*citing TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438,

20   449 (1976)).  In that case, America West had begun "secret" settlement negotiations with the

21   FAA in May 1998 and had verbally promised FAA officials that America West would

22   resolve its maintenance problems.  *Id.* at 928.  On June 23, 1998, the Wall Street Journal

23   reported that "America West face[d] the prospect of substantial federal sanctions for failing

24   to properly oversee the work of outside maintenance contractors on its jetliners.  The [FAA]

25   is seeking to impose at least $1 million in civil penalties."  *Id.*  at 928-29.  The article further

26   reported that "the FAA put America West on its 'watch list' as of June 9 because of labor

27   unrest among maintenance workers and flight attendants."  *Id.* at 929.

28

1    AWA representatives attempted to downplay the importance of the FAA investigation.

2    For example, An AWA spokeswoman commented that "the increased surveillance hasn't

3    turned up any 'significant maintenance or operational problems." *Id.* On June 24, 1998, an

4    AWA executive stated in an article published by the Knight-Ridder Tribune Business News

5    that the increased surveillance was "routine FAA procedure when an airline is involved in

6    labor negotiations, and reiterated no significant maintenance or operating problems had been

7    discovered." *Id.* Ultimately, however, the FAA and AWA reached a settlement agreement

8    in which AWA agreed to pay $5 million to the FAA.[2] *Id.* Similar to the Lead Plaintiff in this

9    case, plaintiffs in *America West* alleged the failure to inform investors and the public of the

10   FAA investigation was part of a scheme to keep AWA stock value high. *Id.* The Ninth

11   Circuit found this sufficient to withstand defendants' motion to dismiss.

12        The Court finds that Lead Plaintiff in this case has also plead sufficiently particular

13   allegations to withstand a motion to dismiss. Lead Plaintiff has alleged that the DOE Report

14   was material and that Apollo had a duty to disclose it. Also, as alleged by Lead Plaintiff,

15   Title IV funding is vital to UOP's financial health. A reasonable investor would "find

16   significant" the specifics of the DOE investigation, including the report that outlined a

17   substantial failure to comply with Title IV's prohibition against basing enrollment counselor

18   compensation solely on recruitment numbers. In addition, a reasonable investor "would

19   consider the potential effects of each of these facts on the overall economic health of the

20   company as 'significantly alter[ing] the 'total mix' of information made available." *America*

21

22   _____

     [2]The Court recognizes that AWA admitted to wrongdoing in the settlement agreement and
23   that Defendants contend here that it is significant that Apollo admitted to no wrongdoing in
     its settlement agreement with the DOE and that it took no corrective action as a result of the
24   settlement agreement. However, the Court also notes that UOP had already started working
     on changes to its compensation plan prior to entering into the settlement agreement and
25   Defendant Nelson told the DOE that he believed the changes would go a long way towards
     fixing the problems the DOE spotted. Defendant Nelson further told the DOE that the
26   changes were in no way related to the investigation. The Court does not find it appropriate
     at this stage to conclude that the changes in the compensation system were in no way related
27   to the DOE investigation based solely on Defendant Nelson's statement.
28

*West*, 320 F.3d at 935.  Alternatively, even if Defendants were correct in their assertion that they had no duty to disclose the report when it was issued, the Court finds that at the point Defendants chose to speak about the DOE investigation, they had a duty to speak fully and truthfully and such full disclosure would have included the negative DOE Report.[3]  *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001)("Even absent a duty to speak, a party who discloses material facts in connection with  securities transactions assume[s] a duty to speak fully and truthfully on those subjects.")

### B.   Falsity

The Court finds that Lead Plaintiff has sufficiently "specified each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading" to withstand Defendants' motion to dismiss.  15 U.S.C. § 78u-4(b)(1).  The Court finds that as a whole, Defendants statements regarding incentive compensation and the DOE investigation after it received the DOE report were misleading as to the true status of the investigation. The Court recognizes that Defendants disputed and still dispute the findings in the DOE Report, but that does not mean it was appropriate to speak partial truths about the report to market analysts and the public.  The Court finds the following statements, taken as a whole, are sufficient to meet the requirements under the PSLRA:

•       The positive spin that Defendants put on the dismissal of the *qui tam* action.  The complaint was not dismissed because the allegations were unfounded, but because the plaintiffs failed to meet a technical element of the False Claims Act.  Defendant Nelson stated repeatedly in conference calls with the investment community that the

---

[3]Much of Defendants motion attempts to put a different spin on the facts alleged in Lead Plaintiff's complaint and of course, Defendants allege that their version is the correct version. For example, Defendants repeatedly state that because Apollo has significant financial resources, the $9.8 million paid to the DOE was immaterial.  The fact, remains, however, that it was the largest sum of money ever paid to the DOE.  The Court certainly cannot conclude that the settlement payment was immaterial.  The Court reminds Defendants that it must assume all facts alleged in Lead Plaintiff's complaint as true and construe them in the light most favorable to Lead Plaintiff.

program review was likely brought on by the lawsuit and referred to the plaintiffs, at least indirectly, as disgruntled employees who could "get an audience."

• The March 12, 2004 telephone conference with market analysts. Defendant Nelson was asked direct questions about when *any type of report* might be issued and yet refused to disclose the fact that a report had already been issued. The Court rejects Defendants' argument that the report was essentially meaningless because UOP was given an opportunity to respond. Despite the direct questioning from analysts, Defendant Nelson spoke in generalities. One inference that can be drawn from Defendant Nelson's answers is that UOP was attempting to hide the existence of the negative DOE report and lead investors to believe that no issues had arisen during the investigation.

• The April 13, 2004 Form 10-Q disclosed that audit reports asserting that IPD, a small subsidiary of Apollo, had "violated the statutory prohibition on the use of incentive payments for recruiting by paying IPD a percentage of tuition revenue." The fact that Apollo would choose to disclose such a violation by IPD, meaning that it found such information to be material, could have led the investing public to conclude that was the only area in which Apollo suffered from problems with its compensation system.

• The June 24, 2004 telephone conference with analysts. This telephone conference followed a decline in UOP stock after negative reports about two of Apollo's competitors. Defendant Nelson stated that in light of the decline in the price of UOP's stock, it would be a good buying opportunity. When asked about the program review, Defendant Nelson stated that it continued to go smoothly, that everything looked great, that the program review was a normal course of business and "nothing that we feel the data that we produced will create any problems for us." Defendant Nelson further stated that disgruntled employees could get an audience and that this fact would have an impact on regulatory scrutiny, but in the case of the ongoing program review, the DOE had assured them that it was a routine audit and that "it doesn't necessarily have to be a negative thing."

1    •      On August 25, 2004, during a telephone conference, one market analyst asked

2           Defendant Nelson whether he could "give us a little bit of a color around the current

3           status of the program review?"  Again, Defendant Nelson did not disclose the DOE

4           Report, but stated that he hoped the review would be concluded in the next few

5           months and that he did not expect it to have any material impact on the company.

6          Lead Plaintiff alleges the above statements were false and misleading because

7    Defendants had possessed the DOE report since February 2004.  In both *Warshaw* and

8    *America West*, plaintiffs withstood a motion to dismiss where company officials not only

9    failed to disclose important negative facts in their possession, but actually painted a picture

10   that was contrary to the facts they possessed.   The Court finds a similar situation here.

11   **C.   Scienter**

12         The Court finds that Lead Plaintiff has adequately plead scienter.[4]  As stated above,

13   to satisfy the PSLRA, plaintiffs must plead facts sufficient to show defendant "acted with

14   intentionality or deliberate recklessness or, where the challenged act is a forward looking

15   statement, with actual knowledge . . . that the statement was false or misleading."  *Ronconi*

16   *v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001).  Here, Defendants knew of the negative DOE

17   Report in February 2004, yet failed to disclose the report until the settlement agreement was

18   reached in September 2004.  During this time period, Defendants made several positive

19   statements about the DOE program review that were contrary to the findings in the DOE

20   Report.  In a letter to the DOE after issuance of the report, Defendant Nelson stated that the

21   report would harm shareholders.  In a conference call with the financial community on

22   September 7, 2004, Defendant Nelson stated that when the company received the DOE

23   report, it was "surprised to see the negative tone."  This, of course, was a surprise to the

24

25   _____

26   [4]Defendants argue that Lead Plaintiff has failed to allege motive.  However, it does not
     appear to the Court that motive is a required element. Plaintiff must allege that defendant

27   "acted with intentionality or deliberate recklessness or, where the challenged act is a forward
     looking statement, with actual knowledge . . . that the statement was false or misleading."

28   *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001).

1  investment community, as the company had previously failed to disclose that any report had

2  been issued, let alone a report with a negative tone.  The Court finds the allegations in the

3  complaint that the company knew about the negative report, but spoke positively about the

4  program review process until announcement of the settlement agreement, are sufficient to

5  adequately plead scienter.

6  **D.  Rule 9(b)**

7  The Court likewise finds that Lead Plaintiff has met the pleading requirements of Rule

8  9(b).  Lead Plaintiff alleges that Defendants knew of and concealed a damaging report by the

9  DOE, while leading the public to believe that the investigation was progressing smoothly.

10 Just as in *Warshaw*, the "Complaint asserts that the defendants knew that the facts

11 contravened their 'optimistic' statements . . . In this case, we easily conclude that the

12 Complaint satisfied Rule 9(b) requirements."  74 F.3d at 960.  The Court recognizes that

13 Defendants allege that their optimistic statements turned out to be true.[5]  However, Lead

14 Plaintiff alleges that it was damaged by the decline in stock after the announcement of the

15 settlement agreement.  The Court cannot say as a matter of law that Lead Plaintiff has failed

16 to state a claim upon which relief can be granted for securities fraud.

17 **IV. REQUEST FOR JUDICIAL NOTICE**

18 Defendants have asked the Court to take judicial notice of certain documents.

19 Plaintiffs have opposed the request and asked the Court to strike portions of the Motion to

20 Dismiss that rely on certain documents.  Because the Court is denying the Motion to Dismiss,

21 the Court denies Plaintiff's Motion to Strike as moot.  The Court grants Defendants' Request

22 for Judicial Notice to the extent that the documents were referenced in the Complaint and

23 denies it in all other respects.

24 Accordingly,

25

26 [5]For example, Defendants allege that the $10 million paid to the DOE as part of the
27 settlement agreement was not material to Apollo because Apollo has significant financial
resources.  However, that does not alter the fact that $10 million is the largest sum of money
28 every paid to the DOE.  The Court cannot conclude that the payment was insignificant.

1      **IT IS ORDERED** denying Defendants' Motion to Dismiss (Doc.# 71);

2      **IT IS FURTHER ORDERED** granting in part and denying in part Defendants'

3  Request for Judicial Notice (Doc. # 73) consistent with the terms of this order;

4      **IT IS FURTHER ORDERED** denying Motion to Strike Portions of the Motion

5  to Dismiss (Doc. # 80) as moot.

6      DATED this 18th day of October, 2005.

7

8

9                              James A. Teilborg
                              United States District Judge
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28