1  GIBSON, DUNN & CRUTCHER LLP
   WAYNE W. SMITH
2  JOSEPH P. BUSCH, III
   DANIEL P. MUINO
3  JARED M. TOFFER
   KRISTOPHER P. DIULIO
4  4 Park Plaza, Suite 1400
   Irvine, CA 92614
5  Telephone:  (949) 451-3800
   Facsimile:  (949) 451-4220
6
   SNELL & WILMER L.L.P.                    OSBORN MALEDON, P.A.
7  JOEL P. HOXIE (#005448)                  DAVID B. ROSENBAUM (#009819)
   JOSEPH G. ADAMS (#018210)                MAUREEN BEYERS (#017134)
8  One Arizona Center                       2929 North Central Avenue, Suite 2100
   Phoenix, AZ  85004-2202                  Phoenix, AZ  85012-2793
9  Telephone:  (602) 382-6353              Telephone:  (602) 640-9000
   Facsimile:  (602) 382-6070              Facsimile:  (602) 640-9050
10 jadams@swlaw.com                         mbeyers@omlaw.com

11 Attorneys for Defendants
   APOLLO GROUP, INC.; TODD S. NELSON;
12 and KENDA B. GONZALES

13

14              IN THE UNITED STATES DISTRICT COURT

15               FOR THE DISTRICT OF ARIZONA

16

17 | In re Apollo Group Inc. Securities Litigation | Master File No.  CV-04-2147-PHX-JAT |

18

19                                          **CLASS ACTION**

20 This Document Relates To:  All Actions      **DEFENDANTS APOLLO GROUP,
                                              INC., TODD S. NELSON, AND KENDA
21                                            B. GONZALES' MOTION FOR
                                              SUMMARY JUDGMENT, OR
22                                            ALTERNATIVELY, FOR SUMMARY
                                              ADJUDICATION; MEMORANDUM
23                                            OF POINTS AND AUTHORITIES IN
                                              SUPPORT**
24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................1

    A.     Regulatory Background.................................................................2

    B.     UOP's Program Review..............................................................2

    C.     The Wittman Report ...................................................................3

    D.     Apollo Consulted the Experts .....................................................6

    E.     Apollo's Disclosures ..................................................................6

    F.     Resolution of the Wittman Report ..............................................7

II. ARGUMENT ....................................................................................................9

    A.     Plaintiff Cannot Carry Its Burden Of Proving Loss Causation.................9

        1.     Plaintiff's Theory of Loss Causation .........................................9

        2.     Courts Require a Statistical Analysis, or Event Study, to Demonstrate Loss Causation.................................................10

        3.     Plaintiff Cannot Demonstrate that a Material Misrepresentation or Omission Caused its Loss, Because its Theory of Loss Causation and Damages Contradicts its Theory of Reliance. .................................................12

        4.     Dr. Feinstein "Cherry Picks" An Event Window to Reach a Damages Conclusion, Contradicting the Complaint. .................................................................13

        5.     The September 20 Reports Were Not Curative Disclosures. ...................................................................15

        6.     Summary .........................................................................16

    B.     Apollo Had No Duty To Disclose The Wittman Report......................16

        1.     Duty To Disclose Information Under The Securities Laws ...............................................................................17

        2.     Numerous Courts Have Rejected Securities Claims Premised On A Failure To Disclose Regulatory Proceedings And Interim Findings................................17

        3.     *America West* And *Warshaw* Are Distinguishable From The Present Case ...........................................20

**TABLE OF CONTENTS**
[Continued]

Page

4. Apollo Had No Duty To Disclose The Report In Its Public Statements ........................................................................22

    a. February 27, 2004: *Qui Tam* Press Release ....................22

    b. Earnings Releases and Reports ..........................................23

    c. Analyst Conference Calls.................................................23

    d. SEC Quarterly Filings.......................................................25

5. Apollo Had No Duty To Confess To The Disputed Allegations Of The Wittman Report ..........................................26

C. No Evidence Supports Plaintiff's Scienter Allegations .........................26

    1. Defendants Acted In Good Faith and Without Any Intent to Deceive Investors. ....................................................................27

    2. Defendants Did Not Act With Scienter With Respect to the Implementation of The New Compensation Plan. ................29

IV. CONCLUSION ...........................................................................................30

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Acito v. Imcera Group, Inc.,*
    47 F.3d 47 (2nd Cir. 1995)................................................................20

*Anderson v. Abbott Labs.,*
    140 F. Supp. 2d 894 (N.D. Ill. 2001) ................................17, 23, 26

*Backman v. Polaroid Corp.,*
    910 F.2d 10 (1st Cir. 1990) ..............................................................17

*Basic, Inc. v. Levinson,*
    485 U.S. 224 (1988) ..........................................................................17

*Binder v. Gillespie,*
    184 F.3d 1059 (9th Cir. 1999) .........................................................12

*Brody v. Transitional Hosps. Corp.,*
    280 F.3d 997 (9th Cir. 2002) ...........................................................17

*Bryson v. Royal Business Group,*
    763 F.2d 491 (1st Cir. 1985) ...........................................................27

*City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc. ("ITT"),*
    388 F. Supp. 2d 932 (S.D. Ind. 2005)..................18, 20, 22, 23

*Daou Systems, Inc., Sec. Litig.,*
    411 F.3d 1006 (9th Cir. 2005) ...................................................10, 11

*DeMarco v. Lehman Bros., Inc.,*
    222 F.R.D. 243 (S.D.N.Y. 2004) .....................................................15

*Dura Pharm., Inc. v. Broudo,*
    544 U.S. 336 (2005)................................................2, 9, 11, 14, 16

*Ernst & Ernst v. Hochfelder,*
    425 U.S. 185 (1976)..........................................................................26

*Gallagher v. Abbott Labs.,*
    269 F.3d 806 (7th Cir. 2001) ..........................17, 19, 20, 22, 23, 26

*Geffon v. Micrion Corp.,*
    249 F.3d 29 (1st Cir. 2001).............................................................27

*Goldberg v. Household Bank, F.S.B.,*
    890 F.2d 965 (7th Cir. 1989) ...................................................................................11

*Greenstone v. Cambex Corp.,*
    777 F. Supp. 88 (D. Mass. 1991) ............................................................................26

*Howard v. SEC,*
    376 F.3d 1136 (D.D.C. 2004) ................................................................................28

*In re Apple Computer Sec. Litig.,*
    886 F.2d 1109 (9th Cir. 1989), *cert. denied,* 496 U.S. 942 (1990) .......................27

*In re Avista Corp. Sec. Litig.,*
    415 F. Supp. 2d 1214 (E.D. Wa. 2005) ..................................................................15

*In re Convergent Tech. Sec. Litig.,*
    948 F.2d 507 (9th Cir. 1991) ..................................................................................23

*In re GlenFed,*
    11 F.3d 843 (9th Cir. 1993) ....................................................................................26

*In re Imperial Credit Indus., Inc.,*
    252 F. Supp. 2d 1005 (C.D. Cal. 2003) .................................................................11

*In re Initial Pub. Offering Secs. Litig.,*
    399 F. Supp. 2d 261 (S.D.N.Y. 2005) ...................................................................15

*In re Medimmune, Inc. Sec. Litig.,*
    873 F. Supp. 953 (D. Md. 1995) ................................................................19, 20, 25

*In Re Merck & Co., Inc. Sec. Litig.,*
    432 F.3d 261 (3d Cir. 2005) ......................................................................12, 15, 16

*In re Northern Telecom Ltd. Sec. Litig.,*
    116 F. Supp. 2d 446 (S.D.N.Y. 2000) ...................................................................27

*In re Open Joint Stock Co. "Vimpel-Communications" Sec. Litig.,*
    2006 U.S. Dist. LEXIS 10256 (S.D.N.Y. 2006)...............................................20, 23

*In re Oracle Sec. Litig.,*
    829 F. Supp. 1176 (N.D. Cal. 1993) .................................................................11, 13

*In re Polymedica Corp. Sec. Litig.,*
    453 F. Supp. 2d 260 (D. Mass. 2006) ....................................................................12

*In re Seagate Tech. II Sec. Litig.,*
    No. C-89-2493 MHP, 1990 U.S. Dist. LEXIS 14056 (N.D. Cal. 1990) ................25

*In re Teco Energy, Inc. Sec. Litig.,*
  2006 U.S. Dist. LEXIS 18101 (M.D. Fla. Mar. 30, 2006) .....................................................15

*In re Xcelera.com Sec. Litig.,*
  430 F.3d 503 (1st Cir. 2005) ..............................................................................................12

*Krogman v. Sterritt,*
  202 F.R.D. 467 (N.D. Tex. 2001) ......................................................................................12

*Lentell v. Merrill Lynch & Co.,*
  396 F.3d 161 (2d Cir. 2005) ......................................................................................11, 15

*McKowan Lowe & Co. v. Jasmine, Ltd.,*
  2005 U.S. Dist. LEXIS 32164 (D.N.J. June 30, 2005) .......................................................11

*Miller v. Thane Int'l, Inc.,*
  372 F. Supp. 2d 1198 (C.D. Cal. 2005) ..............................................................................12

*No. 84 Employer-Teamster Joint Council Pension Trust Fund*
  *v. America West Holding Corp.,* 320 F.3d 920 (9th Cir. 2003) ....................12, 13, 20, 21

*Nordstrom, Inc. v. Chubb & Son, Inc.,*
  54 F.3d 1424 (9th Cir. 1995) .............................................................................................26

*Ong v. Sears, Roebuck & Co.,*
  459 F. Supp. 2d 729 (N.D. Ill. 2006) .................................................................................11

*Robbins v. Moore Medical Corp.,*
  894 F. Supp. 661 (S.D.N.Y. 1995) .........................................................................17, 20, 23

*Ronconi v. Larkin,*
  253 F.3d 423 (9th Cir. 2001) .......................................................................................27, 29

*Sailor v. Northern States Power Co.,*
  4 F.3d 610 (8th Cir. 1993) ..................................................................................................22

*Santa Fe Indus., Inc. v. Green,*
  430 U.S. 462 (1977) .............................................................................................................26

*Simpson v. AOL Time Warner Inc.,*
  452 F.3d 1040 (9th Cir. 2006) ............................................................................................12

*Teachers' Retirement Sys. v. Schoenfeld,*
  2007 U.S. App. LEXIS 3698 (4th Cir. Feb. 20, 2007) .........................................................11

*Unger v. Amedisys, Inc.,*
  401 F.3d 316 (5th Cir. 2005) ..............................................................................................12

*Ventry v. Sands (In re Canandaigua Sec. Litig.)*,
    944 F. Supp. 1202 (S.D.N.Y. 1996) ................................................................25

*Warshaw v. Xoma Corp.*,
    74 F.3d 955 (9th Cir. 1996) ................................................................20, 22

*Wielgos v. Commonwealth Edison Co.*,
    892 F.2d 509 (7th Cir. 1989) ................................................................23

## TREATISES

*Materiality and Magnitude: Event Studies in the Courtroom*
    *in Litigation Services Handbook* (3rd ed. 2001) ................................................................18

Defendants[1] move under Rule 56 for an order granting summary judgment in their favor on the claims of the Consolidated Class Action Complaint ("Complaint"). This Motion is based on the following Memorandum of Points and Authorities and its supporting papers.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Defendants seek summary judgment on three grounds: (i) no loss causation and damages; (ii) no violation of any disclosure duty; and (iii) lack of scienter.

This case stems from a document issued by DOE employee Donna Wittman claiming that UOP violated DOE's incentive compensation rules. The Court's ruling on the Motion to Dismiss found that, *assuming the allegations of the Complaint to be true*, the Wittman Report constituted material, adverse findings made by the DOE after a thorough investigation and, as such, should have been disclosed. What Defendants could not present to the Court then, and what has been confirmed in discovery, are the following facts:

- UOP consulted with its outside SEC disclosure counsel who advised UOP that it did *not* have to disclose the Wittman Report.
- UOP consulted with Tim Hatch, the lawyer representing it in the *qui tam* case. He advised that he had just been through an incentive compensation matter with ITT, and that the process used there would lead to an immaterial resolution.
- UOP consulted with regulatory experts and spoke to high level DOE officials, who stated that the DOE would work with UOP to resolve the matter using the "ITT Model."
- UOP honestly (and correctly) believed that Donna Wittman was a low level DOE employee who *lacked* authority to issue a program review report ("PRR").
- What are labeled "findings" in the Wittman Report are legally just allegations.
- The purported "findings" were based on anecdotes, not critical analysis.
- UOP promptly hired the reputable national accounting firm KPMG to do a statistical

---

[1] Capitalized terms have the same meaning as found in Defendants' Statement of Facts ("SOF").

1   study, which concluded the Wittman Report's purported findings were wrong.

2   • Ultimate disclosure in September 2004 of the contents of the Wittman Report caused no

3   statistically significant stock price movement, which under *Dura Pharm., Inc. v. Broudo*,

4   544 U.S. 336 (2005), means Plaintiff fails the loss causation test.

5   These undisputed facts conclusively demonstrate that summary judgment should be granted.

6   **A.    Regulatory Background**

7   For many years, Congress has supported higher education by making available grants

8   and student loans, called "Title IV" funds.  In 1992, concerned that some schools were

9   recruiting unqualified students, Congress enacted a provision barring "any commissions,

10  bonus, or other incentive payments based directly or indirectly on success in securing

11  enrollments . . . . "  HEA § 487(a)(20).  The statute's vagueness and the DOE's inconsistent

12  enforcement of it left schools uncertain of their obligations.  SOF ¶¶ 8, 11.

13  In December 2000, the DOE issued a determination against Computer Learning

14  Centers (CLC) and demanded the repayment of $187 million.  SOF ¶ 10.  This and

15  restrictions on CLC's access to Title IV funds, forced it into bankruptcy.  *Id.*  CLC's collapse

16  was followed by two major policy changes.  First, a DOE policy memo (the "Hansen Memo")

17  was issued stating that generally the government is *not* harmed by a violation of the incentive

18  compensation rules.  SOF ¶ 15.  This meant that in the future violators could be fined, but

19  would not be bankrupted by draconian reimbursement demands.  Second, the DOE adopted

20  Safe Harbor Regulations, making some practices automatically lawful.  SOF ¶¶ 12-14.  One

21  safe harbor clarifies that salary adjustments can be based on success in securing enrollments,

22  so long as they are not based *solely* on that factor.

23  In 2003, ITT was faced with an incentive compensation challenge.  The DOE staff

24  asserted that ITT violated the incentive compensation rules and, in direct conflict with the

25  Hansen Memo, internally advocated that ITT should repay $400 million.  SOF ¶ 9.  ITT,

26  represented by the same lawyer who later became one of Apollo's advisors, elevated the

27  discussions to senior DOE officials and the matter was settled for just $230,000.  *Id.*

28  **B.    UOP's Program Review**

2

In August 2003, the DOE commenced a program review of UOP with a field visit. SOF ¶ 18. A program review is an administrative, regulatory event, and can cover any of the areas subject to federal regulation.[2] While the field visit is supposed to *begin* the information gathering process, here, a DOE staff attorney admitted, the review team had already made up its mind before visiting UOP, and was simply looking to what size fine to impose. SOF ¶ 22.

The program review team visited only seven of UOP's over 133 locations and interviewed just 60 of UOP's thousands of Enrollment Counselors ("EC"). SOF ¶ 25. Some of the 60 claimed that their compensation was based solely on the number of enrollments they obtained. Of course, a few anecdotes from a few employees about how they *think* their compensation was set is not evidence of anything.[3] As Magistrate Judge Trumbull stated when Apollo sought discovery against Relators in this very case:

> The allegations in [the Wittman Report] concern the activities of [UOP]. UOP either engaged in the alleged activities or not. . . . What [enrollment counselors] may have told the DOE about the terms of compensation simply does not impact what those terms actually were.

SOF ¶ 28. What the program review team did not do, because it did not request the necessary personnel files until *after* the Wittman Report was issued, was perform any type of statistical analysis to see if what the few ECs *thought* was really *true*.

At the conclusion of a field visit, the review team conducts an exit interview and tells the school in general terms what it has found. Here, although she raised concerns about some gifts and trips, Wittman told UOP that there were no systemic violations. SOF ¶ 23.

## C.   The Wittman Report

Unfortunately, the Wittman Report was not what UOP expected based on (i) what it knew about how it compensates enrollment counselors and operates its business, and (ii) the

---

[2] Unknown to UOP, its program review was triggered by a *qui tam* complaint which was not served until August 29, 2003, *after* the program review field visit. SOF ¶¶ 16, 34.

[3] When ECs were deposed in this case, some said only enrollments counted (*see* Maria Arce Dep. 118:15-20, Leah Johnson Dep. 89:22-25), and some acknowledged that other factors were also counted (*see* Shannan Bartz Dep. 48:10-49:6, Julie O'Ferrall Dep. 47:12-48:7, Donald Rose Dep. 28:10-20). SOF ¶ 29. Thus, even if anecdotes were relevant to how the system really worked, the EC testimony establishes that the system did consider other factors.

1    exit interview comment that there were no "systemic" violations.  Instead, it purported to find
2    systemic violations and an unethical culture.  If this lawsuit were about the truth or falsity of
3    the Wittman Report's details, a fact issue might exist; but no fact issue exists about how the
4    Report affected Defendants' states of mind and their disclosure decision.

5        First, UOP was informed by its DOE regulatory counsel that Donna Wittman was a
6    staff employee who lacked authority to sign a PRR.  SOF ¶ 32.  Thus, while the Wittman
7    Report stated Wittman's views, it was *not* the DOE's position unless and until approved by
8    someone with authority to do so.  This was important to Defendants because the ITT story
9    showed the significant disconnect that can occur between lower level staff and DOE
10   officials.[4]  Several upper-level DOE officials confirmed to Defendants that some staff within
11   the DOE harbored a bias against for-profit educators.  SOF ¶ 108.

12       Second, and critical to Apollo's disclosure decision, what Wittman stated as "findings"
13   are just the beginning of the DOE process before any remedy or fine decision issues.  Plaintiff
14   may emphasize that only one PRR ever issues and that the DOE concluded, in the context of
15   a FOIA request, that a PRR is a "final" document subject to release under FOIA; but this
16   misses the point.  Although Defendants have frequently referred to the Report as preliminary,
17   initial or draft, Defendants do not mean another document entitled "program review report"
18   would be forthcoming.  What matters is that the *contents* of the Report are merely tentative
19   findings.  This is confirmed by the very FOIA documents calling the Report "final," but
20   stating:

21       [F]or purposes of this FOIA analysis, the PRR is a discrete final action; its
22       findings outline the ***alleged*** violations detected during the Department's review of
         the University's administration of its Title IV programs.  In essence, the PRR
23       represents a "fixed stop" in an ongoing process . . . .  Consequently, we do not
         consider the PRR to be an "interim" report.  [Emphasis added.]

24   SOF ¶ 37; Diulio Dec., Ex. 32.  That the allegations of a PRR are not "cast in stone" is also
25   reflected in DOE guidance dating back to 1995:

26

27   _____

28   [4]  Plaintiff may argue that a DOE official later told UOP that he had "fixed" the authority
     issue; but the Wittman Report was never reissued.

We realize that some regional offices have followed a practice of permitting release of FPRDs only, but not program review reports. The reasons: the review report is not a final document; many findings could change and be resolved; and there was a concern that a preliminary finding could be misrepresented by a press report which fails to provide readers with these facts. * * * [¶] Nevertheless, despite these concerns, the guidance given to us by OGC on these issues is clear: We should release the report . . . if we have already issued it to the institution. * * * [¶] However, to reduce the likelihood of a press report misconstruing *the nature of any preliminary findings*, we are attaching a statement which you should affix to each program review report forwarded to each requestor. [Emphasis added.]

SOF ¶ 37; Diulio Dec., Ex. 31. The cover statement that should be included with each PRR produced pursuant to a FOIA request reads:

Enclosed is a copy of the program review report you requested. * * * [¶] Institutions are provided an opportunity to respond to program review report findings, and this process can result in resolution of some or all of the findings or potential liabilities cited in the program review report. *This report does not constitute a final determination.* [Emphasis added.]

*Id.*

Two of the most experienced DOE regulatory counsel in the country agree. Stan Freeman, UOP's usual regulatory counsel, referred to the Wittman Report as "initial" *immediately* upon its receipt and characterized it as such in his time sheets. SOF ¶ 38. Defendants also have retained Blain Butner who has practiced in this area for 27 years. He has stated unequivocally:

Following the on-site evaluation and exit conference by the ED program reviewers, the ED program review team issues a written program review report to the institution. The program review report includes the program review team's summary of the program review and a listing of tentative findings made by the program review team. * * * [¶] The program review team's program review report is not a final decision or assessment of liability by ED – in fact, far from it. The program review report is simply an intermediate step in the process. The school that is the subject of the program review has multiple steps within ED to dispute any or all of the program review team's tentative findings, before a final assessment of liability, if any, is assessed.

SOF ¶ 36.

Because the proposed findings are only allegations, a PRR makes no demand for reimbursement or a fine, and triggers no appeal rights. It is still early in the process and the school has the opportunity to fully respond to the allegations. After the DOE analyzes the school's response, it issues a document called a Final Program Review Determination. SOF ¶¶ 19, 20. The FPRD takes the draft findings of a PRR and deletes, modifies or adopts some

1   or all of them.  The FPRD for the first time states the DOE's monetary demands; and the

2   FPRD for the first time triggers the school's appeal rights.  *Id.*

3        Not only did UOP believe the report was unauthorized and preliminary, but its content

4   was highly suspect and thus very likely to end in a whimper, like the ITT experience:

5   • The Report's language was intemperate and indicative of a biased analysis of the facts.

6   • The Report castigated UOP for various practices (e.g., making a profit) and alleged abuses

7      of employees (e.g., sending underperforming employees to a "red room" for training) that

8      had nothing to do with incentive compensation, again demonstrating bias by the author.

9   • The Report was internally inconsistent, stating on one page that it was common

10     knowledge that each enrollment was worth $500 in salary, but on another page asserting it

11     to be $750.  Both of these "findings" were proven untrue by KPMG.  SOF ¶ 95(d).

12  • The Report said *only* enrollments counted, but contained two charts showing that ECs

13     with similar enrollments (100 and 98) had markedly different salaries.  SOF ¶ 30(b).

14  **D.     Apollo Consulted the Experts**

15       Before reaching a disclosure decision, Apollo consulted with expert advisors.  Tim

16  Hatch related his experience with the ITT matter.  SOF ¶¶ 105.  In an early conversation with

17  DOE following the Wittman Report, UOP was told that DOE would resolve the issues at

18  senior levels, not staff, and that they would follow the ITT model.  SOF ¶ 108.  Hatch advised

19  this should lead to an immaterial financial resolution.  SOF ¶ 105.  Apollo also consulted with

20  Freeman and with Vic Klatt, a consultant for the company concerning DOE issues.  They

21  reinforced the tentative nature of the Report's findings and that DOE officials had committed

22  to working to resolve the matter.  SOF ¶¶ 106, 109.  Apollo also consulted with Jon Cohen,

23  its longtime regular outside counsel and SEC disclosure attorney at Snell & Wilmer.  Cohen

24  advised the company that it had a reasonable basis not to publicly disclose the Report.  SOF

25  ¶ 110.  Thus, Apollo advisors gave comfort to the Company that the results of the process

26  would not be significant – *and they were right* – and that the Report need not be disclosed.

27  **E.     Apollo's Disclosures**

28       Apollo made the informed decision not to disclose the contents of the Wittman Report.

1   But Apollo also disclosed sufficient information about the Report that the market concluded

2   that one existed and, more importantly, specifically told the market the results of a program

3   review would not be disclosed until the process had reached its conclusion.   SOF ¶ 50.

4   Although Plaintiff alleges that Nelson's statements at the March 12, 2004 analyst conference

5   concealed the existence of the Report, Nelson was speaking to analysts who covered the

6   industry.  After describing the program review process, he stated exactly where UOP was in

7   that process [SOF ¶¶ 50-52] -- a point  that could only have been reached after a report had

8   been issued.  More importantly, even if Nelson's statements were not understood by all, the

9   market clearly knew of the existence of the Report because on June 25, 2004, analyst Kelly

10   Flynn expressly stated that a PRR had been issued.  SOF ¶ 63.  If this was the first disclosure

11   of the Report's existence, the market showed it did not care as it "yawned."  SOF ¶ 64.

12        Thus, the issue is not disclosure of the existence of the Report, but rather the

13   disclosure of its contents.  And, on that score Nelson told the market loudly and *clearly* that

14   UOP was *not* going to disclose the contents until the process had run its course.  SOF ¶ 50.

15   This type of "no comment" remark is not actionable.

16        Plaintiff, however, misapprehends the disclosure requirements.  There is *no* continuing

17   duty to disclose information, even if material.  Rather, the duty exists when a company makes

18   its periodic SEC reports or if it needs to correct a prior statement which is no longer true.

19   Periodic reporting requirements of the SEC do *not* require an update of regulatory matters any

20   more often than annually.  This is in contrast to litigation matters which are required to be

21   updated quarterly.  Notably, even this litigation update requirement has a threshold of 10% of

22   a company's assets being at risk – a threshold which the resolution of the Wittman Report did

23   not remotely approach.

24   **F.     Resolution of the Wittman Report**

25        Authorized or not, Apollo wanted to put the Wittman Report behind it.  UOP had

26   started working on a new compensation plan in 2003 to address the Safe Harbor Regulations

27   and to reflect a new overtime policy that reclassified ECs as non-exempt.  SOF ¶ 43.  This

28   new plan assigned weights to the various evaluation factors, eliminating the likelihood that

1    EC's would misapprehend the basis for their compensation adjustments. *Id.* Also, the DOE

2    made it clear that it would at some point publicly release the Wittman Report. Diulio Dec.,

3    Ex. 32. The Report's intemperate language would have the (undoubtedly intended) effect of

4    severely damaging UOP's reputation. However, if the incentive compensation matter could

5    be quickly put to rest, the release of the Report would be in the context of a fully resolved

6    matter with no material impact on Apollo or its subsidiary schools.

7         Starting almost immediately upon receipt of the Wittman Report, UOP requested a

8    meeting with DOE and sought to negotiate. Diulio Dec., Ex. 33. DOE officials promised a

9    speedy resolution, but it was not until August 2004 that the first settlement meeting was held.

10   SOF ¶ 40. Plaintiff may argue that in the first settlement meetings DOE said it adopted the

11   Wittman Report findings and demanded a payment of $81 million. But, these were all

12   settlement negotiations and clearly posturing. Almost immediately, DOE revealed its real

13   number was $15 million, and it soon settled for $9.8 million. *Id.* Although the settlement

14   agreement said the DOE would not issue a fine, the DOE subsequently characterized the

15   payment as a fine. SOF ¶ 41. However labeled, $9.8 million to a company with a billion

16   dollars in cash and cash equivalents plus other assets is simply immaterial. Analysts covering

17   the events agreed. SOF ¶¶ 67-69.

18        The wisdom of Apollo's non-disclosure decision was borne out when the settlement

19   and then the Wittman Report's contents were disclosed. When the settlement was disclosed

20   after the close of trade on September 7, 2004, there was no material movement in the price of

21   Apollo stock. SOF ¶ 71. When the *Arizona Republic* and the *Wall Street Journal* ran

22   extensive stories on the Wittman Report's contents on September 14 and 15, 2004, again

23   there was no material movement in Apollo's stock. SOF ¶¶ 74, 79. When Plaintiff's own

24   expert established that there was no significant price movement when the "truth" was

25   disclosed, he went looking for a theory found nowhere in the Complaint. Plaintiff *now*

26   asserts that the market could not understand the "truth" revealed on September 14 until a

27   week later, when on September 20 one lone analyst downgraded Apollo's stock. SOF ¶¶ 80-

28   83. Not only is this theory absent from the Complaint, it ignores that two newspapers fully

1 ventilated the Wittman Report. And one analyst's downgrade, even if based on the Report, is

2 not what *Dura* meant by a corrective disclosure as it disclosed nothing but one person's

3 *opinion* of the previously disclosed facts.

4     The market's failure to react when the settlement and Wittman Report were fully

5 disclosed is fatal to Plaintiff's case. Under *Dura*, a plaintiff can carry its burden to establish

6 loss causation only if it can show that, when the "truth" entered the market, there was a

7 significant drop in the price of the stock. 544 U.S. at 347. The Complaint did not anticipate

8 *Dura*, and alleges the "inflation" damages that *Dura* prohibits. But, the Complaint also

9 alleges that the "truth" entered the market on September 14, 2004. With no statistically

10 significant price decline on September 14, *Dura* compels that summary judgment be granted.

## II. ARGUMENT

### A. Plaintiff Cannot Carry Its Burden Of Proving Loss Causation.

13     Plaintiff must show that the alleged material misstatements or omissions caused its

14 losses. Plaintiff cannot make that showing. When the supposed omission was fully disclosed

15 to the market on the last day of the class period, that disclosure caused no stock price decline.

16 Not until September 21, seven days after the close of the class period, did the stock price see

17 a statistically significant decline. Plaintiff's expert argues that an "event period" this long

18 demonstrates Plaintiff's loss; but the expert's argument for a week-long event period cannot

19 survive Plaintiff's claim that Apollo's stock traded in an efficient market, as a class action

20 plaintiff *must* claim to demonstrate "fraud on the market" reliance.

### 1. Plaintiff's Theory of Loss Causation

22     Plaintiff claims that the market for Apollo's stock was inflated during the class period

23 from February 27, 2004, to September 14, 2004, because Defendants never disclosed the

24 Wittman Report's contents. Complaint ¶¶ 7-12, 95-100, 103-04, 107-18. Plaintiff alleges

25 that the true facts began to be disclosed after the market closed on September 7, 2004, and

26 were finally revealed in two curative disclosures the following week. After the market closed

27 on September 7, 2004, "the Company announced that it had…agreed to pay a $9.8 million

28 fine imposed by the DOE in connection with its regulatory investigation into the issue of

Apollo's tying the compensation of its enrollment counselors to enrollments numbers."[5] Complaint, ¶ 13, 120-21. On September 14 and 15, 2004, "articles in the *Arizona Republic* and *The Wall Street Journal* disclosed more of the truth with regard to UOP's flagrant violations of the law with respect to incentive compensation relating to student enrollments and the prior DOE Report's findings and conclusions, including the DOE's findings of a 'culture of duplicity,' and instances in which UOP recruiters forged student signatures on loan documents. Revelations of the DOE Report . . . caused a further decline in the trading price of Apollo's shares...." *Id.*, ¶ 13, 129-32.

Before the market opened on September 20, 2004, six days after the close of the purported class period, UBS analyst Kelly Flynn downgraded Apollo's stock from "Neutral" to "Reduce." SOF ¶ 80. She downgraded, her report said, in part due to her concern about regulatory risk.[6] SOF ¶¶ 80-82. Another report from Flynn that day discussed the regulatory environment for Apollo's industry group. SOF ¶ 81. On September 21, 2004, Apollo's stock price had a statistically significant, negative residual return, the first such decline since the disclosure of the contents of the Wittman Report on September 14. SOF ¶¶ 85, 87.

## 2. Courts Require a Statistical Analysis, or Event Study, to Demonstrate Loss Causation.

Loss causation is an essential element of a Rule 10b-5 claim. *Dura*, 544 U.S. at 342. To demonstrate loss causation, a plaintiff must establish a "causal connection" between the claimed material misrepresentation or omission and any loss. *Id.*; *Daou Systems, Inc., Sec. Litig.*, 411 F.3d 1006, 1025 (9th Cir. 2005). In this action, Plaintiff pled that a series of disclosures to the market corrected the previous alleged misstatements and omissions and

---

[5] Plaintiff alleges that "Defendants' partial disclosure caused the trading price of Apollo's stock to materially decline on September 7, 2004" (Complaint, ¶ 121). However, the announcement was not made until after the close of trading on that date. SOF ¶ 42. In fact, it is also undisputed that the residual return on Apollo's stock price for September 7, 2004, was not statistically significant. Lehn Report (Diulio Dec., Ex. 38), Ex. 4 at 7.

[6] Although the Complaint notes that Apollo's stock price had declined by the close of trading on September 20, 2004, it does not allege that "new information" was released to the market on that date. Complaint, ¶¶ 13, 132. The residual return on that date, although negative, was not statistically significant. SOF ¶ 84.

caused a decline in Apollo's stock price. To be considered a corrective disclosure for loss causation purposes, the disclosure must actually reveal to the market the falsity of prior statements. *Daou*, 411 F.3d at 1026; *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005). These disclosures, in turn, must cause the stock price to decline, resulting in a loss to plaintiff. *Dura*, 544 U.S. at 345-46; *Teachers' Retirement Sys. v. Schoenfeld*, 2007 U.S. App. LEXIS 3698 (4th Cir. Feb. 20, 2007). After *Dura*, the measure of damages is the amount of the drop in the price of a security once the truth comes out. *Ong v. Sears, Roebuck & Co.*, 459 F. Supp. 2d 729, 751 (N.D. Ill. 2006); *see also Goldberg v. Household Bank, F.S.B.*, 890 F.2d 965, 966-67 (7th Cir. 1989). However, when properly measured, damages must eliminate any portion of the price decline caused by either general market factors or company-specific factors unrelated to the alleged fraud. *In re Imperial Credit Indus., Inc.*, 252 F. Supp. 2d 1005, 1014-15 (C.D. Cal. 2003).

An event study is the appropriate tool for that inquiry. *Id.* at 1014; *In re Oracle Sec. Litig.*, 829 F. Supp. 1176, 1181 (N.D. Cal. 1993). In an event study, statistical significance is measured in terms of a "t-statistic," which can be either a positive or negative number. *McKowan Lowe & Co. v. Jasmine, Ltd.*, 2005 U.S. Dist. LEXIS 32164, *17 (D.N.J. June 30, 2005). The standard for statistical significance is 95% confidence, *i.e.*, a t-statistic with an absolute value of 1.96 or higher. *Id.* at *17 & n.7.

Both parties' experts performed event studies. The studies' statistical results are virtually identical, and both experts found that Apollo's stock traded in an efficient market. SOF ¶¶ 46, 66. Both studies found that Apollo's stock price did not change in a statistically significant fashion on any of the trading days from September 8 to September 15, the period in which Plaintiff claims the fraud was being disclosed to the market. Instead, the first statistically significant stock price decline occurred on September 21, seven days after the close of the class period. SOF ¶¶ 85, 87. Dr. Feinstein found that the cumulative residual return *from* September 14 *through* September 21 resulted in a statistically significant decline (with a t-statistic for the cumulative return of -2.38). SOF ¶ 87. However, this "window" was the only period of time measured from the end of the class period, September 14, forward

1  that resulted in a statistically significant price decline. *Id.*

2      **3.**    **Plaintiff Cannot Demonstrate that a Material Misrepresentation or**
           **Omission Caused its Loss, Because its Theory of Loss Causation and**
3             **Damages Contradicts its Theory of Reliance.**

4         Plaintiff's theory that the market took six trading days to digest publicly disclosed

5  information contradicts both experts' conclusions that Apollo's stock traded in an efficient

6  market. As courts recognize, in an efficient market the stock's trading price reflects all

7  publicly available information. *Binder v. Gillespie*, 184 F.3d 1059, 1065 (9th Cir. 1999);

8  *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1051-52 (9th Cir. 2006); *Miller v. Thane*

9  *Int'l, Inc.*, 372 F. Supp. 2d 1198, 1209 (C.D. Cal. 2005) ("failure of the market to react to the

10  disclosure of news is an indicator that the news is not material."). An efficient market

11  necessarily involves rapid assimilation of new information. *Unger v. Amedisys, Inc.*, 401

12  F.3d 316, 324-25 (5th Cir. 2005); *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 508 (1st Cir.

13  2005); *In Re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 269 & n.5 (3d Cir. 2005). In fact,

14  courts have held that for a market to be considered efficient, information must be reflected in

15  the stock price in hours or minutes. *See, e.g.*, *In re Polymedica Corp. Sec. Litig.*, 453 F.

16  Supp. 2d 260, 278 (D. Mass. 2006). In *Krogman v. Sterritt*, 202 F.R.D. 467, 477 n.14 (N.D.

17  Tex. 2001), in response to an expert's argument that "the impact of news on the price of a

18  stock…will typically last approximately one week to ten days," the court concluded that

19  "such a lengthy time frame is inconsistent with the concept of market efficiency." *Id.*

20        The Ninth Circuit's *America West* decision comports with these well-established

21  principles, as it merely rejected a "bright line" rule that stock will *always* react "instantly,"

22  recognizing that "distortions" may sometimes prevent instant market reaction to news. *No.*

23  *84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*,

24  320 F.3d 920, 934 (9th Cir. 2003). But a plaintiff must still *prove* that such a distortion

25  prevented the market's reaction. *Id.* In *America West*, the defendants' continued misleading

26  statements allegedly caused the distortion. *Id.* at 935 ("America West continued to reassure

27  analysts that the settlement agreement and compliance therewith would not have noticeable

28  economic effects on the company"). That is precisely the type of distortion that an event

1    study is meant to isolate. *Oracle*, 829 F. Supp. at 1181.

2        Here, however, Apollo was silent after the analyst conference call on September 7

3    through and including the end of the month.  Unlike *America West*, no facts can be proved

4    showing that Apollo distorted the market's ability to react instantly to that news.  Plaintiff's

5    theory -- that the market required six trading days to understand the articles in *The Wall Street*

6    *Journal* and the *Arizona Republic* – thus fails as a matter of law.

7        **4.    Dr. Feinstein "Cherry Picks" An Event Window to Reach a**
         **Damages Conclusion, Contradicting the Complaint.**
8
9        Dr. Feinstein's loss causation theory is further flawed because he selected the *only*

10   "event period" – September 14 (when the news articles about the "scathing" nature of the

11   Wittman Report were released) to September 21 - that generates any statistically meaningful

12   stock decline.  The measurement of any other period with a starting date of September 14

13   results in a statistically *insignificant* change in price, rendering his choice entirely arbitrary.

14   SOF ¶ 87.  Dr. Feinstein's decision to ignore the cumulative effect of the disclosures from

15   September 14 through September 20, from September 14 through September 22, or from

16   September 14 through September 30 ignores additional market movements.  *Id.*

| Time Period | Cum. Residual Return | Cum. Res. Ret. T-Statistic |
|---|---|---|
| 9/14/04 | 0.32% | 0.27 |
| 9/14/04-9/15/04 | -0.40% | -0.23 |
| 9/14/04-9/16/04 | -0.53% | -0.25 |
| 9/14/04-9/17/04 | -0.54% | -0.22 |
| 9/14/04-9/20/04 | -2.43% | -0.90 |
| 9/14/04-9/21/04 | -7.08% | -2.38 |
| 9/14/04-9/22/04 | -5.12% | -1.59 |
| 9/14/04-9/23/04 | -5.02% | -1.46 |
| 9/14/04-9/24/04 | -5.44% | -1.50 |
| 9/14/04-9/27/04 | -4.45% | -1.16 |
| 9/14/04-9/28/04 | -4.73% | -1.18 |
| 9/14/04-9/29/04 | -4.96% | -1.18 |
| 9/14/04-9/30/04 | -5.42% | -1.24 |

25       Even if it were appropriate for Dr. Feinstein to utilize a two-day event window to

26   assess the impact of Flynn's reports, this Court must reject Dr. Feinstein's method because he

27   has failed to assess whether the market overreacted on September 21.  To support the use of a

28   multi-day trading window, Dr. Feinstein cites David Tabak & Frederick Dunbar, *Materiality*

1    *and Magnitude: Event Studies in the Courtroom* in *Litigation Services Handbook* (3rd ed.

2    2001), as authoritative on the subject. SOF ¶ 89. But Tabak & Dunbar do not advocate the

3    use of such windows; rather, they warn that the "longer the event window, the more likely it

4    incorporates all of the prior leakage and the market's ongoing adjustment to the news, but

5    also the more likely it picks up other effects unrelated to the event under consideration." *Id.*

6    Tabak & Dunbar further caution that "the potential for stock market overreaction is now

7    generally accepted as a factor in stock market behavior." *Id.* Accordingly, when using a

8    multi-day window, as posited by Dr. Feinstein, an analyst is compelled to consider movement

9    of the market price *after* the window selected:

10   [If]f the price initially declines after an event and if, say on the second day, the
     price returns to a level that makes the event not material with no intervening news
11   event, then there is justification for assuming short-term overreaction. The analyst
     would be hard pressed to make a finding that the event was material under this fact
12   pattern.

13   *Id.* Viewing the movement of Apollo's stock price on September 21 in light of its positive

14   movement on September 22 results in a statistically insignificant change when one looks at

15   the period from September 14 through September 22. SOF ¶ 87. Certainly, using a window

16   of September 20 through 22 yields a statistically significant negative residual return; but such

17   an "event window" ignores the market's reaction to the September 14 and September 15 news

18   articles which actually disclosed the contents of the Wittman Report. Thus, Plaintiff's theory

19   of loss causation must be rejected for failing to consider market overreaction.

20   Dr. Feinstein's statistical gymnastics are an attempt to cure the fact that Plaintiff's

21   theory of loss causation *as alleged in the pre-Dura Complaint* results in no damages.

22   Although Dr. Feinstein argues that the truth reached the market, in part, on September 20, the

23   Complaint identifies no curative disclosure on that date that would cause the stock price to

24   decline on September 21. Complaint, ¶ 13, 132. As Plaintiff recognized in the Complaint,

25   the Wittman Report was fully reported by the *Arizona Republic* and *The Wall Street Journal*

26   on September 14 and 15, and in an efficient market, that information was rapidly absorbed

27   into the stock price. But with no analysis supporting the Complaint's allegations, Plaintiff

28   needed Dr. Feinstein to create a new, albeit faulty, loss causation theory.

5.     **The September 20 Reports Were Not Curative Disclosures.**

Whether or not the Court permits a multi-day event window, Plaintiff would still need to find an individual curative disclosure that caused the drop in the stock price on September 21, 2004. There was no such disclosure.

Flynn's reports concededly introduced no "new" information into the market, but instead analyzed existing information, and, as such, were not corrective. *Lentell*, 396 F.3d at 176; *In re Avista Corp. Sec. Litig.*, 415 F. Supp. 2d 1214, 1220-21 (E.D. Wa. 2005). Indeed, even Dr. Feinstein acknowledges that what was "new" was Flynn's analysis and assessment of the impact of the Wittman Report. SOF ¶¶ 82, 83. As a matter of law, analyst reports containing new *analysis*, as opposed to new facts, cannot create a loss attributable to the company. *In re Teco Energy, Inc. Sec. Litig.*, 2006 U.S. Dist. LEXIS 18101, at *20 (M.D. Fla. Mar. 30, 2006); *see also In re Tellium, Inc. Sec. Litig.*, 2005 WL 2090254, at *4 (D.N.J. Aug. 6, 2005); *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005). As courts have recognized, there is a "qualitative difference between a statement of fact emanating from an issuer and a statement of opinion emanating from a research analyst. A well-developed efficient market can reasonably be presumed to translate the former into an effect on price, whereas no such presumption applies to the latter." *DeMarco v. Lehman Bros., Inc.*, 222 F.R.D. 243, 246 (S.D.N.Y. 2004); *see also Lentell*, 396 F.3d at 176. In other words, the efficient market hypothesis presumes that the rest of the market is just as capable as Kelly Flynn to analyze the implications of the Wittman Report for Apollo, and presumably did so when the contents of the Wittman Report were disclosed on September 14 and 15.

In addition, subsequent analysis of previous disclosures cannot demonstrate loss causation. In *In re Merck & Co.*, an initial disclosure failed to cause the stock price to fall, but a later news article that contained more detailed analysis of that information was followed by a sharp decline in the defendant's stock price. 432 F.3d at 269-70. The court held that because the stock price did not decline when the information was first disclosed, it was not material, and a later elaboration of the issue with more calculations regarding the effect of the disclosure did not release new information so as to tie the subsequent decline in the stock

1   price to the disclosure. *Id.* Even though the reporter analyzed the information to a greater

2   degree than was done in Merck's initial disclosure, "the efficient market hypothesis suggests

3   that the market made these basic calculations months earlier." *Merck*, 432 F.3d at 271.

4       *And, finally,* the September 20 reports contained nothing new.  Flynn, herself,

5   disclosed the bulk of her concerns about "regulatory turmoil" in her September 8 report.  SOF

6   ¶ 70.   In that report, she stated that the settlement "may reduce near-term event risk, but

7   doesn't eliminate chance that industry regulatory turmoil may hurt Apollo, or that incentive

8   comp Qui Tam suit may be alive in appellate court." *Id.* Other analysts offered commentary

9   on the developments, as well.  SOF ¶¶ 65, 69, 73.  Thus, Flynn, and others, had squarely

10  addressed the effect of the regulatory concerns that plagued Apollo's sector and specifically

11  raised the specter of a "slowdown at UOPX," as well as "rising 'student acquisition costs'"

12  almost two weeks before the stock price decline on September 21.

13      **6.    Summary**

14      Plaintiff cannot show damage under *Dura*.  When the Wittman Report's contents were

15  disclosed on September 14 and 15, the residual return on Apollo's stock price did not change

16  in a statistically significant fashion.   Later stock price movements based on an analyst's

17  "digestion" of the contents of the Wittman Report, as a matter of law, cannot serve as a basis

18  for a damage claim.  Under *Dura*, Plaintiffs Rule 10b-5 claim must be rejected.

19  **B.    Apollo Had No Duty To Disclose The Wittman Report**

20      Plaintiff accuses Apollo of making false or misleading statements in connection with

21  nine press releases, conference calls or SEC filings during the class period.  Complaint, ¶¶

22  94-119.  Plaintiff alleges that Apollo "concealed from investors the DOE Report containing

23  materially adverse findings and conclusions that Apollo's UOP subsidiary was violating the

24  ban on incentive compensation with respect to student enrollments." *Id.*, ¶ 12.

25      As a matter of law, Apollo had no duty to disclose the contents of the Wittman Report

26  sooner than it did.  This is because a corporation has no duty to disclose interim findings --

27  whether or not material --  in an ongoing regulatory process where discussion and negotiation

28  is still occurring.

1.     **Duty To Disclose Information Under The Securities Laws**

"For an omission to be actionable under §10(b), (1) there must have been a duty to disclose the omitted fact, and (2) the omitted information must have been material." *Robbins v. Moore Medical Corp.*, 894 F. Supp. 661, 668 (S.D.N.Y. 1995).   Materiality alone is not sufficient to establish a claim for securities fraud – a plaintiff must demonstrate that the defendant had a duty to disclose the information in question at a given time.   *Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 903 (N.D. Ill. 2001).   Corporations do not have an absolute duty to disclose material information as it arises:

> Much of plaintiffs' argument reads as if firms have an absolute duty to disclose all information material to stock prices as soon as news comes into their possession. Yet that is not the way the securities laws work.  We do not have a system of continuous disclosure.  Instead, firms are entitled to keep silent (about good news as well as bad news) unless positive law creates a duty to disclose.

*Gallagher v. Abbott Labs.*, 269 F.3d 806, 808 (7th Cir. 2001).   "Information need only be revealed if disclosure is required by statute or regulation, or if it is necessary to prevent a different statement from being materially misleading." *Robbins*, 894 F. Supp. at 668; *see also Basic, Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988).   Case law is clear that "[m]erely mentioning a topic . . . does not require [a] company to disclose every tangentially related fact that might interest investors, only those that are sufficiently important." *Anderson*, 140 F. Supp. 2d at 903.   It is only when "omitting the fact would make the statement so incomplete as to be misleading" that a company must disclose it. *Id.*   It is recognized that "[n]o matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).   "[R]evealing one fact" does not mean that "one must reveal all others that, too, would be interesting, market-wise, but means only such others, if any, that are needed so that what was revealed would not be so 'incomplete as to mislead.'" *Backman v. Polaroid Corp.,* 910 F.2d 10, 16 (1st Cir. 1990).

2.     **Numerous Courts Have Rejected Securities Claims Premised On A Failure To Disclose Regulatory Proceedings And Interim Findings**

As many courts have recognized, a corporation is not duty-bound to disclose ongoing regulatory proceedings and interim findings:

(a) In *City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.* ("ITT"), 388 F. Supp. 2d 932 (S.D. Ind. 2005), investors asserted securities claims against ITT. *Id.* at 935-36. Like Apollo, ITT's financial performance was "highly dependent on its eligibility to participate in programs under Title IV of the federal Higher Education Act of 1965." *Id.* at 936. The investors accused ITT of making false and misleading statements touting ITT's business and financial performance, while failing to disclose that it was under investigation by the California Attorney General. *Id.* at 939. Since October 2002, the California Attorney General had been investigating "whether one or more of the California ITT institutes had falsified records related to student attendance or academic progress or falsified grade point average calculations used to qualify for state financial aid." *Id.* ITT did not disclose this investigation until March 2004. The investors claimed that ITT's public statements were rendered false or misleading by its failure to disclose the investigation.

The court rejected the investors' argument. The court first noted that "[t]he gap in time between the onset of the investigation and the disclosure does not, without more, provide a basis for a securities fraud claim, even assuming the materiality of the California Attorney General's" investigation," because companies do not have an absolute duty to disclose material information as it comes into their possession. *Id.* at 945.

Plaintiff investors then pointed to several press releases and a Form 10-K filing that were allegedly rendered false or misleading by ITT's failure to disclose the investigation. The court found that these disclosures were not false or misleading:

> This argument does not explain how statements attributing increased enrollments to a strong business model and effective marketing are rendered misleading by failure to disclose the CAG investigation. A company can have a strong business model, effective marketing and increasing enrollment and at the same time be the object of a state investigation. . . .

> Likewise, plaintiff's argument does not explain how statements about a company's belief in its compliance with Title IV of the Higher Education Act, or that its internal audit department reviews that compliance, are rendered false or misleading by the failure to disclose the CAG investigation. A company can both believe in and internally monitor its compliance with federal law and be the object of a state investigation, even one targeted at the very metrics of that compliance.

*Id.* at 946. Accordingly, the court dismissed plaintiff's 10b-5 claim.

1       (b)  In *In re Medimmune, Inc. Sec. Litig.*, 873 F. Supp. 953 (D. Md. 1995), investors

2   brought securities claims against Medimmune, a developer of therapeutics and vaccines for

3   treating infectious diseases.   In December 1992, Medimmune filed a product license

4   application seeking FDA approval for its new drug, Respivir.   Subsequently, Medimmune

5   made several public statements regarding the development and marketing of Respivir, and its

6   stock price soared.  In December 1993, the FDA denied approval of the drug, and the stock

7   price fell.   Plaintiffs alleged that during the review process, the FDA had communicated

8   various concerns to Medimmune that put the company on notice that the drug's approval was

9   in jeopardy.  Plaintiffs complained that Medimmune did not disclose these FDA concerns and

10  instead made misleading statements regarding the drug's approval prospects.

11      The court found that most of the allegedly misleading statements were not actionable.

12  Most importantly for present purposes, the court concluded that Medimmune had no duty to

13  disclose the concerns expressed by the FDA during the review process:

14      ***Requiring ongoing disclosure of FDA's questions would not only be disruptive
    to the review process; it could easily result in misleading the public more than
15  not reporting the questions.*** Where mere disclosure of a question might cause the
    company's stock to decline in value, the eventual answer to the question might
16  cause it to rise once again.  Investors who sold that stock when the FDA's question
    was asked but before the company's answer was given might have legitimate cause
17  for concern when a satisfactory answer came forth and the stock's price began to
    climb again.   As defense counsel cogently argues, Defendants might then find
18  themselves defending the opposite of the present lawsuit. . . . ***The Court finds
    Defendants, as a general proposition, had no duty to report its ongoing
19  discussions with FDA during the review process.*** [Emphasis added.]

20  *Id.* at 966.

21      (c)  In *Gallagher*, 269 F.3d 806, investors brought securities claims against Abbott

22  Laboratories, whose Diagnostic Division underwent FDA inspections throughout the 1990s.

23  In March 1999, the FDA sent Abbott a letter warning of severe consequences if it failed to

24  comply with regulations.  Abbott did not publicly disclose the letter until September 1999.

25  That disclosure caused its stock value to drop significantly.   The investors claimed that

26  Abbott committed fraud by not earlier disclosing the FDA's warning letter.

27      The Seventh Circuit affirmed the dismissal of plaintiffs' 10b-5 claims.   The court

28  noted that corporations do not have "an absolute duty to disclose all information material to

1   stock prices as soon as news comes into their possession." *Id.* at 808.  Abbott was entitled to

2   remain silent about the FDA's letter, unless and until (1) disclosure was required in Abbott's

3   periodic SEC filings, or (2) Abbott made an affirmative statement that would be false or

4   misleading if the FDA's letter was not mentioned. *Id.* at 808-10.  The court observed that

5   Abbott was not required to disclose its "regulatory problems" in its Forms 10-Q. *Id.* at 809.

6       The court also concluded that Abbott's public statements were not false or misleading

7   for failure to mention the FDA's letter.  Plaintiffs complained that Abbott's CEO touted

8   Abbott's growth potential at an annual meeting without mentioning the FDA's letter.  *Id.* at

9   811.  But his statements were not misleading for failure to mention the regulatory issues:

10  "The statement about past performance was accurate, and the plaintiffs have not given us any

11  reason to doubt that [CEO] White honestly believed that similar growth would continue, or

12  that White honestly believed 'Abbott's diagnostics pipeline [to be] fuller than ever before.'

13  Even with the benefit of hindsight these statements cannot be gainsaid." *Id.*[7]

14      3.   *America West* **And** *Warshaw* **Are Distinguishable From The Present
            Case**

15      In the Court's denial of Apollo's motion to dismiss, the Court relied largely on two

16  cases to conclude that Plaintiff's Complaint was adequately pled, *America West* and *Warshaw*

17  *v. Xoma Corp.*, 74 F.3d 955 (9th Cir. 1996).  In these cases, defendants were accused of

18  misrepresenting and contradicting the nature of certain regulatory proceedings.  In both cases,

19  the Ninth Circuit found that plaintiffs had sufficiently pled allegations of securities fraud.

20      Now that this case has reached the summary judgment stage, Plaintiff can no longer

21  rely on mere allegations.  The facts established during discovery reveal a story that is similar

22  to those in *ITT*, *Medimmune* and *Gallagher*, not *America West* or *Warshaw*.

23      In *America West*, the FAA had investigated and found numerous aircraft maintenance

24

25

26  [7] *See also In re Open Joint Stock Co. "Vimpel-Communications" Sec. Litig.*, 2006 U.S. Dist.
    LEXIS 10256, at *19 (S.D.N.Y. 2006) (no duty to disclose ongoing tax inspection, even
    while touting financial performance); *Robbins*, 894 F. Supp. at 674 (no duty to disclose

27  ongoing FDA inspection while reporting "material compliance with all regulations"); *Acito v.
    Imcera Group, Inc.*, 47 F.3d 47, 52 (2nd Cir. 1995) (no duty to disclose results of two FDA

28  inspections in an ongoing review process).

1   problems at America West Airlines over several years.  America West began secret

2   settlement negotiations with the FAA to resolve its substantial maintenance issues.  Several

3   months later, America West settled, agreeing to "devise comprehensive corrective actions"

4   fixing the maintenance problems.  320 F.3d at 929.  Later, the company announced it would

5   miss earnings estimates and would need significant additional steps to address its

6   maintenance issues.  The company's stock price fell dramatically upon these later

7   announcements.

8        Plaintiffs accused America West of falsely portraying its maintenance problems and

9   the impact of the FAA's investigations, both before and during the settlement negotiation

10   process.  America West told the market there were no significant problems and no adverse

11   consequences expected, when in fact there were many verified maintenance problems that,

12   when disclosed, had a major adverse impact on the company's stock price and business.  The

13   court found these allegations sufficient to survive a motion to dismiss.  320 F.3d at 935.

14        *America West* bears no likeness to the actual facts, as opposed to the allegations, of

15   this case.  In *America West,* the FAA found substantial, verified maintenance problems about

16   which America West allegedly lied (*id*. at 926-28).  In stark contrast, the Wittman Report

17   contained only initial findings that were legitimately contested by Apollo and were the

18   subject of ongoing discussion.  Undisputed evidence shows that the Wittman Report was

19   merely an interim step in the ongoing program review process, not an FPRD.  SOF ¶¶ 20, 36-

20   38.  As a matter of law, still valid after *America West,* corporations are not obliged to disclose

21   such unresolved allegations in an ongoing regulatory process.

22        Equally important, the FAA's settlement with America West required the airline to

23   "devise comprehensive corrective actions" that would be costly to implement.  Apollo's

24   settlement with the DOE required no corrective action of any kind.  SOF ¶¶ 41, 43, 120.

25   And, while America West was tagged for lying about its maintenance problems, Apollo's

26   public statements projecting an immaterial result from the program review proved to be

27   entirely true.  The program review was settled for an immaterial $9.8 million, with no

28   findings of wrongdoing or corrective action required.  *America West* upheld allegations

1    involving *false* statements, not truthful statements that predicted events exactly as they ended

2    up occurring.

3          *Warshaw* is distinguishable for the same reasons.  In *Warshaw*, defendant was accused

4    of falsely reassuring investors that the FDA would approve a new drug, when it knew that

5    approval was doubtful.  *Warshaw*, 74 F.3d at 957.  The FDA ultimately denied approval of

6    the drug.  *Id.*  By contrast, Apollo's projections that the program review would result in an

7    immaterial payment turned out to be correct.

8          **4.     Apollo Had No Duty To Disclose The Report In Its Public Statements**

9          As stated above, Apollo had no generalized duty to disclose the Wittman Report when

10   it was issued on February 5, 2004, as corporations lack an absolute duty to disclose

11   information (even material information) the moment it comes into their possession.  *See ITT*,

12   388 F. Supp. 2d at 945; *Gallagher*, 269 F.3d at 808 ("[F]irms are entitled to keep silent (about

13   good news as well as bad news) unless positive law creates a duty to disclose").  Nor did a

14   specific duty arise in later public statements.

15         **a.     February 27, 2004: *Qui Tam* Press Release**

16         Plaintiff alleges that Apollo's February 27, 2004 press release regarding the dismissal

17   of the *qui tam* lawsuit was "materially misleading in all respects" because it failed to mention

18   the DOE's program review or the Wittman Report.  *See* Complaint, ¶¶ 97-98.  But there is

19   nothing false or misleading about this press release.  First, the statements in the press release

20   that "the [court] granted [Apollo's] motion to dismiss" and "[t]he government declined to

21   intervene in the lawsuit" were both absolutely true.  Indeed, Plaintiff admits that "it was true

22   that the qui tam lawsuit . . . had been dismissed" and that it was "technically accurate" that

23   the government declined to intervene.  *Id.*  Second, the press release could not mislead

24   investors as to the substance of the court's dismissal, since the court's ruling was publicly

25   available on PACER and in the court's physical file.  SOF ¶ 17.  Any investor interested in

26   the details of the ruling could easily have obtained a copy.  Apollo cannot be faulted for

27   failing to disclose extra information concerning a judicial ruling that was already publicly

28   available.  *Sailor v. Northern States Power Co.*, 4 F.3d 610, 613 (8th Cir. 1993); *Wielgos v.*

*Commonwealth Edison Co.*, 892 F.2d 509, 517 (7th Cir. 1989).   Third, there was no reason for Apollo to mention the DOE's program review in a press release concerning the *qui tam* lawsuit, as these were two separate proceedings. *See Anderson*, 140 F. Supp. 2d at 903.

### b.   Earnings Releases and Reports

Plaintiff alleges that Apollo's press releases (and Forms 8-K) reporting its quarterly financial results during fiscal year 2004 were misleading for failure to disclose the Wittman Report.   Complaint, ¶ 99, 110, 116, 119.   These press releases did nothing more than report historical financial information and indicate the company's satisfaction with its results.   Such statements will not support a securities fraud claim. *In re Convergent Tech. Sec. Litig.*, 948 F.2d 507, 513 (9th Cir. 1991).   Nor was there any duty to disclose the Wittman Report in the press releases since the DOE's ongoing program review had nothing to do with the subject of the releases. *ITT*, 388 F. Supp. 2d at 946 ( "[Plaintiff] does not explain how statements attributing increased enrollment to a strong business model and effective marketing are rendered misleading by failure to disclose the CAG investigation."); *see also Gallagher*, 269 F.3d at 811; *Vimpel-Communications*, 2006 U.S. Dist. LEXIS 10256, at *6-7, 9, 19; *Robbins*, 894 F. Supp. at 674.   Apollo's earnings releases are not actionable.

### c.   Analyst Conference Calls

Plaintiff alleges that Nelson's statements on March 12, 2004 concerning the program review process "deceptively misled the market into believing that nothing adverse had occurred, that no adverse report had been rendered and that the DOE review in question was simply a normal or routine event, thereby comforting investors."   *See* Complaint, ¶ 101. Particularly, Plaintiff alleges that during the conference call, Nelson misled the investment community by not answering the following question:

> [D]o you have any sort of timetable when you think the program review will be completed or when any type of report will be issued?

*See* Complaint, ¶ 100.   Nelson's statements during the March 12 conference call were not false or misleading.   If Nelson failed to answer that question directly, his failure to do so would have been apparent to anyone listening to the conference call.   More importantly, and

1    taken in their contextual whole, Nelson's remarks accurately described the typical program

2    review process for the benefit of the analysts.  SOF ¶¶ 50-52.  He also stated that Apollo

3    would not disclose the program review issues until a final report had been received.  SOF

4    ¶ 50.  This description of the overall process was entirely accurate and not misleading.  With

5    respect to the 2003 program review, Nelson made clear that the review process was ongoing

6    ("the next step sometimes takes months or years"), that Apollo was responding to the DOE's

7    concerns ("we had an opportunity to do that in both cases, and we feel very good about that

8    response"), that the DOE was concerned expressly about incentive compensation ("[t]he other

9    area is incentive compensation"), and that Apollo believed the review would not have a

10   material effect on Apollo ("[t]here may be some sort of a nominal fine type thing, but . . .

11   nothing that would be material for us").  SOF ¶¶ 50-51.  All of these statements were

12   accurate, including the projection that the resolution of the program review would have no

13   material effect.

14       Plaintiff also alleges that Nelson's statements during the June 24, 2004 conference call

15   were false and misleading because Nelson failed to reveal the Wittman Report.  In that call,

16   Nelson accurately stated that the DOE had requested information, to which Apollo had

17   responded, and surmised that the *qui tam* litigation had served as the precipitating basis for

18   the program review.  SOF ¶ 58.  He again projected that the program review would not

19   "create any problems" for Apollo, which proved to be correct.  *Id.*  Notably, the day after the

20   June 24 analyst conference, Kelly Flynn in her analyst report discussed the existence of the

21   Wittman Report and that Apollo was in the process of responding to it.  SOF ¶ 63.

22       Finally, Plaintiff alleges that Nelson's statement during the August 25, 2004

23   conference call that the program review would "not have any material impact on the company

24   in any way" was false and misleading because Apollo failed to disclose the Wittman Report

25   and because Apollo's financial performance would suffer as a consequence of making

26   Apollo's operations compliant with the incentive compensation regulations.  Complaint, ¶¶

27   117-119.  Nelson's statement is not actionable, as it was not false or misleading.  Nelson

28   accurately explained that Apollo had "been going back and forth with the department . . . to

1    reach a resolution." *Id.* at ¶ 117.  His projection that the program review would have no
2    material impact "in any way" was a non-actionable forward looking statement.

3         The court's discussion in *Medimmune* is instructive on these types of statements.
4    Medimmune made statements projecting FDA approval of its drug, Respivir, but did not
5    disclose the concerns the FDA was expressing throughout the approval process.  *Medimmune*,
6    873 F. Supp. at 959.  Ultimately, the FDA did not approve of Respivir.  *Id.* at 957.  The court
7    found that Medimmune had no duty to disclose the FDA's concerns expressed during the
8    review process, because those concerns were only an interim piece of the ongoing regulatory
9    process.  *Id.* at 966 ("Continuous dialogue between the FDA and the proponent of a new drug
10   is the essence of the product license application process.").  Indeed, the court observed that
11   premature revelation of the FDA's questions before the company's response was revealed
12   could actually hurt investors, as the stock price might drop in reaction to the question and
13   then recover when the answer came forth.  *Id.* ("Where mere disclosure of a question might
14   cause the company's stock to decline in value, the eventual answer to the question might
15   cause it to rise once again.").  Accordingly, Medimmune "had no duty to report its ongoing
16   discussions with FDA during the review process."  *Id.*  Similarly, Nelson had no duty to
17   disclose the Wittman Report while DOE discussions continued.

18         **d.    SEC Quarterly Filings**
19         Plaintiff alleges that Apollo's quarterly Forms 10-Q were misleading because Apollo
20   "purposely failed to disclose the DOE Report of February 5, 2004 or its findings or that UOP
21   . . . was violating the ban on incentive compensation respecting enrollments."  Complaint,
22   ¶¶ 105, 115.  Apollo's Forms 10-Q are not actionable, because there was no duty to disclose
23   Apollo's regulatory issues in the Forms 10-Q.  The quarterly reports are designed to update
24   specific information from the prior Form 10-K.  Regulation S-K (the SEC's list of disclosure
25   requirements) demands more comprehensive disclosure in Forms 10-K than Forms 10-Q.  *See*
26   *Ventry v. Sands (In re Canandaigua Sec. Litig.)*, 944 F. Supp. 1202, 1209 n.3 (S.D.N.Y.
27   1996); *In re Seagate Tech. II Sec. Litig.*, No. C-89-2493 MHP, 1990 U.S. Dist. LEXIS 14056,
28   at * 26 (N.D. Cal. 1990).  Regulation S-K does not require disclosure of "regulatory

problems" in Forms 10-Q at all. *See Gallagher,* 269 F.3d at 809. Hence, Apollo had no duty

to disclose the Wittman Report (which obviously could not have been disclosed in the 2003

10-K) in any of the Forms 10-Q.[8]

### 5.    Apollo Had No Duty To Confess To The Disputed Allegations Of The Wittman Report

In addition to faulting Apollo for failing to disclose the Wittman Report, Plaintiff also

contends that Apollo's public statements were misleading because they "failed to disclose"

that "the Company improperly based recruiter's compensation on enrollment figures, in

violation of U.S. regulations." Complaint, ¶ 119. Plaintiff is essentially arguing that Apollo

was obliged to confess to the allegations of the Wittman Report. But this theory is barred as a

matter of law. Courts have rejected the notion that corporations are duty-bound to accuse

themselves of wrongdoing. *See Anderson,* 140 F. Supp. 2d at 906; *Greenstone v. Cambex

Corp.,* 777 F. Supp. 88, 91 (D. Mass. 1991). Apollo had no duty to confess to the violations

alleged in the Wittman Report, which Apollo strongly disputed and which were ultimately

abandoned by the DOE. *See also Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 478-79

(1977) (securities fraud action may not be based on mismanagement claim); *In re GlenFed,*

11 F.3d 843, 849 (9th Cir. 1993) (same).

## C.    No Evidence Supports Plaintiff's Scienter Allegations

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst

& Ernst v. Hochfelder,* 425 U.S. 185, 193 n.12 (1976). Scienter may also be found where the

defendant has acted with deliberate recklessness – defined as "a highly unreasonable

omission, involving not merely simple or even inexcusable negligence, but an extreme

departure from the ordinary standards of care, . . . which presents a danger of misleading

buyers or sellers that is either known to the defendant or is so obvious that the actor must

have been aware of it." *Nordstrom, Inc. v. Chubb & Son, Inc.,* 54 F.3d 1424, 1435 (9th Cir.

1995). To prove Defendants acted with scienter, Plaintiff must establish specific

---

[8]  The OIG audits of IPD's client institutions were disclosed in the April 13, 2004 Form 10-Q
because they had previously and initially been disclosed in Apollo's Form 10-K filed
November 24, 2000. SOF ¶ 100.

1   "'contemporaneous statements or conditions' that demonstrate the intentional or the

2   deliberately reckless false or misleading nature of [Defendants'] statements when made."[9]

3   *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001).  Summary judgment on scienter is

4   appropriate where there is no rational basis in the record for concluding that any of the

5   challenged statements was made with requisite scienter.  *In re Apple Computer Sec. Litig.*,

6   886 F.2d 1109, 1116-17 (9th Cir. 1989), *cert. denied*, 496 U.S. 942 (1990).  Many courts have

7   granted summary judgment on the issue of scienter.  *Geffon v. Micrion Corp.*, 249 F.3d 29, 37

8   (1st Cir. 2001); *In re Northern Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 462-63

9   (S.D.N.Y. 2000).  As in these cases, the record here demonstrates that there is no rational

10  basis to conclude that Defendants' actions were made in bad faith and with an intent to

11  deceive investors.

12  **1.     Defendants Acted In Good Faith and Without Any Intent to Deceive
         Investors.**

13
14          Although the issue of scienter is often a highly factual inquiry not suitable for

15  summary adjudication, summary judgment is appropriate here because the evidence

16  developed through discovery presents a clear picture of executives who sought to protect, not

17  mislead, investors.  There was no inside trading or personal profiteering.  Instead, the

18  evidence for Apollo's executives establishes their honest intentions clearly, consistently, and,

19  most importantly, with full corroboration by all contemporaneous documents and

20  communications.  *Bryson v. Royal Business Group*, 763 F.2d 491, 494-95 (1st Cir. 1985)

21  (uncontradicted affidavit by defendant allows summary judgment on issue of scienter).

22  Indeed, Defendants' states of mind about the disclosure decisions can be readily established

23  without reaching the bottom line of the truth or falsity of the Wittman Report's allegations.

24          As a starting point, Defendants did not decide whether to disclose the Wittman Report

25  simply by reading it and reacting.  Rather, the disclosure decision was well thought out after a

26

27  9  Because scienter cannot be imputed to the Individual Defendants, that element of
    Plaintiff's claim cannot be imputed to Apollo.  See *In re Apple Computer, Inc., Sec. Litig.*,
28  243 F. Supp. 2d 1012, 1023 (N.D. Cal. 2002).

number of important communications with senior DOE officials and consultation with the

Company's lawyers, who were experts in both DOE regulations and processes and SEC

disclosure requirements.  The record is clear that both Apollo executives and the Company's

advisors reacted strongly to the Wittman Report as being a biased, unfair and inaccurate

report.  SOF ¶¶ 105, 106.  While Plaintiff may say it disagrees, or that these beliefs were not

adequately tested at the time, what it cannot present is any contemporaneous evidence

demonstrating that Defendants or their advisors did not honestly hold these beliefs.

   Then, against the backdrop of these beliefs, Defendants and their advisors had several

very important communications with DOE officials.  SOF ¶¶ 96, 97, 108, 109, 116, 118.

These senior officials told Apollo:  (i) to calm down; (ii) to cease their aggressive response to

the report ; (iii) that (while acknowledging the bias of some staff members against for-profit

institutions) the senior officials, not the review team, would be responsible for resolving the

issues raised in the Wittman Report; (iv) that they would work with Apollo to achieve a

speedy resolution; and (v) the resolution would be approached using the ITT model.  SOF

¶ 108, 109.

   In addition to these important discussions, Defendants' advisors – Stan Freeman, Tim

Hatch and Jon Cohen -- were intimately involved in the process and provided important

advice.  SOF ¶¶ 105, 106, 110; *see Howard v. SEC*, 376 F.3d 1136, 1147 (D.D.C. 2004)

("[R]eliance on the advice of counsel need not be a formal defense; it is simply evidence of

good faith, a relevant consideration in evaluating a defendant's scienter.").  Defendants

simply were not operating in a vacuum or out of self interest.[10]  Rather, Defendants made a

carefully considered decision based on all the information available and consultation with all

of their professional advisors.  There is simply not a shred of evidence that the Defendants

decided not to disclose the Wittman Report to mislead investors.  Instead, they understood the

damage to investors which could occur through the release of an unauthorized, biased and

---

[10]  Defendants sold no shares after receipt of the Wittman Report or before the Wittman
Report was fully covered by the Wall Street Journal.  SOF ¶ 122.

1  unfairly negative report which they knew could be resolved without material effect on Apollo

2  – a belief borne out by the subsequent settlement for an immaterial amount.  SOF ¶¶ 67, 68.

3      **2.   Defendants Did Not Act With Scienter With Respect to the**
       **Implementation of The New Compensation Plan.**

4  Plaintiff has suggested that Defendants knew UOP's new compensation plan would

5  slow Apollo's business growth.  Although this position is easy to assert, it is wholly

6  unsupported by the evidence.

7      UOP began the process of developing a new compensation plan in June 2003 because

8  of changes to overtime requirements.  SOF ¶ 43.  That this work started wholly independently

9  of the program review is indisputably shown by the fact UOP created a committee in July

10  2003 to discuss the new plan before there was even a field visit for the program review.  *Id.*

11  This committee met regularly and kept minutes.  *Id.*  The committee originally planned to roll

12  out the new compensation plan in October 2003.  *Id.*  Although the rollout was delayed until

13  June 2004, there were no substantive changes made to the plan after receipt of the Wittman

14  Report.  *Id.*  This was a voluntarily prepared and adopted program, and it defies logic to

15  suggest that Apollo adopted it knowing it was going to hurt its business.[11]

16      Just as important, no contemporaneous document or communication show that

17  Defendants expected Apollo's growth to slow under the new compensation plan.  *Ronconi*,

18  253 F.3d at 432.  Indeed, for nearly a year after adoption of the plan, Apollo's enrollment

19  continued to grow at a 24% to 28% annual sequential rate.  SOF ¶ 121.  If the new

20  compensation plan was the problem, how is it possible that it worked fine for a full year?

21  Even when the sequential rate of annual growth slowed in the August 2005 quarter to 20%,

22  the student population grew in absolute terms by nearly 12,000 students.  *Id.*  The market

23  long knew that the law of large numbers would catch up with Apollo, as many analysts

24  discussed and as management had conceded [SOF ¶¶ 59, 80], so it is important to look at

25  recruiting results in absolute numbers, not percentages, to see how the new compensation

26

27  _____

28  [11]  In fact, all contemporaneous evidence shows that Defendants believed the new
compensation plan would lead to greater productivity.  SOF ¶ 120.

plan was working.  This chart shows total combined student enrollments at each quarter end for the year before and after adoption of the new compensation plan:

**Combined Enrollments**



The evidence is capable of only one interpretation – Defendants' disclosure decision and public statements were made without the intent of misleading investors.

## IV.   CONCLUSION

For the foregoing reasons, Defendants respectfully submit that judgment be entered in their favor.

Dated: March 9, 2007

Respectfully submitted

By: _Joseph C. Busch_

    Joseph P. Busch, III

GIBSON, DUNN & CRUTCHER LLP
JOSEPH P. BUSCH, III, *Appearing Pro Hac Vice*
4 Park Plaza, Suite 1400
Irvine, CA 92614
Telephone:  (949) 451-3800

OSBORN MALEDON, P.A.
DAVID B. ROSENBAUM (AZ 009819)
The Phoenix Plaza 21st Floor
2929 North Central Avenue
Phoenix, Arizona 85012-3311
Telephone:  (602) 640-9000
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on March 9, 2007, the foregoing document was electronically transmitted to the Clerk of the Court using the CM/ECF System which will send notification of such filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

| | |
|---|---|
| Ramzi Abadou | ramzia@lerachlaw.com |
| Joseph G Adams | jadams@swlaw.com |
| Francis Joseph Balint, Jr. | fbalint@bffb.com |
| William J. Ban | wban@barrack.com |
| Jeffrey A. Barrack | jbarrack@barrack.com |
| Stephen R. Basser | sbasser@barrack.com |
| Maureen Beyers | mbeyers@omlaw.com |
| James R. Condo | jcondo@swlaw.com |
| William S. Lerach | general_efile@lerachlaw.com |
| William J. Maledon | wmaledon@omlaw.com |
| Robert D. Mitchell | robertmitchell@mitchelllaw.com |
| Mark R. Rosen | mrosen@barrack.com |
| David B. Rosenbaum | drosenbaum@omlaw.com |
| Stephen G. Schulman | sschulman@milbergweiss.com |
| Rosemary J. Shockman | RShock@aol.com |
| Geoffrey M. Trachtenberg | gmt@lclegal.com |
| Marc M. Umeda | mumeda@ruflaw.com |
| Samuel M. Ward | sward@barrack.com |

Gibson, Dunn &
Crutcher LLP

I further certify that copies of the foregoing were sent on March 9, 2007 via U.S. Mail to the following parties:

**Leonard Barrack**
Barrack Rodos & Bacine
2 Commerce Sq
2001 Market St., Ste 3300
Philadelphia, PA 19103

**Patrick Joseph Coughlin**
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
100 Pine St
Ste 2600
San Francisco, CA 94111

**Sharon M Lee**
Milberg Weiss Bershad & Schulman LLP
1 Pennsylvania Plaza
49th Floor
New York, NY 10119-0165

**Lesley E. Weaver**
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
100 Pine St.
Suite 2600
San Francisco, CA  94111


/s/ Dena F. Kennedy

100182363_1 (2).DOC

Gibson, Dunn &
Crutcher LLP