BONNETT, FAIRBOURN,
  FRIEDMAN & BALINT, P.C.
ANDREW S. FRIEDMAN (005425)
FRANCIS J. BALINT, JR. (007669)
2901 North Central Avenue, Suite 1000
Phoenix, AZ 85012
E-mail afriedman@bffb.com
Telephone: (602) 274-1100
Facsimile:  (602) 274-1199

Co-Local Counsel

BARRACK, RODOS & BACINE
STEPHEN R. BASSER
SAMUEL M. WARD
402 West Broadway, Suite 850
San Diego, CA 92101
E-mail:  sbasser@barrack.com
Telephone: (619) 230-0800
Facsimile:  (619) 230-1874

BARRACK, RODOS & BACINE
LEONARD BARRACK
MARK R. ROSEN
JEFFREY A. BARRACK
WILLIAM J. BAN
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
E-mail:  lbarrack@barrack.com
Telephone: (215) 963-0600
Facsimile:  (215) 963-0838

Lead Counsel for Lead Plaintiff, the Policemen's Annuity
and Benefit Fund of Chicago and the Class

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| In re APOLLO GROUP, INC. SECURITIES LITIGATION<br><br>This Document relates to:<br><br>ALL ACTIONS. | Lead Case No.  CV 04-2147-PHX-JAT<br><br>CLASS ACTION<br><br>LEAD PLAINTIFF'S MOTION FOR PARTIAL SUMMARY ADJUDICATION<br><br>ORAL ARGUMENT REQUESTED<br><br>DATE:      September 4, 2007<br>TIME:      10:00 a.m.<br>CTRM:     503, 5th Floor<br>JUDGE:   Hon. James A. Teilborg |

### FILED UNDER SEAL PURSUANT TO
### PROTECTIVE ORDER REGARDING CONFIDENTIALITY

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................ 1

II.  STATEMENT OF UNDISPUTED FACTS .................................................... 3

III. ARGUMENT ................................................................................................... 10

    A.   Standards for Partial Summary Adjudication ................................. 10

    B.   Legal Standards Respecting a Securities Fraud Claim .............................. 11

    C.   The Program Review Report Constituted Highly Material Adverse Information.................................................................................................... 12

    D.   Defendants Duty to Make Timely and Full Disclosure of Material Adverse Information.................................................................................................... 15

    E.   Defendants Failure to Speak the Whole Truth Rendered Their Class Period Statements Indisputably False and Misleading........................................... 18

        1.   February 27, 2004 Press Release .................................................... 18

        2.   March 12, 2004 Analyst Conference Call ...................................... 19

        3.   April 13, 2004 Form 10-Q .............................................................. 22

        4.   June 24, 2004 Analyst Conference Call ......................................... 23

        5.   August 25, 2004 Analyst Conference Call ..................................... 24

        6.   September 7, 2004 Analyst Conference Call................................... 24

    F.   Defendants' False Statements Were Made With the Requisite Scienter.... 25

IV.  CONCLUSION ............................................................................................... 27

1              TABLE OF AUTHORITIES

2    **CASES**

3

4    *Anderson v. Liberty Lobby, Inc.,*
         477 U.S. 242 (1986) ............................................................................... 10

5    *Associated Hardware Supply Corp. v. Big Wheel Distrib. Co.,*
6        355 F.2d 114 (3rd Cir. 1965)................................................................. 10

7    *Basic v. Levinson,*
         485 U.S. 224 (1988) .................................................................. 1, 2, 12, 15

8    *Binder v. Gillespie,*
9        184 F.3d 1059 (9th Cir. 1999) ............................................................... 11

10   *Blackford v. Action Prod. Co., Inc.,*
         92 F.R.D. 79 (D. Mo. 1981) .................................................................. 10

11   *Bushnell v. Vis Corp.,*
         Case No.C-95-4256 MHP, 1996 U.S. Dist. LEXIS 22572,
12       1996 WL 506914 (N.D. Cal. Aug. 29, 1996). ....................................... 11

13   *Celotex v. Catrett,*
         477 U.S. 317 (1986) .............................................................................. 10
14

15   *Ernst & Ernst v. Hochfelder,*
         425 U.S. 185 (1976) .............................................................................. 26

16   *Gadsden v. Fripp,*
         330 F.2d 545 (4th Cir. 1964) ................................................................ 10
17

18   *Ganino v. Citizens Utils. Co.,*
         228 F.3d 154 (2nd Cir. 2000) ............................................................... 12

19   *Grossman v. Waste Mgmt. Co.,*
         No. 83 C 2167, 1983 WL 1370 (N.D. Ill. Sept. 9, 1983) ..................... 16
20

21   *Hanon v. Dataproducts Corp.,*
         976 F.2d 497 (9th Cir. 1992) ............................................................ 2, 15

22   *Helwig v. Vencor Inc.,*
23       251 F.3d 540 (6th Cir. 2001) ............................................................ 2, 15

24   *Howard v. Everex Sys. Inc.,*
         228 F.3d 1057 (9th Cir. 2000) ........................................................ 11, 25

25   *In re Caterpillar, Inc.,*
         SEC release No. 30532, 1992 SEC LEXIS 786 (Mar. 31, 1992)............ 3
26

27   *In re Sharon Steel Corp.,*
         SEC Release Number 18271, 1981 SEC LEXIS 292 (Nov. 19, 1981)..... 12

28   *In re Apollo Group Inc. Sec. Litig.,*
         395 F. Supp. 2d 906 (D. Az. 2005). ..................................................... 15

                                    ii

*In re Craftmatic Sec. Litig.,*
    890 F.2d. 628 (3rd. Cir. 1989) ................................................................ 17

*In re Indep. Energy Holdings PLC Sec. Litig.,*
    154 F. Supp. 2d 741 (S.D.N.Y. 2001). ................................................... 16

*In re Worlds of Wonder Sec. Litig.,*
    35 F.3d 1407 (9th Cir. 1994) ................................................................. 26

*Klein v. PDG Remediation, Inc.,*
    937 F. Supp. 323 (S.D.N.Y. 1996) ........................................................ 16

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,*
    416 F.3d 940 (9th Cir. 2005) ................................................................. 12

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) ............................................................................... 10

*Nelson v. Serwold,*
    576 F.2d 1332 (9th Cir. 1978) ............................................................... 26

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v.*
    *Am. West Holding Corp.,*
    320 F.3d 920 (9th Cir. 2003) ................................................................. 16

*Pommer v. Medtest Corp.,*
    961 F.2d 620 (7th Cir. 1992) ................................................................. 12

*Provenz v. Miller,*
    102 F.3d 1478 (9th Cir. 1996) ............................................................... 13

*Powell v. Radkins,*
    506 F.2d 763 (5th Cir. 1975) ................................................................. 10

*Robi v. Five Platters, Inc.,*
    918 F.2d 1439 (9th Cir. 1990) ............................................................... 11

*Roeder v. Alpha Indus. Inc.,*
    814 F.2d. 22 (1st Cir. 1987) ............................................................. 17, 18

*Rolf v. Blyth, Eastman Dillon & Co.*
    570 F.2d 38 (2d. Cir. 1978) *cert denied* 439 U.S. 1039 (1978) ................ 26

*Rubin v. Schottenstein, Zox & Dunn,*
    143 F.3d 263 (6th Cir. 1998) .............................................................. 2, 15

*Rubinstein v. Collins,*
    20 F.3d 160 (6th Cir. 1994) ..................................................................... 2

*Santa Fe Indus., Inc. v. Green,*
    430 U.S. 462 (1977) ........................................................................... 2, 15

*Siam v. Potter,*
    Case No. C04-129MHP,
    2005 U.S. Dist. LEXIS 11893 (N.D. Cal. May 16, 2005) ........................ 11

*SEC v. Alliance Leasing Corp.,*
   Case No. 98-CV-1810,
   2000 U.S. Dist. LEXIS 5227 (S.D. Cal. Mar. 17, 2000) ............................................ 13

*SEC v. Falstaff Brewing Corp.,*
   629 F.2d 62 (D.C. Cir. 1980), *cert denied*, 449 U.S. 1012 (1980)............................ 26

*Triton Energy Corp. v. Square D. Co.,*
   68 F.3d 1216 (9th Cir. 1995) .................................................................................... 10

*TSC Indus. Inc. v. Northway, Inc.,*
   426 U.S. 438 (1976) ..................................................................................... 12, 13, 17

*United States v. Berger,*
   473 F.3d 1080 (9th Cir. 2007) .................................................................................. 12

*United States v. Bingham,*
   992 F.2d 975 (9th Cir. 1993) .................................................................................... 13

*Velsicol Corp. v. Hyman,*
   103 F. Supp. 363 (D. Colo. 1951) ............................................................................ 10

*William Hablinski Architecture v. Amir Constr., Inc.,*
   Case No. CV-03-6365 CAS(PJWX),
   2004 U.S. Dist. LEXIS 27659 (C.D. Cal. April 26, 2004)......................................... 11


**STATUTES, RULES & REGULATIONS**

Securities Exchange Act of 1934

   § 10(b).................................................................................................................. 12, 26
   § 10(b)-5 .............................................................................................................. 12, 15

Code of Federal Regulations

17 C.F.R. § 240.10(b)-5............................................................................................ 11

Federal Rule of Civil Procedure

   § 56(a).................................................................................................................... 10
   § 56(c)................................................................................................................. 10, 11
   § 56(d)................................................................................................................. 10, 11
   § 56(e).................................................................................................................... 10

11-56 Moore's Federal Practice — Civil Section 56.40 (2005)..................................... 10

H.R. Rep. No. 102-447 at 10, reprinted in 1992 U.S.C.C.A.N. 334, 343...................... 19
S. Rep. No. 102-58 (1991) ...................................................................................... 19

## I.    INTRODUCTION

This is a class action brought by the Policemen's Annuity and Benefit Fund of Chicago ("Lead Plaintiff" or "PABF") on behalf of purchasers of Apollo Group, Inc. ("Apollo" or the "Company") securities between February 27, 2004 and September 14, 2004 (the "Class Period").  Lead Plaintiff charges Apollo and its senior management with knowingly making a series of false and misleading statements and omissions when they spoke to the market during the Class Period.  Defendants' false and misleading statements failed to timely, adequately or fully disclose, and in fact misstated, the existence and contents of an adverse Program Review Report issued to Apollo by the Department of Education ("DOE") on February 5, 2004, (hereafter "Program Review Report" or "Report").  During the Class Period, Defendants painted a false picture of the true status of the DOE's Program Review of Apollo and they concealed the adverse findings, conclusions and requirements set forth in the Report.

Lead Plaintiff respectfully requests that the Court summarily determine that (1) each of Defendants' Class Period statements, as fully identified and discussed in Part III - E below, were false and misleading by virtue of their failure to disclose the existence and contents of the adverse Program Review Report when Defendants spoke to the market on matters concerning the DOE Program Review of Apollo and its status, including compliance with the federal ban on incentive compensation based on student enrollments, and Title IV funding; (2) the Program Review Report was adverse to Apollo; (3) the existence and contents of the adverse Program Review Report constituted a material event and information at that time; and (4) Defendants' false and misleading statements and omissions were made with actual knowledge of the adverse Program Review Report and true status of the DOE's Program Review, *i.e.*, scienter.

Lead Plaintiff's case is simple, straightforward and founded firmly upon the United States Supreme Court's rulings that the fundamental philosophy underlying the federal securities laws is one of ***full and fair disclosure***.  In *Basic v. Levinson*, the Court held:

1
2
3

"There cannot be honest markets without honest publicity. Manipulation and dishonest practices of the market place thrive upon mystery and secrecy." H.R. Rep. No. 1383, 73d Cong., 2d Sess., 11 (1934). This court "repeatedly has described the 'fundamental purpose' of the Act as implementing a 'philosophy of *full disclosure*.'"

4   485 U.S. 224, 230 (1988) (emphasis added) (quoting *Santa Fe Indus., Inc. v. Green*, 430

5   U.S. 462, 477-78 (1977).

6       Here, when Defendants chose to speak about the DOE Program Review regarding

7   Apollo's compliance with the Title IV ban on incentive compensation and the status of

8   that Program Review, they were required by law to speak the truth — the whole truth —

9   in their dialogue with the investment community. *Basic*, 485 U.S. at 248; *see also*

10  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 504 (9th Cir. 1992); *Helwig v. Vencor Inc.*,

11  251 F.3d 540, 561 (6th Cir. 2001) ("[e]ven absent a duty to speak, a party who discloses

12  material facts in connection with securities transactions 'assumes a duty to speak fully

13  and truthfully on those subjects"); *Rubin v. Schottenstein, Zox & Dunn*, 143 F.3d 263,

14  268 (6th Cir. 1998); *see also Rubinstein v. Collins*, 20 F.3d 160, 170 (6th Cir. 1994) ("a

15  duty to speak the full truth arises when a Defendant undertakes a duty to say anything").

16      The Program Review Report that was received by and known to the Defendants

17  prior to the advent of the Class Period is indisputably adverse, both in tone and content,

18  and directly concerns a key issue of regulatory compliance related to Title IV funding,

19  which is vital to Apollo's operations and profitability. The very fact that such a Report

20  issued out of the powerful regulator of Apollo's business — the Department of

21  Education — is a material event. It cannot credibly be disputed that when viewed

22  objectively, the adverse contents and findings of the Program Review Report would

23  have been considered by a reasonable investor as altering the "total mix" of information

24  made available regarding Apollo and would have significance with regard to his or her

25  investment deliberations. Reasonable minds simply cannot differ as to the materiality of

26  this adverse event and information when Defendants spoke. Accordingly, having chosen

27  to speak, the adverse Program Review Report was required to have been fully disclosed

28  by Apollo in order to make Defendants' communications to the market about the

2

Program Review, its status, and governmental review of Apollo's compliance with related Title IV regulations not false and misleading.

It cannot be genuinely disputed that the Defendants violated their solemn duty to speak the whole truth when addressing the investment community and failed to timely or adequately provide accurate and complete information to investors so that they may see the Company "through the eyes of management," which failure rendered Defendants' statements false and misleading. *In re Caterpillar, Inc.*, SEC release No. 30532, 1992 SEC LEXIS 786, at *15 (Mar. 31, 1992). Indeed, the falsity and materiality of Defendants' Class Period statements, and the fact that they were rendered with scienter — here, actual knowledge — are incontrovertible and appropriate for summary adjudication in favor of Plaintiffs and the Class.

## II.    STATEMENT OF UNDISPUTED FACTS

The undisputed facts upon which Lead Plaintiff bases this motion are fully stated in the accompanying Lead Plaintiff's Statement of Undisputed Facts in Support of Motion for Partial Summary Adjudication ("LPSUF"). The following is an overview for the convenience of the Court.

Apollo is a for-profit educational institution that describes itself as a provider of higher education to working adults. The University of Phoenix ("UOP") is a wholly owned subsidiary of Apollo which, at all times relevant, accounted for approximately 95% of Apollo's revenue. LPSUF ¶7. Approximately 60% of UOP's revenue is derived from federal financial aid programs administered by Apollo pursuant to Title IV of the Higher Education Act. LPSUF ¶8. Eligibility to grant student loans pursuant to Title IV subjects Apollo to extensive regulation by the Department of Education. Indeed, Apollo's success was and continues to be highly dependant upon its compliance with Title IV regulations.[1]

---

[1]    Apollo's Form 10-Q filed with the Securities and Exchange Commission ("SEC") on July 15, 2004, states, in pertinent part:

> Our future success is highly dependant on our ability to obtain, maintain or renew required regulatory approvals, accreditation or state

3

1   On August 14, 2003, the DOE gave written notice to Apollo that it intended to
2   commence a Program Review of UOP's policies and procedures relating to compliance
3   with Title IV. LPSUF ¶13. The DOE Program Review commenced on August 18, 2003
4   and encompassed witness interviews and site inspections at several UOP campuses in
5   Northern California and Phoenix, Arizona, including Apollo's online division.[2] LPSUF
6   ¶¶14-16.  The Program Review of Apollo was conducted by numerous "reviewers"
7   employed by the Department of Education, headed by the DOE's Donna Wittman, an
8   Institutional Review Specialist in the DOE's Southwest Case Management Division.

9   On February 5, 2004, the DOE issued a detailed, 45 page report entitled "Program
10  Review Report" with a coversheet on DOE letterhead that included many adverse
11  findings and conclusions to the effect that Apollo's subsidiary, UOP, had violated the
12  Higher Educations Act's prohibition on incentive compensation to recruiters.  LPSUF
13  ¶¶17-20. These recruiters, also referred to as enrollment counselors, were relied upon by
14  UOP to secure new student enrollees whose tuition revenue was vitally important.

15  The Program Review Report cover sheet, included the following statement:

16  This report contains a ***serious finding*** regarding the school's substantial
    ***breach of its fiduciary duty;*** specifically that the University of Phoenix
17  (UOP) ***systemically engages in actions designed to mislead the
    Department of Education and to evade detection of its improper
18  incentive compensation system for those involved in recruiting
    activities.*** The ***finding of noncompliance*** is referenced to the applicable
19  regulations, and specifies the action required to comply with the
    regulations and statutes. (Emphasis added).
20
    Among its findings, the text of the Program Review Report noted that UOP:
21
22  •   hires its recruiters with the promise of lucrative ***compensation
        for success in securing enrollments***;
23
24  authorizations.  We are subject to extensive private, federal and state
    regulation.  The Higher Education Act of 1965, as amended, and the
25  related regulations govern all higher education institutions participating
    in Title IV Funds.

26  LPSUF ¶5, *See also* LPSUF ¶¶4-12 regarding the importance of the regulator, Apollo's
27  relationship with the regulator and regulatory compliance.

    [2]   By 2004, Apollo's UOP Online Division accounted for approximately half of
28  UOP's total enrollments. LPSUF ¶9.

    4

- maintains a recruiter evaluation and salary system that provides *incentive payments based both directly and indirectly on success in securing enrollments*; and

- systematically and *intentionally operates in a duplicitous manner* so as to *violate* the *Department's prohibition against incentive compensation while evading detection.* (Emphasis added.)

The Program Review Report clearly expressed, as part of its findings, that UOP's compensation of its enrollment counselors violated the federal ban on incentive compensation because, *inter alia*, enrollment counselors were receiving salary increases based "*solely*" on the number of students they enrolled. LPSUF ¶20. In addition, among other things, the Program Review Report concluded that:

> The action of *UOP* and the *system* it has established *cultivates and maintains a corporate culture in defiance of UOP's fiduciary duty.* UOP has *created an environment that puts the strong motivation of individual gain against its fiduciary duty to the Department.* It is one that *flaunts* the Department's *regulations and the prohibition against incentive compensation based on enrollments.* (emphasis added).

Both the text of the Program Review Report and its cover sheet included a call for corrective action by Apollo. LPSUF ¶20.

Almost immediately after receiving the adverse Program Review Report, Apollo's Chief Executive Officer, Todd Nelson, with assistance from counsel, dashed off a letter dated February 9, 2004 to then-Secretary of Education, Rod Paige, objecting to the "central premise of the report... [that] the UOP compensation system is based 'solely' on enrollments, in violation of the Department's controlling regulations" and demanding that the Report be retracted. In the letter, Nelson assured Secretary Paige that should the Program Review Report's findings be accurate, Apollo would "alter our compensation system to bring it into compliance and negotiate in good faith with the Department over the consequences of our non-compliance." LPSUF ¶42. CEO Nelson further stated that "*it is imperative that the Department take all appropriate actions to ensure that the Report not be publicly disclosed*, whether by release, FOIA, or leak," and acknowledged

1   Apollo's recognition that the "*release of the Report would significantly, [and]*

2   *irreparably... damage... thousands of... shareholders.*" LPSUF ¶42.[3]

3       Internally, Nelson and Apollo's Chief Financial Officer, Kenda Gonzales,

4   believed that the disclosure of the Program Review Report would adversely impact the

5   stock price of Apollo securities.  LPSUF ¶¶45-46.  In fact, the existence and contents of

6   the Program Review Report was internally acknowledged by Apollo to have constituted

7   material, non-public, adverse information by virtue of the fact that the *trading window*

8   within which Apollo insiders could trade Apollo securities *remained closed*, at the

9   direction of CFO Gonzales, from the receipt of the Program Review Report, pending

10   resolution with the Department of Education.  LPSUF ¶41.

11       On February 11, 2004, counsel for the Defendants circulated a draft press release

12   that acknowledged the existence of the Report and noted that the Report was "critical of

13   some of the Company's business practices."  LPSUF ¶44.  Apollo's counsel also drafted

14   and circulated "talking points" that provided suggested answers to questions such as

15   "[w]hy is the Company disclosing this information at this time?" and acknowledging that

16   Apollo might face a "fine" as a result of the Program Review.  LPSUF ¶44.  But, the

17   press release was not issued and the Program Review Report remained concealed from

18   investors.

19       On February 25, 2004, Defendants Gonzales and Nelson internally circulated a

20   draft press release announcing the receipt of a Report "critical of some of the Company's

21   compensation practices as they are applied to enrollment counselors" and scheduling a

22   conference call with analysts to discuss the Program Review Report and its findings.

23   LPSUF ¶65.  But this press release was not issued and the adverse Report remained

24   hidden from investors.

25

[3]     In addition to disclosing the Program Review Report to outside counsel and
26  authoring the February 9, 2004 letter to Secretary of Education Rod Paige, Defendant
Nelson disclosed the existence and contents of the DOE Program Review Report to
27  Apollo's board member and largest individual shareholder, John Sperling, within days of
receiving the Program Review Report and, within weeks thereafter disclosed the
28  existence and contents of the DOE Program Review Report to Apollo's Board of
Directors.  LPSUF ¶43.

6

1    On March 1, 2004, Defendant Nelson wrote to DOE Institutional Review

2    Specialist Wittman, repeating his demand for a retraction of the Report, the disclosure of

3    which he again acknowledged would cause "great harm" to "shareholders."   Nelson

4    made further assurances that Apollo would institute changes to its compensation systems

5    and take corrective action as needed to satisfy the DOE.  LPSUF ¶46.

6    In March 2004, another draft press release was being internally circulated within

7    Apollo, stating that Apollo was disclosing the existence of the Program Review Report

8    because "...given the events in the education sector of the last few months we are

9    sensitive to investor concerns."  LPSUF ¶51.  Yet, despite Defendants' "sensitivity to

10    investor concerns," their belief that disclosure of the Report would have had an adverse

11    impact on the stock price, the fact that they shut the trading window from the issuance of

12    the Report pending resolution with the DOE, and their recognition of the importance of

13    the issue of regulatory compliance and of the DOE to Apollo's business, Defendants did

14    not issue this press release.  Instead, they continued to conceal the adverse Program

15    Review Report when choosing to speak to the market about the DOE Program Review,

16    its status, or the issue of compliance with the regulatory ban on incentive compensation,

17    throughout the Class Period.[4]

18    Indeed, Defendants actively concealed the existence and contents of the adverse

19    Program Review Report even when directly confronted by an analyst who inquired on a

20    March 12, 2004 conference call:

21           Todd..., do you have any sort of timetable when you think the program
22           review will be completed or when *any* type of report will be issued
              (emphasis added).

23

24

25

---

[4]     Nelson's February 9, 2004 and March 1, 2004 letters to the DOE and deposition
26    admissions of both he and Gonzales indisputably demonstrate the materiality of the
      existence of the adverse Program Review Report.  The fact that the Program Review
27    Report constituted a material adverse event and information is also demonstrated by the
      fact that Apollo repeatedly asked the DOE to prevent or abstain from any public
28    disclosure of the Report.  LPSUF ¶¶42, 45-46.

7

1   To this question, CEO Nelson gave an evasive response by stating:  "Well, again you

2   know, its tough to say...."  LPSUF at ¶70.[5]

3        Defendants continued to actively conceal the adverse Program Review Report

4   regarding UOP from investors in an April 13, 2004 Form 10-Q filed with the SEC,

5   discussing "assertions" by the Office of Inspector General ("OIG") of violations of the

6   ban on incentive compensation by Apollo's very small subsidiary, IPD, which accounted

7   for just 5% of Apollo revenue.  LPSUF ¶¶79-80.  Thereafter, on June 24, 2004, Nelson

8   proclaimed that the Program Review was going "*very smoothly*," that Apollo

9   represented a good buying opportunity, that everything looks "*great*" and that "'*nothing'*

10  *in the data that we produced will cause any problems" for Apollo*.  LPSUF ¶83.

11  Nelson also claimed that Apollo had been assured by the DOE that its *Program Review*

12  *was "routine*," adding that "it *doesn't necessarily have to be a negative thing*" — all

13  false statements that were belied and contradicted by the existing and highly adverse

14  Program Review Report known to all Defendants.  LPSUF ¶¶18, 21.

15       On August 19, 2004, DOE counsel informed Apollo that a) it maintained the

16  Program Review Report's findings regarding Apollo's violation of the ban on incentive

17  compensation of its enrollment counselors; b) a potential maximum fine exposure could

18  be as high as approximately *$900 million*; and c) the DOE proposed a fine payment of

19  about $81 million–$27,500 per violation (the DOE's maximum per violation fine

20  authority) multiplied by the sum of the number of enrollment counselors who attended

21  "Sperling Club" events (240) and the number of enrollment counselors who the DOE

22  had determined had been illegally compensated (2,728), to resolve the Program Review

23  at that time.  LPSUF ¶¶96-98.  The DOE's aggressive position of August 19, 2004

24  caused Apollo to consider taking their problem to the "White House."  LPSUF ¶95.

25  Nonetheless, on August 25, 2004, when another market analyst asked Nelson during an

26

27  ---
    [5]     Nelson concealed the existence and contents of the Report on the March 12, 2004 conference call about the DOE Program Review and related matters despite having

28  affirmatively represented to the market on February 27, 2004 that the government declined to intervene against Apollo in an earlier *qui tam* case concerning alleged non-compliance with the federal ban on incentive compensation for recruiters.  LPSUF ¶63.

                                                                          8

1    Apollo investor conference call whether he could "give us a little bit of color around the

2    current status of the Program Review," Defendants once again hid the existence and

3    contents of the Program Review Report and failed to disclose the adverse events related

4    to the DOE's aggressive position that had occurred just days earlier on August 19, 2004.

5    LPSUF ¶94.

6          Even on September 7, 2004, upon disclosing that the Company agreed to pay the

7    DOE $9.8 million in order to settle the Program Review, Apollo merely revealed having

8    previously received an "interim report" with a "negative tone."  LPSUF ¶106.  In so

9    doing, Defendants again failed to make a full or adequate disclosure that could enable

10   the market to immediately and truly understand and appreciate the full scope, truth and

11   consequences of what had occurred.  Defendants failed to disclose the investment risks

12   going forward,[6] including the full scope and nature of Apollo's changes to its

13   compensation plan and corrective action that followed in the wake of the receipt of the

14   DOE Program Review Report.[7]

15         At bottom, the adverse Program Review Report was not timely, adequately or

16   fully disclosed, despite Defendants' duty to do so when speaking to the market so as not

17   to make their statements about the Program Review and its status, or the related issue of

18   Apollo's compliance with the federal ban on incentive compensation, false and

19   misleading.

20

21

22

23

---

24   [6]      Rather than make a full disclosure at any time, and consistent with the pattern of
     deception, the Defendants actually "bundled" the disclosure of the $9.8 million
25   settlement with very positive news about Apollo's expansion into the potentially
     lucrative market of new students in Mexico, thereby giving the news a positive spin, as
26   discussed in Part III F below.

27   [7]      Nelson commented that Apollo changed its compensation plan to make it more
     transparent when, in truth, there were a host of corrective actions taken or planned and
     significant changes to Apollo's enrollment counselor compensation system that were
28   instituted effective June 1, 2004, following receipt of the Program Review Report.
     LPSUF ¶¶54-61, 106.

9

## III.    ARGUMENT

### A.    Standards for Partial Summary Adjudication

Rule 56 of the Federal Rules of Civil Procedure plainly states that a plaintiff may "move with or without supporting affidavits for a summary judgment in the party's favor upon all [of a claim] or any part thereof." Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "there is no genuine issue as to any material fact" and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56 (c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).[8]

Importantly, courts have granted ***partial summary judgment*** where the effect is ***to streamline the issues for trial.  See Powell v. Radkins***, 506 F.2d 763 (5th Cir. 1975); *Associated Hardware Supply Corp. v. Big Wheel Distrib. Co.*, 355 F.2d 114 (3rd Cir. 1965); *Blackford v. Action Prod. Co., Inc.*, 92 F.R.D. 79 (D. Mo. 1981); *Velsicol Corp. v. Hyman*, 103 F. Supp. 363 (D. Colo. 1951); *Gadsden v. Fripp*, 330 F.2d 545 (4th Cir. 1964) (summary judgment as to a portion of a claim permitted).

The Advisory Committee Notes to the 1945 Amendment of the Rule explains:

> The partial summary judgment is merely a pre-trial adjudication that certain issues shall be deemed established for the trial of the case.  This adjudication...serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact.

In addition, based on the plain language of Rule 56(d), partial summary judgment that establishes the existence or non-existence of certain facts may be granted even

---

[8]    Once the moving party meets its initial burden of showing that there is no genuine issue of fact, the non-moving party must set forth specific facts showing that there is a genuine issue of fact for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 256. While courts are not to make credibility determinations or weigh conflicting evidence, the non-moving party cannot defeat summary judgment by merely demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986).  The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient. *See Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) (citing *Anderson*, 477 U.S. at 252).  Rather, the non-moving party must "go beyond the pleadings and by their own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate specific facts showing that there is a genuine issue for trial." *Celotex v. Catrett*, 477 U.S. 317, 321 (1986) (quoting Fed. R. Civ. P. 56(e)).

10

1   though no actual judgment is entered on the claim. *See* 11-56 Moore's Federal Practice
2   — Civil Section 56.40 (2005).

3       The Ninth Circuit is in accord. *See Robi v. Five Platters, Inc.*, 918 F.2d 1439 (9th
4   Cir. 1990) (summary adjudication of issues to establish claim or issue preclusion
5   pursuant to Fed. R. Civ. P. 56(c) is proper); *see also William Hablinski Architecture v.*
6   *Amir Constr., Inc.*, Case No. CV-03-6365 CAS(PJWX), 2004 U.S. Dist. LEXIS 27659,
7   *8-9 (C.D. Cal. April 26, 2004) (deciding motion for a partial summary judgment on
8   limited issues); *see also Siam v. Potter*, Case No. C04-129MHP, 2005 U.S. Dist. LEXIS
9   11893, *20 (N.D. Cal. May 16, 2005) (reconfirming that a "proper interpretation of Rule
10  56(d) allows summary adjudication on individual parts of claims brought against a
11  party") (citing *Bushnell v. Vis Corp.*, Case No.C-95-4256 MHP, 1996 U.S. Dist. LEXIS
12  22572, 1996 WL 506914, *11 (N.D. Cal. Aug. 29, 1996).

13      **B.    Legal Standards Respecting a Securities Fraud Claim**

14      Section 10(b) of the Securities Exchange Act of 1934 and Rule 10(b)-5
15  promulgated thereunder make it unlawful to "make any untrue statement of a material
16  fact or to omit to state a material fact necessary in order to make the statements made, in
17  light of the circumstances under which they are made, not misleading..." 17 C.F.R.
18  Section 240.10(b)-5.  To prove a violation of Section 10(b) and Rule 10b-5 thereunder,
19  Lead Plaintiff must show "(1) a misrepresentation or omission (2) of material fact (3)
20  made with scienter (4) on which the plaintiff justifiably relied (5) proximately causing
21  the alleged loss." *Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir. 1999).  Regarding
22  scienter, plaintiff must show that a defendant knowingly or, at a minimum, recklessly
23  made a material misstatement or omission. *See* 17 C.F.R. § 240.10b-5(b); *Howard v.*
24  *Everex Sys. Inc.*, 228 F.3d 1057, 1063 (9th Cir. 2000).  Here, it is appropriate to
25  summarily adjudicate the issues of falsity, materiality and scienter with respect to
26  Defendants' Class Period statements, as more fully discussed below.

27
28

11

## C. The Program Review Report Constituted Highly Material Adverse Information

In the context of claims asserted under the federal securities laws, a statement or omission is material if there is a substantial likelihood that the misrepresentation "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" regarding Apollo. *Basic*, 485 U.S. at 231-32 (quoting *TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). In a Section 10(b) action, "courts assess materiality by examining a fact's potential to influence an investor's particular decision — the decision to buy or sell a security." *See United States v. Berger*, 473 F.3d 1080, 1100 (9th Cir. 2007) (citations omitted); *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005) (citing *Basic*, 485 U.S. at 231-32).[9] A representation or omission is material if it would have been significant to the deliberations of a "reasonable shareholder." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). Materiality is an objective test.[10]

The analysis of materiality is ***not*** an exercise by hindsight. To the contrary, materiality must be determined based on "whether the 'reasonable investor' would have considered the omitted information significant ***at the time***." *Basic*, 485 U.S. 224, 232 (1988) (emphasis added). *See also Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 165 (2nd Cir. 2000) (" Materiality is determined in light of the circumstances existing at the time the alleged misstatement occurred."); *Pommer v. Medtest Corp.*, 961 F.2d 620, 625 (7th Cir. 1992) ("....materiality, must be assessed at the time the statements are made, and not in the light of hindsight.").

---

[9]    The SEC has emphasized that "[i]nvestors have legitimate expectations that public company's are making and will continue to make, prompt disclosure of significant corporate developments." *In re Sharon Steel Corp.*, SEC Release Number 18271, 1981 SEC LEXIS 292, at *13 (Nov. 19, 1981).

[10]    It is not necessary to prove that Defendants knew or believed that the information or fact misstated or omitted was material. Here, nevertheless, while the record establishes objective materiality, it also establishes that the Defendants clearly knew that the Program Review Report was an adverse event that investors would find significant. LPSUF ¶¶39-53, 65, 79-80.

12

1    While materiality is generally considered a mixed question of law and fact,

2  where, as here, the information that was misstated or omitted is "so obviously important

3  to an investor, that reasonable minds cannot differ on the question of materiality," the

4  question of materiality can be resolved by the court as a matter of law.  *TSC Indus.*, 426

5  U.S. at 450, *United States v. Bingham*, 992 F.2d 975, 977 (9th Cir. 1993); *Provenz v.*

6  *Miller*, 102 F.3d 1478, 1489 (9th Cir. 1996), *see also SEC v. Alliance Leasing Corp.*,

7  Case No. 98-CV-1810, 2000 U.S. Dist. LEXIS 5227, *33-34 (S.D. Cal. Mar. 17, 2000)

8  (finding, on a motion for summary judgment, the omission of information from a

9  securities offering material).

10    It cannot be genuinely disputed but that the existence and contents of the highly

11  adverse Program Review Report constituted material information from the objective

12  perspective of a reasonable investor.  The existence and contents of the adverse Program

13  Review Report significantly altered the "total mix" of information regarding Apollo and

14  had the potential to influence a reasonable investor when making an investment decision

15  regarding Apollo.   Indeed, anyone placing himself or herself in the shoes of a

16  prospective Apollo investor considering the purchase of Apollo securities would have

17  viewed the existing adverse Program Review Report with considerable interest and

18  concern.[11]  Even if Defendants do contest materiality, it remains an incontrovertible fact

19  that this important event and information was viewed as material at the time by

20  Defendants and that its materiality has been established, without genuine dispute, by the

21  evidentiary record.  LPSUF ¶¶39 – 53, 65, 79-80.

22    Nelson and Gonzales both recognized and acknowledged the significance of the

23  Program Review Report to investors by conceding that its disclosure would have

24  adversely impacted the trading price of Apollo stock at that time.  LPSUF ¶¶45-46.  In

25  addition, the *"trading window" for Apollo insiders was closed from Defendants'*

26

27  [11]    Lead Plaintiff's outside investment manager testified that had the Program
Review Report been disclosed, it would have had significance in the investment decision
28  regarding the purchase of Apollo stock.  LPSUF ¶¶49-50.

1   *receipt of the Report pending resolution with the DOE.*  LPSUF ¶41.  This is a *clear*

2   *acknowledgment of the materiality* of the adverse Report concealed by Defendants.

3   Further, recognizing its materiality, press releases and analyst talking points were

4   drafted by Apollo and/or its counsel due to "concerns" of investors, though they at all

5   times remained unpublished.  LPSUF ¶¶44, 51, 65.  The Program Review Report was

6   considered a serious matter, LPSUF ¶47, "devastating" LPSUF ¶48, and was attended to

7   by a legion of law firms and lawyers, who worked to reach resolution with the DOE at

8   the same time that Apollo demanded both its retraction and that the DOE not publicly

9   disclose the Report under FOIA.[12]

10      Most importantly, the Defendants chose to speak about the Program Review, it

11  status, the investigation of Apollo's compensation system and changes to its

12  compensation plan — *all* subject matters that Apollo determined were important to

13  discuss with investors and that the investment community considered important as

14  reflected by Apollo's public dialogue and the inquiries of market analysts.  LPSUF ¶¶

15  63-113.  Hence, these subject matters were themselves material, as Defendants cannot

16  genuinely deny.  Nor can they genuinely or reasonably deny the importance of the

17  subject matter of the Report, especially given the significant issue of regulatory

18  compliance, the power of the DOE, and the importance of Title IV funding to Apollo's

19  business.  LPSUF ¶¶4-12.  Once Defendants elected to discuss the Program Review and

20  its status and the issue of Apollo's compliance with the Title IV related federal ban on

21  incentive compensation in their dialogue with the investment community, they were duty

22  bound and required by law to speak the whole truth about these important matters, as

23  more fully discussed below.

24

---

25  [12]     Chairman of Apollo's Board and founder, John Sperling, Apollo's largest inside
    shareholder, is not bashful about expressing his disrespect and contempt for the Title IV
26  related federal law and regulations banning incentive compensation based on student
    enrollment numbers.  He unabashedly acknowledges that his antagonistic views towards
27  the ban on incentive compensation were known *within* the Company.  LPSUF ¶53.
    Sperling conceded that had the Program Review Report been released, "in this case it's
28  pretty clear that there's going to be a …potentially material impact…all you have to do is
    read the first sentence and the cover letter."  LPSUF ¶53.

14

**D.**   **Defendants Duty to Make Timely and Full Disclosure of Material Adverse Information**

The Supreme Court has repeatedly stated that the fundamental philosophy underlying the federal securities laws is one of *full and fair disclosure*. In *Basic*, the Court held:

> This Court repeatedly has described the "fundamental purpose" of the Act as implementing a "philosophy of *full disclosure*."

485 U.S. at 230 (emphasis added) (quoting *Santa Fe Indus., Inc.*, 430 U.S. at 477-78). "Rule 10(b)-5 imposes a duty to disclose material facts that are necessary to make disclosed statements, whether mandatory or volunteered, not misleading." *Hanon*, 976 F.2d at, 504.[13]

Simply put, when Defendants chose to speak to the market about the Program Review and related topics, they were required to speak the truth — the *whole truth* — in their dialogue with the investment community. *Basic*, 45 U.S. at 230. This, in turn, obligated them to fully disclose the existence and contents of the Program Review Report, even if they did not agree with it or intended to ultimately reach a resolution with the DOE. As this Court has previously observed:

> [E]ven if defendants were correct in their assertion that they had no duty to disclose the Report when it was issued, the Court finds that at the point defendants chose to speak about the DOE investigation, they had a duty to speak fully and truthfully and such full disclosure would have included the negative DOE Report.

*In re Apollo Group Inc. Sec. Litig.*, 395 F. Supp. 2d 906, *919-20 (D. Az. 2005).[14]

---

[13]   "[E]ven absent a duty to speak, a party who discloses material facts in connection with securities transactions '[a]ssumes a duty to speak fully and truthfully on those subjects.'" *Helwig v. Vencor, Inc.*, 251 F.3d at, 561 (quoting *Rubin v. Shottenstein*, 143 F.3d 263, 268 (6th Cir. 1988); *see also Rubenstein*, 20 F.3d at 170 ("...a duty to speak the full truth arises when a defendant undertakes the duty to say anything").

[14]   Citing *Helwig v. Vencor, Inc.*, 251 F.3d at 561. ("Even absent a duty to speak, a party who discloses material facts in connection with securities transactions assumes a duty to speak fully and truthfully on those subjects."). Whether the defendants believed the Program Review Report was accurate or not does not alter their duty to speak the whole truth to the investment community.

1   Indeed, the securities laws require disclosure of information that would permit an

2   investor to appreciate the risks associated with potential future sanctions that might

3   arise.  *See In re Indep. Energy Holdings PLC Sec. Litig.,* 154 F. Supp. 2d 741, 760

4   (S.D.N.Y. 2001).  The Program Review Report, with its serious adverse findings posing

5   potential adverse consequences to Apollo, and call for corrective action, was required to

6   be disclosed when the Company spoke about the material issues of regulatory

7   compliance, the Program Review and the status thereof, and the government's review of

8   Apollo's incentive compensation practices.  When Defendants were directly asked about

9   the timing of the issuance of *any* report from the Program Review, they were duty bound

10   to speak candidly and truthfully, even if the DOE had not yet reached a final

11   determination about potential sanctions and irrespective of whether any such final

12   determination was a contingency.  *Grossman v. Waste Mgmt. Co.,* No. 83 C 2167, 1983

13   WL 1370 (N.D. Ill. Sept. 9, 1983).[15]

14   In *Klein v. PDG Remediation, Inc.,* 937 F. Supp. 323 (S.D.N.Y. 1996), the Court

15   found that the *existence* of a *government report regarding a program that was a large*

16   *source of Company revenue was material to investors,* and its *concealment* from the

17   investment community was *deemed actionable.*  Similarly, in *America We*st, the Ninth

18   Circuit held that a reasonable investor would find significant a *possible* sanction

19   stemming from a federal aviation administration investigation, and that such information

20   would "significantly alter the total mix 'of information made available.'"   No. 84

21   Employer–*Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.,* 320

---

[15]   Importantly, on April 13, 2004, Apollo disclosed an adverse "*assertion*" by the OIG of a violation of the ban on incentive compensation related to a small Apollo subsidiary–IPD.  This disclosure about IPD was made before a negotiated resolution.  It is hypocritical for Defendants to contend, on the one hand, that they were not required to disclose the Program Review Report, which they clearly knew about, regarding UOP operations accounting for 95% of Apollo's revenues, while, on the other hand, on April 13, 2004, they disclosed that "the OIG *asserted* that the client institutions violated the statutory prohibition on the use of incentive payments for recruiting by paying IPD a percentage of tuition revenue."  This conclusion is bolstered when considering that IPD represented less than 5% of Apollo's revenues and defendants had made clear that "IPD is currently in active negotiations with the U.S. Department of Education to eliminate or settle the issues raised in the audit reports."  LPSUF ¶79.

16

1  F.3d 930, 939 (9th Cir. 2003) (citing *TSC Indus.*, 426 U.S. at 449). Thus, the existence

2  and findings of the concealed DOE report here would "have assumed actual significance

3  in the deliberations of the reasonable shareholder." *TCS Indus.*, 426 U.S. at 449.

4        Defendants' concealment of the Program Review Report asserting statutory

5  violations constituted an omission of information that was necessary to make their

6  statements not misleading. A violation of law that is substantially likely to be significant

7  to a reasonable investor is a fact that must be disclosed, **"even though the legal**

8  **consequence of the violation may be a contingency"**. *In re Craftmatic Sec. Litig.*, 890

9  F.2d. 628, 640 n.16 (3rd. Cir. 1989) (emphasis added); *see also Roeder v. Alpha Indus.*

10  *Inc.*, 814 F.2d. 22, 25 n.1 (1st Cir. 1987). There is no genuine dispute that the question

11  of whether Apollo was complying with federal law and regulations relative to the ban on

12  incentive compensation of its enrollment counselors was significant to a reasonable

13  investor.  Any contention that Apollo either did not know what the ultimate

14  consequences would be to the Company, or that it believed those consequences would be

15  immaterial, simply does not change the fact that the Program Review Report would have

16  been viewed by investors as significant given the risks of future consequences,

17  corrective action as demanded by the Department of Education, and its reflection on the

18  reputation and integrity of management, in addition to the time consuming burden on

19  management of dealing with the Program Review Report in an effort to resolve the

20  dispute with the DOE.

21        Defendants' contention that a disclosure of the adverse event may harm the

22  Company's then-current shareholders who purchased prior to the disclosure or that

23  management had a reason to hide the adverse material information is preposterous. As

24  the First Circuit Court of Appeals ruled in *Roeder*:

25          The securities laws do not operate under the assumption that material
        information need not be disclosed if management has reason to

26          suppress it. Investors may want to know about illegal activity for the
        same reason management will be reluctant to reveal it: it threatens to

27          damage the corporation severely. Excepting from the disclosure rules
        information management has reason to hide would eviscerate the

28          protection for investors embodied in the securities law.

17

1   *Roeder*, 814 F.2d at 25.  At all times relevant hereto, Defendants were duty bound to

2   speak truthfully and disclose the existence and contents of the Program Review Report.

3   They failed to do so.

4   **E.    Defendants Failure to Speak the Whole Truth Rendered Their Class Period Statements Indisputably False and Misleading**

5

6   **1.    February 27, 2004 Press Release**

7   On February 27, 2004, Apollo issued a press release announcing that a *qui tam*

8   lawsuit brought against the Company by two employees had been dismissed.  The action

9   alleged that Apollo improperly compensated its recruitment officers.  In that regard, the

10  Company stated, in relevant part, as follows:

11      Apollo Group Inc. learned today that on February 19, 2004, the U.S.
        District Court for the Eastern District of California granted our motion

12      to dismiss the previously disclosed *qui tam* action.

13      The *qui tam* action was brought by two of our current employees on
        behalf of themselves and the federal government and alleged that we

14      improperly compensate our employees who are involved in the
        recruitment of new students.  The government declined to intervene in

15      the lawsuit.

16      ...Although we had expected the dismissal of the *qui tam* lawsuit, we
        were very pleased to obtain this ruling.

17

18  LPSUF¶63.

19      Apollo's February 27, 2004 press release announcing the dismissal of the *qui tam*

20  lawsuit was deceptive and misleading.  While it was true that a *qui tam* lawsuit brought

21  by two employees of UOP had been dismissed, in fact, the dismissal was based solely on

22  the grounds that the False Claims Act violation asserted therein could not be brought

23  because that court was convinced that such a claim requires that a false "certification of

24  compliance" be filed.  LPSUF ¶66.  The DOE does not require such a certification.

25  (Citation).  Hence, the dismissal was not an indication whatsoever that the *qui tam*

26  relaters' claims of improper compensation of enrollment counselors lacked merit, as

27  Defendants' Class Period statements implied.

28

18

1   Defendants' statement that the government declined to intervene in the *qui tam*

2   suit, while technically accurate, was also misleading.  As Defendants already knew, the

3   DOE — an agency of the U.S. government — had conducted an investigation, pursuant

4   to a Program Review, relative to UOP employee whistleblower complaints that UOP

5   was violating the law, including the ban on incentive compensation and had already

6   issued an adverse Program Review Report, as discussed above.[16]  LPSUF ¶¶17-20, 66.

7   ## 2.   March 12, 2004 Analyst Conference Call

8   On March 12, 2004, Apollo, via defendants Nelson and Gonzales, held a

9   conference call with analysts to discuss its second quarter of fiscal 2004 results.  LPSUF

10  ¶70.  During the call, defendant Nelson coyly discussed the DOE Program Review, a

11  material event, without disclosing the serious tone and nature of the review.   *Id.*

12  Defendants concealed the fact that the DOE had already issued its Program Review

13  Report more than a month earlier, on February 5, 2004, with its adverse findings and

14  conclusions resulting from its Program Review.  LPSUF ¶¶17-20.  Defendants concealed

15  the contents of the Report setting forth that Apollo's UOP was continuously and

16  systemically violating the ban on incentive compensation respecting student enrollments,

17  among other unlawful and unethical practices.   LPSUF ¶¶17-20.   Instead, Nelson

18  downplayed and minimized the Program Review itself while concealing the Report and

19  its adverse findings, speaking only generally in his discussions with analysts, who were

20  eager to know more about the review.

21

22

---

23  [16]    On September 5, 2006 the 9th Circuit Court of Appeals reversed the dismissal of
the *qui tam* action. *See United States v. Univ. of Phoenix*, 461 F.3d 1166 (9th Cir. 2006).
24  The Ninth Circuit's opinion contains an excellent discussion of the genesis of the ban on
incentive compensation of recruiters based on student enrollments. *Id.* at 1169 (citing S.
25  Rep. No. 102-58 at 8 (1991)) (identifying "abuses in federal student aid programs" and
noting testimony of contests for sales representatives to earn incentive awards for
26  enrolling the highest number of students); *see* H.R. Rep. No. 102-447 at 10, *reprinted in*
1992 U.S.C.C.A.N. 334, 343 (noting that the "new provisions include prohibiting the use
27  of commissions to sales persons and recruiters").   The 9th Circuit further provides an
excellent review of Title IV and the Higher Education Act of 1965's funding eligibility,
28  which is "explicitly conditioned, in three ways, on compliance with the incentive
compensation ban." *Id.* at 1175.

19

1    For example:

2    TODD NELSON:. . . The next area would be U.S. DOE approval. This
     area usually gets a lot of attention because of the visibility. Their
3    involvement usually comes in the form of a program review and
     (indiscernible) audit. These types of reviews are a normal part of doing
4    business and it is their responsibility to actually [sic] these types of
     reviews. Over the years, we have had many of these kind of reviews.
5    For example, as most of you know, we currently have an OIG audit
     involving IPD that has been ongoing for several years. We also have
6    an ongoing program review at The University of Phoenix.

7    Over the years, although these reviews are complex and time-
     consuming, they have never resulted in a material impact on Apollo.
8    Our experience with the process is that, first, there is a visit, then a
     preliminary draft – or preliminary report or a draft report is issued. It
9    has also been our experience that it is not unusual that these reports
     may contain some negative comments. Following the initial reports,
10   though, the institution then has an opportunity to research the issues in
     question and draft a response. This information is then considered by
11   the department, and a final report is issued. It is usually at this point
     that we realize if there is an issue and normally disclose that matter if it
12   involved any type of material consequences for the school.

13   GREG CAPELLI:...You mentioned the programming view (ph). How
     common is it, actually, for you to have a program review? I'm sure you
14   have had them, as you have mentioned, over the past 10 years. And
     then any more color on specifically what, in this case, we are looking
15   for?

16   TODD NELSON: Well, the bottom line is, in my history with the
     company, especially over the last 10 years, I don't know that there has
17   ever been a time when there hasn't been either a program review or an
     OIG audit going on. So it's a very common thing for us. . .And so
18   basically, I guess, an answer to your question, we have these things, I
     guess, happening on a regular basis. And I would say the good news is
19   our track record has shown that although during the process, I guess
     from our point of view, your first draft reports or your first indication
20   back from the initial visit is they usually have some questions. And, in
     some cases, a very negative reaction to things, in some cases, a very
21   positive reaction.

22   But the end result, which you have been able to see, has been very
     positive – I shouldn't say positive for us, but it has been immaterial to
23   us in a sense that these are things that are, again, interpretation of
     regulations versus any intent to do anything wrong.
24
     The types of things that I think are the hot button that they certainly
25   look at us, and I think with everybody in particular . . .The other area is
     incentive compensation. Again, that's an area that I think all of us have
26   been very interested in how they are interpreting that.

27   Unfortunately, again, you have got some period of time before and how
     those things are interpreted and what that actually means. The good
28   news from our point of view, is that as we have looked at this and
     looked very carefully at what we do, the types of things that we would

                                          20

1    be subject to would be saying, well, you need to change this.  There
     may be some sort of a nominal fine type thing, but short of that we are
2    very comfortable that – nothing would be material for us.  So we feel
     very good about that.
3
     LPSUF ¶70.
4        Nelson did not disclose the existing adverse Program Review Report despite a

5    direct analyst inquiry:

6        RICHARD CLOSE, ANALYST JEFFRIES:  Congratulations as well.
     Todd, maybe hitting on that last point, do you have any sort of
7    timetable when you think the program review will be completed or
     when *any* type of report will be issued?  [Emphasis supplied.]
8
     *Id.*
9    Nelson danced around that direct question with what was, at best, an evasive response

10   that he commenced by stating: "[w]ell, it's you know, again, tough to say...."

11       Certainly, the topic of a Program Review was important, as reflected by another

12   analyst inquiry and Nelson colloquy as follows:

13       KELLY FLYNN, ANALYST, UBS:  The questions relates to the
     program review, again.  I'm sorry to beat a dead horse here.  But I'm
14   hoping, Todd, you can just help to manage expectations a little bit more
     here.  How many have you had?  And then what are the circumstances
15   that can bring them about?  I know some are just regular, and
     sometimes some event brings them about.
16
     And then finally, what do you consider normal frequency, that we
17   should expect down the road?  If you could speak to that?

18       TODD NELSON: First off, as far as the amount, I can't really give you
     off the top of my head.  I would say approximately, probably-I don't
19   know, because they take several years to happen.  But I would say,
     probably in the neighborhood of a half dozen or so.
20
     As far as why – they can be brought about for a lot of different reasons.
21   We have found that the most frequent reason from our point or view
     would be – and this is when they come in, you ask them, is there reason
22   why you are here?  And typically, the normal response is no.  this is
     just a known review – you are a very large school.  You receive a lot of
23   Title IV dollars.  And this is part of the process....

24   *Id.*

25       Nelson's statements not only concealed the existence of the DOE Report, but they

26   created the misleading picture that nothing adverse had yet occurred, that no Program

27   Review Report had yet been rendered or adverse findings formally expressed in such a

28   Report, and that there was nothing out of the ordinary by virtue of the DOE's conducting

21

1  such a review.  This, of course, was a totally false portrayal of what had already

2  occurred.

3      As this Court has observed with regard to the falsity of the March 12, 2004

4  telephone conference with market analysts:

5      Defendant Nelson was asked direct questions about when *any type of*
       *report* might be issued and yet refused to disclose the fact that a report

6      had already been issued.  The Court rejects Defendants' argument that
       the report was essentially meaningless because UOP was given an

7      opportunity to respond.  Despite the direct questioning from analysts,
       Defendant Nelson spoke in generalities.

8  *Apollo*, 395 F. Supp at 42.  The evidence of record demonstrates that the Defendants

9  were aware of the Report and that it was knowingly concealed by them, as discussed

10  more fully in §II *infra*.  This is incontrovertible.

11      **3.     April 13, 2004 Form 10-Q**

12      On April 13, 2004, Apollo filed a Form 10-Q with the SEC executed by CEO

13  Nelson and CFO Gonzales disclosing that an OIG audit report asserted that IPD, a small

14  subsidiary of Apollo, had "violated the statutory prohibition on the use of incentive

15  payment for recruiting by paying IPD a percentage of tuition revenue."  LPSUF ¶79.

16  The Form 10-Q did not, however, disclose the existence or contents of the adverse

17  Program Review Report regarding UOP, which accounted for approximately 95% of

18  Apollo's revenue.  LPSUF ¶7.  Nor did it disclose the fact that corrective action was

19  required by the Program Review Report, or that the Company had responded or was

20  responding to the DOE's call for corrective action.  LPSUF ¶¶54-62.  The fact that

21  Apollo would choose to disclose an assertion by the OIG of IPD's alleged violation of

22  the ban on incentive compensation relative to its very small subsidiary IPD, before

23  resolution of that issue — a strong acknowledgement that Defendants recognized that

24  such information is material — without disclosing, as they already knew, that UOP

25  suffered from problems with the DOE relating to its own compensation system, rendered

26  the April 13, 2004 Form 10-Q false and misleading.

27

28

1    ### 4. June 24, 2004 Analyst Conference Call

2    On June 24, 2004, following a significant decline in the trading price of Apollo

3    securities after negative reports about two of Apollo's competitors, defendant Nelson

4    stated that the decline in Apollo's stock price presented a good buying opportunity.

5    When asked by an analyst about the Program Review, Nelson stated that it continued to

6    go "*very smoothly,*" that everything looked "*great,*" that the ***Program Review*** was a

7    ***normal course of business*** and that "***nothing [in] the data that we produced will create***

8    ***any problems for us.***"   LPSUF ¶83.   Nelson further stated that while disgruntled

9    employees could get an audience, and that this fact would have an impact on regulatory

10   scrutiny, in the case of the ongoing Program Review, Apollo had been assured by the

11   DOE that it was "*routine,*" adding that "***it doesn't necessarily have to be a negative***

12   ***thing.***" *Id.* These statements were patently false and misleading by virtue of the fact that

13   Defendants possessed and were aware of the adverse Program Review Report since

14   February 2004 and were working to secure its retraction and nondisclosure by the DOE,

15   while privately communicating to the DOE corrective actions, including those made to

16   Apollo's compensation plan in order to assuage that powerful regulator.   LPSUF ¶¶42,

17   46, 54-62.  Given the adverse language, findings, conclusions and tone of the Program

18   Review Report, and the DOE's rejection of Apollo's repeated efforts to secure its

19   retraction, Nelson's June 24, 2004 statements to the analyst, as noted above, were

20   knowingly false on their face.

21   There is simply no way that the Program Review could have been going "very

22   smoothly," was simply "routine," or did "not necessarily have to be a negative thing" in

23   light of the existence of the adverse Program Review Report.  Nelson clearly painted a

24   false picture to investors and the Defendants cannot possibly controvert the fact that they

25   knew of the adverse findings and conclusions of the Program Review Report of

26   February 5, 2004, when Nelson spoke to the market on June 24, 2004.

27

28

**5.     August 25, 2004 Analyst Conference Call**

On August 19, 2004 the DOE proposed a fine in the magnitude of approximately $81 million and confirmed the findings of the Program Review Report regarding salary and Sperling Club violations of the law.  LPSUF ¶¶95-98.  At that time, Defendants knew that the DOE was taking a hard line position, which was so troublesome to Apollo that it was considering going to the "White House." LPSUF ¶95.  Nonetheless, in their analyst conference call on August 25, 2004, Defendants continued to conceal from the market the existence and contents of the Program Review Report.  Defendants concealed the existence and contents of the Program Review Report even when one market analyst asked Nelson whether he could "give us a little bit of color around the current status of the Program Review." LPSUF ¶94.  Nelson's failure to disclose the adverse Program Review Report or the true nature and status of the Program Review, as known by Apollo management, rendered the statements of August 25, 2004 false and misleading, and painted a picture that was contrary to the facts known to Defendants at that time.

**6.     September 7, 2004 Analyst Conference Call**

On September 7, 2004, just after the Labor Day weekend, speaking about the DOE investigation of Apollo's compensation policy and Program Review, Defendant Nelson stated:

> The University of Phoenix Program Review...is ...centered around the same issue of incentive comp.... we then received an interim report, and we were surprised to see the negative tone of the report.

> We decided to settle this issue now rather than later for $9.8 million and put it behind us...

> Back in June, we introduced a new comp. plan that actually had been being worked on for about a year that is just more transparent.

> The old comp. plan was not that clear.  The new one is ... more transparent, I guess, for someone to come in and take a look at.

This was simply not a full, fair or complete disclosure of the Program Review Report and its adverse contents.  This was not full and fair disclosure as to the actual changes that were made to Apollo's compensation plan effective June 1, 2004, together with

24

1    other corrective action that Apollo represented to the DOE by letter dated March 19,

2    2004 had been or would be implemented, mindful that the Program Review Report

3    called for corrective action. LPSUF ¶¶54-62. Defendants downplayed the situation and

4    provided no real content or background with respect to their $9.8 million payment and

5    failed to disclose what the DOE had found and concluded from its Program Review, as

6    discussed in the Report.

7         In addition to falling well short of a full and adequate disclosure with regard to

8    adverse events and information, Defendants' September 7, 2004 conference call

9    statements were bundled with highly positive news of Apollo's expansion into the large

10   and potentially lucrative market of new students in Mexico.  The issue of Apollo's

11   incentive compensation and its investigation by the DOE now appeared behind the

12   Company — also positive. The contents of the DOE Program Review Report, the many

13   adverse conclusions and findings therein, and the risks to Apollo investors going

14   forward, would not begin to be publicly disclosed, analyzed and assessed until the period

15   of September 14 through 21, 2004, and then only because of disclosures by the media

16   and in addition, the rendering of reports on September 20, 2004 by a securities analyst.

17   Defendants never disclosed the contents of the Report.  Hence, even the September 7,

18   2004 statements were false and misleading by virtue of Defendants failure to make

19   accurate and complete disclosure of the truth.

20        **F.    Defendants' False Statements Were Made With the Requisite Scienter**

21        As previously discussed in Part III-B above, a plaintiff may satisfy the scienter

22   requirement of Section 10(b) by showing that the defendant made false and misleading

23   statements knowingly or, at a minimum, recklessly.  The PSLRA has not changed the

24   substantive elements of Section 10(b). *Howard v. Everex Sys. Inc.*, 228 F.3d 1057, 1063

25   (9th Cir. 2000).

26        The Supreme Court and Circuit Courts of Appeal have held that the requisite

27   proof of scienter under Section 10(b) encompasses actual knowledge of material facts

28

that have been misstated or omitted. As the Supreme Court ruled: "[t]he words 'manipulative or deceptive'...strongly suggest that §10(b) was intended to proscribe *knowing or intentional* misconduct." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197 (1976) (citations omitted) (emphasis added).   The Second Circuit explained in *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 45 (2d Cir. 1978) *cert. denied* 439 U.S. 1039 (1978), that:

> "[t]he term scienter is used by the Supreme Court to mean, *in the disjunctive*, 'knowing *or* intentional misconduct...' Use of the word 'knowing' implies conduct which is somewhat less directed and focused than 'intentional' activity which commonly is characterized by a specific mental state whose animus is to bring about a particular result...." (Emphasis added.)

As the Ninth Circuit has ruled: "[t]he issue is...whether [defendant] had 'actual knowledge' of a misrepresentation...." *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994); *see Gray v. First Winthrop Corp.*, 82 F.3d 877, 884 (9th Cir. 1996) (scienter requires either knowing or reckless conduct); *Nelson v. Serwold*, 576 F.2d 1332, 1337 (9th Cir. 1978) (Congress intended to reach knowing or reckless conduct). Scienter is not a matter of subjective belief as to the legality of one's actions but, rather, it is a mater of *awareness of underlying facts*. *SEC v. Falstaff Brewing Corp.*, 629 F.2d 62, 77 (D.C. Cir. 1980), *cert denied*, 449 U.S. 1012 (1980).

Here, unlike most securities cases, there can be no genuine dispute as to Defendants' scienter and Lead Plaintiff is not forced to rely on circumstantial evidence. The proof is direct that the Apollo Defendants — especially CEO Nelson — made a series of misstatements and omissions, as set forth above, with *actual knowledge* of the fact of the existence of the adverse Program Review Report and its findings and conclusions.   The Report and its contents directly contradicted Defendants' statements about the Program Review and its status, thereby rendering all Defendants' Class Period statements false and misleading.   While Defendants may contend that they believed the Report was erroneous, or that they felt they could have successfully resolved the situation with the DOE favorably, that does not change the fact that Defendants knew of

26

1   the adverse Report and knew that this Report and its findings and conclusions were
2   concealed when Nelson, as Apollo's CEO, falsely and misleadingly spoke about the
3   Program Review and related matters.   The existence and contents of the Program
4   Review Report were required to be disclosed during the Class Period in order to make
5   Defendants' statements not false and misleading.   Hence the existence of scienter — here
6   "actual knowledge" — is not genuinely capable of being disputed.

7   **IV.    CONCLUSION**

8       There are not many instances when summary adjudication of the false and
9   misleading nature of statements, materiality and scienter, are appropriate in a securities
10  case.  But this case presents one of those instances.  There simply can be no reasonable
11  dispute but that Defendants made false and misleading statements that were material
12  with actual knowledge that they were false and misleading.

13      It cannot be disputed that the Defendants were in possession of and had actual
14  knowledge of the Program Review Report, with its adverse findings and conclusions,
15  when Defendants chose to speak to the market on February 27, 2004, March 12, 2004,
16  April 13, 2004, June 24, 2004, August 25, 2004 and September 7, 2004, about the DOE
17  Program Review and its status in connection with Apollo's incentive compensation of its
18  recruiters.   It cannot be disputed that these statements were false and misleading.
19  Defendants themselves acknowledged throughout the Class Period the materiality of the
20  Program Review, the Program Review Report and the adverse findings and conclusions
21  of that Report.  Violating their solemn duty to make full disclosure when they spoke to
22  the market, the Defendants made a series of affirmatively false and misleading
23  ///
24  ///
25  ///
26  ///
27  ///
28  ///

27

1    statements and omissions about the DOE Program Review and its status.  Hence, it is

2    appropriate that summary adjudication be granted against the Defendants on the issues

3    of falsity, materiality and scienter, as requested herein.

4    DATED:  March 9, 2007                    Respectfully submitted,

5                                             BONNETT, FAIRBOURN,
                                                FRIEDMAN & BALINT, P.C.
6                                            ANDREW S. FRIEDMAN
                                             FRANCIS J. BALINT, JR.
7                                            2901 North Central Avenue, Suite 1000
                                             Phoenix, AZ  85012
8                                            Telephone:  (602) 274-1100

9                                            BARRACK, RODOS & BACINE
                                             STEPHEN R. BASSER
10                                           SAMUEL M. WARD

11

12
                                             _____
13                                                 STEPHEN R. BASSER

14                                           402 West Broadway, Suite 850
                                             San Diego, CA  92101
15                                           Telephone:  (619) 230-0800

16                                           BARRACK, RODOS & BACINE
                                             LEONARD BARRACK
17                                           MARK R. ROSEN
                                             JEFFREY A. BARRACK
18                                           WILLIAM J. BAN
                                             3300 Two Commerce Square
19                                           2001 Market Street
                                             Philadelphia, PA  19103
20                                           Telephone:  (215) 963-0600

21                                           Lead Counsel for Lead Plaintiff, the
                                             Policemen's Annuity and Benefit Fund of
22                                           Chicago

23

24

25

26

27

28

LD. PL.('S) MOT. FOR PARTIAL SUMM. ADJUDICATION
Lead Case No. CV 04-2147-PHX-JAT