**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re Apollo Group Inc. Securities Litigation, | Master File No. CV 04-2147-PHX-JAT (LEAD) |
| | CV 04-2204-PHX-JAT (Consolidated) |
| | CV 04-2334-PHX-JAT (Consolidated) |
| This Document Relates To: All Actions | CLASS ACTION |
| | **ORDER** |

In this consolidated securities-fraud class action, Lead Plaintiff Policemen's Annuity and Benefit Fund of Chicago alleges violations of section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. Lead Plaintiff has filed a motion for partial summary judgment (Doc. # 204), and Defendants Apollo Group, Inc. ("Apollo"), Todd S. Nelson, and Kenda B. Gonzales have filed a cross-motion for summary judgment (Doc. # 215). After reviewing these motions, and the responses and replies thereto, the Court denies both motions.

**I.   Background**

Defendant Apollo is the largest for-profit provider of higher education in the United States and the parent company of the University of Phoenix ("UOP"), a wholly-owned subsidiary that accounts for over ninety percent of Apollo's total revenue. During the time period relevant to this case, Defendant Nelson was Apollo's chief executive officer, and Defendant Gonzales was Apollo's chief financial officer. Lead Plaintiff represents a class of persons who purchased Apollo stock between February 27, 2004, and September 14, 2004.

At issue in the case is whether Defendants kept Apollo stock artificially high during the class period by misrepresenting the status of a Department of Education ("DOE") program review at the UOP. Lead Plaintiff alleges that the failure to disclose the contents of a DOE report[1] rendered certain public statements made by Defendants during the class period false or misleading. The report, which was issued on February 5, 2004, concluded, among other things, that the UOP improperly compensated its enrollment counselors "solely based on [the] recruiters' success in securing enrollments," a violation of DOE regulations [Lead Plaintiff's Statement of Undisputed Facts ("LPSUF") ¶ 20]. Violations of DOE regulations can result in "limitation, suspension, or termination" of Title IV eligibility [LPSUF ¶ 6], a significant event to a company whose future success is "highly dependant" on such eligibility [LPSUF ¶ 5].

On September 7, 2004, before the DOE issued a final determination in the program review, the UOP agreed to pay $9.8 million to the DOE to settle the program review. The settlement agreement specified that the act of entering into the agreement did not constitute an admission of wrongdoing or liability on the UOP's part. Shortly thereafter, on September 14, 2004, news of the allegations contained in the DOE report were made public for the first time. The price of Apollo stock fell significantly on September 21, 2004. Lead Plaintiff claims that the disclosure of the DOE's allegations caused the stock-price decline.

## II. Legal Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary

---

[1] The Court acknowledges that Defendants dispute whether this report was authorized by the DOE and refer to it throughout their pleadings as the "Wittman Report," Wittman being the DOE employee who authored it. For convenience, however, and without deciding this question, the Court will assume throughout this order that the report was properly issued by the DOE.

- 2 -

1 judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute about a fact is "genuine" if
2 the evidence is such that a reasonable jury could return a verdict for the non-moving party.
3 *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court construes all disputed
4 facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d
5 1072, 1075 (9th Cir. 2004).

6 **III.  Discussion**

7 Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated
8 thereunder forbid the making of "any untrue statement of a material fact" or the omission of
9 any material fact necessary "to make the statements made . . . not misleading." 17 C.F.R. §
10 240.10b-5 (2004). To prevail on its securities-fraud claim, Lead Plaintiff must prove, among
11 other things, that (1) Defendants made a misrepresentation or omission (2) of material fact
12 (3) with scienter (4) that caused the alleged loss. *Binder v. Gillespie*, 184 F.3d 1059, 1063
13 (9th Cir. 1999); *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996).

14 In moving for partial summary judgment, Lead Plaintiff contends that the undisputed
15 evidence in this case establishes as a matter of law that (1) Defendants made
16 misrepresentations (2) of material fact (3) with scienter. In contrast, Defendants maintain
17 that the undisputed evidence demonstrates that they are entitled to summary judgment for
18 three reasons: (1) they had no duty to disclose the DOE report; (2) they did not act with
19 scienter; and (3) the alleged misrepresentations did not cause the alleged loss, i.e., Lead
20 Plaintiff has not proved loss causation. Because of the overlap of the issues raised in these
21 motions, the Court will organize its discussion around the relevant legal elements of Lead
22 Plaintiff's securities-fraud claim.

23 *A.  Misrepresentation*

24 1. Duty of Disclosure

25 As a preliminary matter, Defendants attempt to characterize this lawsuit as a
26 nondisclosure case and contend that, as a matter of law, they had no duty to disclose the DOE
27 report. Their arguments in support of this contention, however, overlook the fact that Lead

28

- 3 -

Plaintiff characterizes this lawsuit as a misrepresentation case and has presented evidence in support of this claim. In other words, Defendants' preliminary arguments regarding disclosure focus only on when an affirmative duty to disclose specific facts is triggered, rather than the corresponding duty to never make misleading public statements.

For example, Defendants' first argument is that, because they believed the DOE report to be unauthorized and the allegations contained in it to be false, they owed a fiduciary duty to their shareholders to not disclose the contents of the report in order to prevent market overreaction. Such paternalism finds no place in the federal securities laws. As the Supreme Court has stated, "Disclosure, and not paternalistic withholding of accurate information, is the policy chosen and expressed by Congress." *Basic v. Levinson*, 485 U.S. 224, 234 (1988).

Defendants' second argument is that they have no duty to disclose interim regulatory findings, like the DOE report, in an ongoing regulatory process, like the DOE program review. It is true that the securities laws do not impose an absolute duty of disclosure on corporations. *Basic*, 485 U.S. at 239 n.17 ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."); *Gallagher v. Abbott Labs.*, 269 F.3d 806, 808 (7th Cir. 2001) ("We do not have a system of continuous disclosure. Instead, firms are entitled to keep silent . . . unless positive law creates a duty to disclose."). However, none of the cases cited by Defendants supports the broad proposition they urge the Court to accept. Instead, each case involves an alleged misrepresentation where a court found — *on the specific facts before it* — that the failure to disclose certain information did not render the statements made false or misleading.[2]

---

[2] See *Gallagher*, 269 F.3d at 811 (holding that the failure to disclose a compliance letter from the FDA did not render the CEO's projection of continued growth false or misleading absent evidence that the CEO did not honestly believe in the projection); *City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*, 388 F. Supp. 2d 932, 946 (S.D. Ind. 2005) (holding that the failure to disclose a state regulatory investigation did not render false or misleading optimistic statements regarding the company's business model and marketing approach); *In re Medimmune, Inc. Sec. Litig.*, 873 F. Supp. 953, 966 (D. Md. 1995) (holding that the failure

In other words, while Defendants may not have an affirmative duty to disclose interim regulatory findings, they do have "a duty to disclose material facts that are necessary to make disclosed statements, whether mandatory or volunteered, not misleading." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 504 (9th Cir. 1992). The language of Rule 10b-5 mandates this result.[3] In its essence, then, Defendants' argument boils down to a contention that the failure to disclose the DOE report, under the circumstances of this case, did not render any of their class-period statements false or misleading. The Court will address this argument below.

## 2. The Alleged Misrepresentations

The heart of Lead Plaintiff's claim is that certain public statements made by Defendants were misleadingly incomplete. Defendants contend that none of their class-period statements were false or misleading as a matter of law. The Court, however, finds that Lead Plaintiff has presented evidence sufficient to create a genuine issue of material fact with regard to a number of class-period statements.

For example, on February 27, 2004, Defendants issued a press release announcing the dismissal of a *qui tam* lawsuit that had been filed against Apollo by two of its employees. The lawsuit alleged that Apollo improperly compensated its enrollment counselors — the same allegation contained in the DOE report that Defendants had received several weeks earlier. In relevant part, the press release read:

> Apollo Group, Inc. learned today that on February 19, 2004, the U.S. District Court for the Eastern District of California granted our motion to dismiss the previously disclosed *qui tam* action.

---

to disclose "mere questioning" by a regulatory body during an application process did not render the projected approval of the application false or misleading).

[3] The pertinent part of the regulation states: "It shall be unlawful for any person . . . [t]o make any untrue statement of a material fact or *to omit to state a material fact necessary in order to make the statements made*, in the light of the circumstances under which they were made, *not misleading* . . . ." 17 C.F.R. § 240.10b-5 (2004) (emphasis added).

- 5 -

> The *qui tam* action was brought by two of our current employees on behalf of themselves and the federal government and alleged that we improperly compensate our employees who are involved in the recruitment of new students. *The government declined to intervene in the lawsuit.*

LPSUF ¶ 63 (emphasis added).

Defendants assert that the press release was literally true and therefore not misleading, an argument that rests on the fallacious premise that literally true statements can never be misrepresentations. On the contrary, a statement that is literally true is a misrepresentation if the context in which it was made misled the listener as to the true state of affairs. *Kaplan v. Rose*, 49 F.3d 1363, 1372 (9th Cir. 1994); *see also* 9th Cir. Civ. Jury Instr. 18.0 (2007). Lead Plaintiff alleges that stating that the government declined to intervene misled investors into thinking that the government viewed the lawsuit's allegation of improper compensation as meritless, when in fact the government had made the same allegation in the DOE report. The Court cannot conclude that no reasonable jury could agree with Lead Plaintiff's interpretation of this press release. Thus, whether the press release was misleading is a genuine issue of material fact for the jury, and Defendants will not be granted summary judgment on this basis.

Lead Plaintiff also moves for summary judgment on this issue, maintaining that certain statements made by Defendants during the class period, including the statement in the press release quoted above, were misrepresentations as a matter of law. The statements Lead Plaintiff relies on, however, are not so obviously misleading "'that reasonable minds [could] not differ.'" *See Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) (quoting *Durning v. First Boston Corp.*, 815 F.2d 1265, 1268 (9th Cir. 1987)).[4] Thus, whether any of Defendants'

---

[4] In addition to the press release discussed above, the alleged misrepresentations include:

(1) the following statement made by Defendant Nelson during a March 12, 2004, conference call in response to the analyst question "[D]o you have any sort of timetable when you think the program review will be completed or when any type of report will be issued?":

> Well, it's, you know, again, tough to say. . . . [O]nce we have had a chance to respond to any issues, that's when we would, again, feel if there's a problem or

- 6 -

1 class-period statements were misleading as to the true status of the DOE program review is
2 a genuine issue of material fact for trial.

### *B. Materiality of the DOE Report*

Lead Plaintiff argues that the DOE report was material as a matter of law for several reasons. First, the alleged regulatory violations contained in it could result in substantial fines or even the termination of the UOP's ability to participate in Title IV programs. Second, the DOE report required the UOP to implement certain corrective actions that could adversely affect its business. In light of these considerations, Lead Plaintiff maintains that the report would unquestionably affect a reasonable investor's decision to buy or sell stock. Moreover, Lead Plaintiff contends that Defendants implicitly admitted the report's materiality by closing the insider trading window after receiving the report.

In response, Defendants challenge the validity of the report and Lead Plaintiff's characterization of its contents. Defendants claim that the DOE employee who issued the report was not authorized to do so. Moreover, even assuming the report's validity, Defendants argue that it was only a preliminary report that was subject to change and that could not, by its nature, require corrective action. Finally, Defendants allege that the market

---

not. And we have had the opportunity to do that in [this case], and we feel very good about that response.
[LPSUF ¶ 70];

(2) Apollo's April 13, 2004, Form 10-Q, in which it disclosed a DOE audit that affected a subsidiary that accounted for less than five percent of Apollo's tuition revenue but failed to disclose the DOE report issued to the UOP, which accounted for about ninety-five percent of Apollo's tuition revenue;

(3) the following statement made by Defendant Nelson during a June 24, 2004, conference call with market analysts: "The program review at the [UOP] continues to go from our point of view very smoothly" [LPSUF ¶ 83];

(4) optimistic statements concerning the program review at an August 25, 2004, conference call days after the DOE had made a settlement offer of $81 million; and

(5) Defendants' disclosure of the existence of the DOE report and its "negative tone" during a September 7, 2004, conference call without disclosing the report's contents [LPSUF ¶ 106].

1 failed to react to the report's disclosure in September 2004, and that this alleged failure is also 2 evidence of the report's immateriality. Lead Plaintiff, in reply, points to evidence that 3 disputes each of Defendants' contentions.

Materiality is an objective concept that is viewed from the perspective of the "reasonable investor." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). In the Rule 10b-5 context, an omission is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." *Basic*, 485 U.S. at 231-32 (quoting *TSC Indus.*, 426 U.S. at 449). The focus of this inquiry is on the "fact's potential to influence an investor's particular decision — the decision to buy or sell a security." *United States v. Berger*, 473 F.3d 1080, 1100 (9th Cir. 2007). Given the pervasive factual disputes surrounding the nature of the DOE report, the Court cannot say that its omission is "'so obviously important to an investor that reasonable minds cannot differ.'" *TSC Indus.*, 426 U.S. at 450 (quoting *Johns Hopkins Univ. v. Hutton*, 422 F.2d 1124, 1129 (4th Cir. 1970)). Thus, the Court finds that the materiality of the report presents a genuine issue of material fact for the jury to decide.

### C. Scienter

Lead Plaintiff contends that, assuming the DOE report was material and the failure to disclose it rendered certain statements misleading, Defendants' knowledge of the allegations contained in the report establishes scienter as a matter of law. Defendants contend that the undisputed evidence shows that their decision to not disclose the DOE report was made in good faith and supported by the advice of counsel, and that, as a result, they are entitled to judgment as a matter of law.

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). To satisfy the scienter element with knowledge, Lead Plaintiff must prove that Defendants acted with knowledge that the failure to disclose the DOE report would make their statements misleading, not merely that

- 8 -

Defendants had knowledge of material information. *See In re Daou Systems, Inc.*, 411 F.3d 1006, 1021 (9th Cir. 2005) (noting that the "knowledge" required for scienter is the "false or misleading" nature of the statement). Thus, although Defendants admittedly knew about the adverse contents of the DOE report at the time they made their statements, such knowledge standing alone does not entitle Lead Plaintiff to judgment as a matter of law.

As for Defendants' theory, even assuming that Defendants acted in good faith on the advice of counsel, which Lead Plaintiff disputes, such evidence would not entitle them to judgment as a matter of law. Although knowledge of the DOE's allegations does not entitle Lead Plaintiff to summary judgment, the knowledge does provide a basis from which a reasonable juror could infer that Defendants knew their statements were misleadingly incomplete, especially in light of other circumstantial evidence in this case.[5] *In re Software Toolworks, Inc.*, 50 F.3d 615, 626 (9th Cir. 1994) (stating that summary judgment is appropriate only when "'there is no rational basis in the record for concluding that any of the challenged statements was made with the requisite scienter'" (quoting *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989))).

Moreover, some of the statements that Lead Plaintiff claims were misleading were Defendant Nelson's optimistic statements about the program review. The Ninth Circuit has held that a statement of opinion or belief is false or misleading "if (1) the statement is not actually believed [by the speaker], (2) [it is believed by the speaker, but] there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending to seriously undermine the statement's accuracy." *Kaplan*, 49 F.3d at 1375. Although undisputed evidence of Defendants' good faith and reliance on the advice of counsel would eliminate the first two prongs of this disjunctive test, the third prong would still remain. A reasonable jury could conclude that Defendant Nelson's knowledge of the DOE report's

---

[5] For example, Defendant Nelson acknowledged in a letter to the DOE that disclosure of the report would cause Apollo's stock price to decline.

- 9 -

1 allegations of regulatory violations seriously undermined his optimistic statements about the
2 program review. In sum, whether Defendants acted with the requisite scienter presents a
3 genuine issue of material fact for the jury to resolve.

### D. Loss Causation

#### 1. Legal Background: The Event Study

To prevail on a Rule 10b-5 claim, the plaintiff must prove loss causation. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). "Loss causation" is the "causal connection" between the alleged misrepresentations or omissions and the economic loss. *Id.* Losses caused by market factors unrelated to the alleged fraud do not afford a basis for recovery. *Id.* at 344; *Green v. Occidental Petroleum Corp.*, 541 F.2d 1335, 1342 (9th Cir. 1976) (Sneed, J., concurring). According to the Restatement of Torts, a person becomes liable for a stock purchaser's loss "when the facts . . . become generally known" and "as a result" share value declines. § 548A, cmt. *b*, at 107.

The tool most often used by experts to isolate the economic losses caused by the alleged fraud is the "event study." *In re Imperial Credit Indus., Inc.*, 252 F. Supp. 2d 1005, 1014 (C.D. Cal. 2003). "An event study is a statistical regression analysis that examines the effect of an event on a dependant variable, such as a corporation's stock price." *Id.* at 1014. For securities-fraud purposes, the "event" analyzed is the disclosure of the alleged fraud to the market.

The fraud is not always "revealed through one correction." Bradford Cornell & R. Gregory Morgan, *Using Finance Theory to Measure Damages in Fraud-on-the-Market Cases*, 37 UCLA L. Rev. 883, 889 (1990). At least some, and perhaps most, securities-fraud actions "consist of a series of exaggerations, omissions, and misleading statements which are corrected, or merely revealed for what they are, in a series of subsequent statements that convey additional information as well." *Id.* In such cases, it is appropriate to view the series of corrective disclosures as a single cumulative event, or event window, for the purposes of

- 10 -

1 the event study. *Id.* at 906. The "length of the window depends on the facts of each case."
2 *Id.*

### 2. Applicability to this Case

In this case, both Lead Plaintiff and Defendants hired experts to perform event studies to determine whether the disclosure of the alleged fraud caused Apollo's stock to decline. Lead Plaintiff's expert concluded that the September disclosures caused the stock to decline, and Defendants' expert concluded that they did not. The fundamental disagreement between the experts, which caused the divergent results, is the dating of the final corrective disclosure, i.e., the point at which the alleged fraud was fully disclosed to the market.

Lead Plaintiff's expert, Dr. Steven P. Feinstein, concluded that the truth of Defendants' alleged omission of the DOE report trickled into the market in a series of partial disclosures that began with several newspaper articles on September 14, 2004, and ended with two analyst reports authored by Kelly Flynn on September 20, 2004 (the "Flynn reports"). According to Dr. Feinstein, each of the partial disclosures was necessary for the market to fully appreciate the significance of Defendants' alleged omission. Consequently, in conducting his event study, he viewed the partial disclosures cumulatively as one overarching event, and found that this event caused Apollo's stock price to decline on September 21.

Defendants' expert, Dr. Kenneth Lehn, concluded that the newspaper articles of September 14 fully disclosed the truth of the alleged fraud. He chose not to include the Flynn reports in his event study because, according to him, they were not corrective disclosures. Dr. Lehn found that, rather than introduce any new *facts* about Defendants' alleged fraud to the market, the Flynn reports merely *analyzed* the facts previously disclosed in the newspaper articles, something the rest of the market was just as capable of doing. Utilizing September 14 as the "event" in his study, Dr. Lehn concluded that the disclosure of the alleged fraud did not cause Apollo's stock to decline six trading days later on September 21.

- 11 -

Dr. Feinstein disagrees with Dr. Lehn's characterization of the Flynn reports. According to Dr. Feinstein, although the contents of the DOE report were concededly revealed in the newspaper articles, the import of those contents was not appreciated until Kelly Flynn issued her reports on September 20. He maintains that the newspaper articles and previous analyst reports — as well as the manner in which Apollo announced its settlement with the DOE without disclosing the specific allegations that led to it — all gave the impression that the DOE report had no bearing on Apollo's current or future regulatory problems. By contrast, the Flynn reports took the position that the seriousness of the allegations in the DOE report revealed that Apollo was vulnerable to future regulatory problems.[6] Predicting future vulnerability on the basis of the contents of the DOE report was additional information that, according to Dr. Feinstein, was necessary to fully reveal the nature of Defendants' alleged fraud.

In order to grant summary judgment to Defendants on this issue, the Court would have to conclude as a matter of law that a market professional's analysis of facts that had been previously disclosed to the investing public can never be a corrective disclosure. Defendants have not cited, and this Court has not found, any case that supports this proposition.[7] Thus, on the record before it, this Court cannot conclude as a matter of law that the Flynn reports were not corrective disclosures. Lead Plaintiff's expert proposes to testify that the analysis

---

[6] In the report, Flynn wrote, "We also think the contents of the DOE's recent program review may cause more concerns about [Apollo's] regulatory risk" [Defendants' Amended Statement of Undisputed Facts ¶ 82].

[7] During oral argument, Defendants relied heavily on *In re Williams Securities Litigation*, 2007 U.S. Dist. LEXIS 49123 (N.D. Okla. July 6, 2007), in which the court excluded an expert's testimony because the expert failed to differentiate between losses caused by corrective disclosures and losses attributable to negative market developments unrelated to the alleged fraud. *Id.* at *200-14. In this case, however, unlike *In re Williams*, if the jury agrees that the Flynn reports were necessary to fully disclose the fraud to the market, then Dr. Feinstein has isolated and removed the non-fraud factors that contributed to the stock-price decline.

- 12 -

1 in the Flynn reports was additional information that, in conjunction with the information 2 previously disclosed, finally and fully revealed Defendants' alleged fraud. A reasonable jury 3 could infer from this testimony that the Flynn reports were necessary to fully disclose the 4 truth of the alleged fraud. *See Perkins v. Standard Oil Co. of Cal.*, 395 U.S. 642, 648 (1969) 5 ("If there is sufficient evidence in the record to support an inference of causation, the ultimate 6 conclusion as to what the evidence proves is for the jury.").

7 Alternatively, Defendants contend that, even assuming the Flynn reports were 8 necessary to fully disclose the alleged fraud, the efficient market would have absorbed the 9 information into the price of Apollo stock by the end of trading on September 20, the day the 10 reports were issued. Dr. Feinstein's use of a two-day window to measure the effect of the 11 corrective disclosures, Defendants maintain, is inconsistent with the efficient market 12 hypothesis.

13 "An efficient market is one which rapidly reflects new information in price." 4 Alan 14 R. Bromberg & Lewis D. Lowenfels, Bromberg and Lowenfels on Securities Fraud and 15 Commodities Fraud § 7:484, at 7-925 (2d ed. 2007).[8] The Ninth Circuit, however, has 16 declined to adopt "a bright-line rule requiring an immediate market reaction" and instead 17 focuses on the specific facts of each case. *No. 84 Employer-Teamster Joint Council Pension* 18 *Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 934 (9th Cir. 2003); *see also* 19 *Basic*, 485 U.S. at 249 n.28 (specifically declining "to adopt any particular theory of how 20 quickly and completely publicly available information is reflected in the market price"). In 21 this case, the proposed testimony of Lead Plaintiff's expert witness directly contradicts 22 Defendants' contention. Thus, whether the efficient market would have absorbed the 23 information in the Flynn reports by the end of trading on September 20 as opposed to

---

[8] This theory was used by the Supreme Court to create a rebuttable presumption that securities-fraud plaintiffs justifiably rely on misrepresentations or omissions in deciding whether to buy or sell stock in an efficient market. *Basic*, 485 U.S. at 245-49. Lead Plaintiff concedes that Apollo's stock traded in an efficient market.

- 13 -

September 21 is a genuine issue of material fact for the jury to decide. *See Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1144 (9th Cir. 1997) ("'As a general rule, summary judgment is inappropriate where an expert's testimony supports the nonmoving party's case.'" (quoting *In re Apple Computer Sec. Litig.*, 886 F.2d at 1116)).[9]

**IV.  Conclusion**

The Court having found a disputed issue of material fact as to each element of the claim,

**IT IS ORDERED** that Lead Plaintiff's Motion for Partial Summary Judgment (Doc. # 204) is denied;

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (Doc. # 215) is denied;

**IT IS FURTHER ORDERED** that all evidentiary objections contained in the motions are overruled without prejudice.

DATED this 11th day of September, 2007.

*/s/ James A. Teilborg*
James A. Teilborg
United States District Judge

---

[9] Defendants make two other arguments that attempt to discredit Dr. Feinstein and the viability of his event study: (1) that Dr. Feinstein employed a result-driven methodology that "cherry-picked" the only event window that generated a statistically significant stock decline; and (2) that Dr. Feinstein failed to assess potential market overreaction by not including September 22 in the event window. These matters are better suited for testing by cross-examination at trial, and the Court will not decide them as a matter of law. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993) (stating that "cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means" of testing the credibility of an expert opinion).