**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re Apollo Group Inc. Securities Litigation, | Master File No. CV 04-2147-PHX-JAT (LEAD) |
| | CV 04-2204-PHX-JAT (Consolidated) |
| | CV 04-2334-PHX-JAT (Consolidated) |
| This Document Relates To: All Actions | CLASS ACTION |
| | **ORDER** |

Pending before the Court are Defendants Apollo Group, Inc. ("Apollo"), Todd S. Nelson, and Kenda B. Gonzales's motions in limine to exclude the expert testimony of Mr. Douglas Branson, Dr. Allan Ingraham, Dr. Jay Finkelman, and Dr. Steven Feinstein. Lead Plaintiff Policemen's Annuity and Benefit Fund of Chicago has responded to each of these motions. Having considered each motion and the responses thereto, the Court now rules on the motions.

**I. Background**

This securities-fraud class action centers around a Department of Education ("DOE") program review at the University of Phoenix ("UOP") that began in August 2003 and ended by settlement agreement in September 2004. Lead Plaintiff claims that Defendants made false or misleading statements concerning the status of this program review by failing to disclose the contents of a DOE report. As a result, according to Lead Plaintiff, Apollo's stock price was artificially inflated throughout the class period until the truth was fully disclosed to the market on September 20, 2007, after which Apollo's stock price fell

significantly.

**II. Legal Standard**

Each of the pending motions concerns challenges to the admissibility of expert testimony. Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993) ("*Daubert I*"), the Supreme Court held that Rule 702 imposed a special gatekeeping obligation upon a trial judge to make a preliminary assessment of the admissibility of expert scientific testimony. Specifically, the Court held that under Rule 702, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* In making this determination, the trial court engages in a two-part inquiry. First, the court must determine whether the expert's testimony reflects "scientific knowledge," that is, "whether their findings are 'derived by scientific method,' and whether their work product amounts to 'good science.'" *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) ("*Daubert II*"). Second, the court must determine whether the proffered expert testimony is relevant, "i.e., that it logically advances a material aspect of the proposing party's case." *Id.* Essentially, under *Daubert*, the trial court's task "is to analyze not what the experts say, but what basis they have for saying it." *Id.* at 1316.

*A. Qualification as Expert*

"The question of admissibility only arises if it is first established that the individuals whose testimony is being proffered are experts in a particular . . . field." *Id.* at 1315. Thus, as an initial matter, the trial court must determine whether the proffered witness is qualified as an expert by "knowledge, skill, experience, training or education." Fed. R. Evid. 702. To satisfy this standard, it is essential that "the proposed witness's qualifying training or

- 2 -

1 experience, and resultant specialized knowledge, are sufficiently related to the issues and 2 evidence before the trier of fact [such] that the witness's proposed testimony will be of 3 assistance to the trier of fact." 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's* 4 *Federal Evidence*, ¶ 702[04][1][b], at 702-45 (citing *United States v. Chang*, 207 F.3d 1169, 5 1173 (9th Cir. 2000) (finding proposed expert witness's expertise in international finance 6 insufficient to qualify witness to testify regarding authenticity of security instrument)).

*B. Reliability*

8 Next, the trial court must ensure that the proffered expert testimony is reliable. 9 Generally, to satisfy Rule 702's reliability requirement, "the party presenting the expert must 10 show that the expert's findings are based on sound science, and this will require some 11 objective, independent validation of the expert's methodology." *Daubert II*, 43 F.3d at 1316. 12 Toward this end, the Supreme Court in *Daubert I* set forth the following factors for the trial 13 court to consider when assessing the reliability of proffered expert testimony. First, "a key 14 question to be answered in determining whether a theory or technique is . . . knowledge that 15 will assist the trier of fact will be whether it can be (and has been) tested." 509 U.S. at 593. 16 Second, the Court looks at whether the theory or technique has been subjected to peer review 17 and publication. *Id.* Because publication in a peer-reviewed journal increases the likelihood 18 that substantive flaws in the technique will be detected, "[t]he fact of publication (or lack 19 thereof) . . . will be a relevant, though not dispositive, consideration in assessing the scientific 20 validity of a particular technique or methodology on which an opinion in premised." *Id.* at 21 594. Third, "in the case of a particular scientific technique, the court ordinarily should 22 consider the known or potential rate of error . . . and the existence and maintenance of 23 standards controlling the technique's operation." *Id.* (internal citations omitted). Fourth, the 24 Court considers the degree of acceptance of the method or technique within the relevant 25 scientific community. *Id.* In engaging in this analysis, the trial court should be mindful that:

> The inquiry envisioned by Rule 702 is . . . a flexible one. Its overarching subject is the scientific validity — and thus the evidentiary relevance and reliability — of the principles that underlie a proposed submission. The focus,

- 3 -

of course, must be solely on principles and methodology, not on the conclusions that they generate.

*Id.* at 594-95 (footnotes omitted).

It is also well-settled that the four *Daubert* factors — testing, peer review, error rates, and acceptability in the relevant scientific community — are merely illustrative, not exhaustive, and may be inapplicable in a given case. *Daubert II*, 43 F.3d at 1317. For instance, the Ninth Circuit has advised that a trial court may also question whether the expert is proposing to testify about matters "growing naturally and directly out of the research they have conducted independent of the litigation, or whether they have developed their opinions expressly for the purposes of testifying" as another significant inquiry weighing on reliability. *Id.* "That the testimony proffered by an expert is based directly on legitimate, preexisting research unrelated to the litigation provides the most persuasive basis for concluding that the opinions he expresses were 'derived by the scientific method.'" *Id.*

Accordingly, "[e]stablishing that an expert's proffered testimony grows out of pre-litigation research or that the expert's research has been subjected to peer review are the two principal ways the proponent of expert testimony can show that the evidence satisfies the first prong of Rule 702." *Id*. at 1318. Failing this, the proponent may attempt to meet this burden through the testimony of its expert. *Id.* at 1319.

> For such a showing to be sufficient, the experts must explain precisely how they went about reaching their conclusions and point to some objective source — a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like — to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field.

*Id.* In other words, "the party proffering the evidence must explain the expert's methodology and demonstrate in some objectively verifiable way that the expert has chosen a reliable scientific method and followed it faithfully." *Id.* at 1319 n.11. Offering the expert's qualifications, conclusions, and an assurance of reliability is insufficient. *Id.* at 1319.

*C. Relevance*

The other component of the trial court's gatekeeping function under Rule 702 is to

- 4 -

ensure that the proffered expert testimony is relevant. As articulated in Rule 702, expert testimony is relevant if it assists the trier of fact in understanding evidence or in determining a fact in issue. *Daubert I*, 509 U.S. at 591. Thus, the party proffering such evidence must demonstrate a valid scientific connection, or "fit," between the evidence and an issue in the case. *Id.*[1] "'Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.'" *Id.* (quoting 3 Weinstein & Berger, ¶ 702[02], at 702-18). The Court therefore examines whether the proffered expert testimony is "'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *Id.* (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)). Expert knowledge also assists the trier of fact when it provides knowledge beyond the trier of fact's common knowledge. *Id.*; *United States v. Finley*, 301 F.3d 1000, 1008 (9th Cir. 2002).

Conversely, expert testimony is inadmissible if it concerns factual issues within the knowledge and experience of ordinary lay people, because it would not assist the trier of fact in analyzing the evidence. In such cases, "[t]he fact finder is . . . fully capable of understanding the evidence and deciding the issues through the use of its common knowledge and common sense." 3 Weinstein & Berger, ¶ 702.03[2][a], at 702-36. In the Ninth Circuit, "[t]he general test regarding the admissibility of expert testimony is whether the jury can receive 'appreciable help' from such testimony." *United States v. Gwaltney*, 790 F.2d 1378, 1381 (9th Cir. 1986). Because unreliable and unfairly prejudicial expert witness testimony is not helpful to the trier of fact, the trial court should exclude such evidence. *Jinro Am., Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1004 (9th Cir. 2001). Likewise, expert testimony that merely tells the jury what result to reach is inadmissible. S*ee, e.g.*, *United States v. Duncan*,

---

[1] "In elucidating the 'fit' requirement, the Supreme Court noted that scientific expert testimony carries special dangers to the fact-finding process because it 'can be both powerful and quite misleading because of the difficulty in evaluating it.'" *Daubert II*, 43 F.3d at 1321 n.17 (quoting *Daubert I*, 509 U.S. at 595). "Federal judges must therefore exclude proffered scientific evidence under Rules 702 and 403 unless they are convinced that it speaks clearly and directly to an issue in dispute in the case, and that it will not mislead the jury." *Id.*

42 F.3d 97, 101 (2d Cir. 1994) ("When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's.").

### D.  Kumho Tire*'s Expansion of* Daubert I

In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court held that the trial judge's general gatekeeping obligation outlined in *Daubert I* not only applies to expert scientific testimony, but to all expert testimony.  It reasoned that neither the language of Rule 702 nor the evidentiary rationale supporting the Court's decision were limited to "scientific" knowledge, and that making the trial court's gatekeeping obligation dependent upon a distinction between "scientific" and "other specialized" knowledge would be unworkable.  *Id.* at 148.  Accordingly, the Court made clear that "*Daubert*'s general principles apply to the expert matters described in Rule 702."  *Id.* at 149.  Further, the Court held that in determining the admissibility of proffered expert testimony, and in particular, in assessing the reliability of the grounds for such testimony, the trial court *may* consider one or more of the reliability factors identified in *Daubert I.*  Thus, when assessing the reliability of a nonscientific expert's testimony, the trial court may ask, for example, how often an expert's skill or experienced-based methodology produces erroneous results, whether the method is generally accepted in the relevant expert community, or whether the expert's preparation would be recognized as acceptable in the expert's field.  *Id.* at 151.  While the trial court should consider the *Daubert* factors when they would be reasonable measures of reliability, the trial court retains the discretion to tailor its reliability determination to suit the facts of a particular case.  *Id.* at 152-53 (noting that the law grants the trial judge "broad latitude" in fashioning its reliability inquiry under *Daubert*).

**III.  Discussion**

With these standards as guidance, the Court now turns to Defendants' motions in limine.

- 6 -

*A. Testimony of Mr. Douglas Branson*

Lead Plaintiff has retained Mr. Branson as an expert on "corporate disclosure norms" to opine on the advice a "reasonable securities practitioner" would give to a client under the facts of this case. Mr. Branson proposes to testify, among other things, that a "reasonable securities practitioner" under the facts of this case would have advised his client that the issuance and contents of the DOE report are material events that must be disclosed. Defendants argue that Mr. Branson is not qualified to render his opinions and that, in any event, his opinions are unreliable and irrelevant.

Even assuming that Mr. Branson is qualified and that his testimony is reliable, his testimony has little, if any, relevance to the issues in this case. Unlike the standard of care at issue in a negligence case, none of the elements of Lead Plaintiff's securities-fraud claim depend on what the "reasonable securities practitioner" would do under the circumstances. See *Apollo Group Inc. Sec. Litig.*, No. CV 04-2147, 2007 WL 2681795, at *2-6 (D. Ariz. Sept. 11, 2007). Therefore, Mr. Branson's testimony has no relevance to Lead Plaintiff's case in chief. Lead Plaintiff, however, argues that the testimony is necessary to rebut Defendants' evidence of the advice they received from their disclosure attorneys. The Court disagrees. There are other proper means of rebutting this evidence that pose no danger of misleading the jury as to the ultimate legal issues in this case. To the extent that Mr. Branson's testimony has any relevance, the Court finds that its probative value is far outweighed by the danger of misleading the jury and confusion of the issues, and thus grants Defendants' motion in limine to exclude this testimony.

*B. Testimony of Dr. Allan Ingraham*

Lead Plaintiff has retained Dr. Ingraham as an expert on econometrics and statistical analysis to determine whether the UOP relied on factors other than enrollments in determining the salary of its enrollment counselors. Dr. Ingraham performed a statistical regression analysis of the potential factors relevant to salary determination at the UOP and

1 concluded that "only enrollments and factors relating to enrollments determined salary" [Defendants' Motions in Limine ("DMIL"), Ex. 121 ¶ 5]. Defendants maintain that Dr. Ingraham lacks expertise in econometrics generally and in the sub-specialty of human capital models in particular, that his statistical regression analysis is unreliable, and that his opinions are irrelevant to the issues in this case.

The Court finds that Dr. Ingraham is qualified as an expert in econometrics. He studied econometrics as part of his doctoral program in economics [DMIL, Ex. 121 app. A]; he has taught econometrics at the university level [DMIL, Ex. 123 at 155]; and he has "provided statistical and econometric analysis for numerous corporate and government clients" [DMIL, Ex. 121 ¶ 8]. Likewise, the Court finds that Dr. Ingraham's methodology and opinions are reliable and relevant to this case. The Ninth Circuit has approved the use of regression analyses as "common statistical tool[s]." *E.E.O.C. v. Gen. Tel. Co. of Northwest, Inc.*, 885 F.2d 575, 577 n.3 (9th Cir. 1989). Moreover, Dr. Ingraham's analysis is related to his prelitigation research in econometrics, and the basic regression model he uses in this case has been subjected to peer review and publication [Lead Plaintiff's Response to DMIL # 19, at 5]. Finally, his opinions are relevant, at the very least, to the materiality of the DOE report. Thus, the Court denies Defendants' motion in limine to exclude Dr. Ingraham's testimony.

The Court does, however, acknowledge that Defendants attack Dr. Ingraham's qualifications and methodology at a more specific level than the Court has addressed. For example, Defendants argue that Dr. Ingraham lacks expertise on human capital models, and they take issue with his choice of variables, especially the use of an enrollments-squared variable. Defendants also claim that his conclusions are not supported by the data generated by his regression. Nevertheless, the Court is satisfied that Dr. Ingraham's published work and expertise in general econometrics meets the requirements of admissibility under *Daubert I* and its progeny. Defendants' specific objections concern matters that go to the weight of the evidence and are appropriately addressed on cross-examination. *Daubert I*, 509 U.S. at

- 8 -

596.

*C. Testimony of Dr. Jay Finkelman*

Lead Plaintiff has retained Dr. Finkelman as an expert on human resources management and organizational psychology. From this perspective, he proposes to opine on the risks that Apollo faced after the issuance of the DOE report, the concerns associated with the implementation of a new compensation plan for enrollment counselors,[2] and the effects of these risks and concerns on the UOP's business. Defendants do not challenge Dr. Finkelman's qualifications; instead, they argue that his opinions are "methodologically flawed" and "inherently unreliable."

The Court finds that Dr. Finkelman's proposed testimony is both reliable and relevant to the issues in this case. Although Defendants attempt to classify Dr. Finkelman's opinions as scientific, the reliability of Dr. Finkelman's testimony depends mainly on his specialized knowledge and experience in human resources management and organizational psychology, both of which are extensive.[3] Before forming his opinions in this case, he reviewed the DOE program review report, deposition testimony, and numerous other relevant company-specific documents [DMIL, Ex. 119 at 30-40]. He also cited references in his expert report to support his opinions [*Id.* at 29-30]. Moreover, Dr. Finkelman's testimony will help the jury understand the business risks the UOP faced and why the DOE report may have added to those risks, issues that are directly relevant to the materiality of the report, which is an

---

[2] Lead Plaintiff contends that the new compensation system was a corrective action that was either required by or adopted in response to the DOE report. Defendants deny any connection between the two events.

[3] For example, he has a Ph.D. in Industrial/Organizational Psychology from New York University, and he has taught, and is currently teaching, doctoral level courses on this topic as well as human resources management; he is a Certified Professional Ergonomist; he spent thirteen years in the staffing and employment industry in upper-management positions; and he currently serves as Interim Systemwide Dean in charge of the Marshall Goldsmith School of Management and Program Director in the Organizational Psychology Division at Alliant International University, which operates in the same for-profit educational sector as the UOP.

element of Lead Plaintiff's claim. Based on the foregoing, the Court is satisfied that Dr. Finkelman's expert opinions are both reliable and relevant, and denies Defendants' motion in limine to exclude this testimony. *See United States v. Hankey*, 203 F.3d 1160, 1168-69 (9th Cir. 2000) (recognizing that the "*Daubert* factors" do not apply to "testimony whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it").

### D. Testimony of Dr. Steven Feinstein

Defendants' motion in limine to exclude Dr. Feinstein's testimony as unreliable under *Daubert I* involves the same arguments they made and lost at the summary-judgment stage of this litigation. For the reasons stated in the summary-judgment order, this Court finds that Dr. Feinstein's opinions are reliable, i.e., his proposed testimony was "derived by the scientific method" and it "fits" the facts of this case. See *In re Apollo Group Inc. Sec. Litig.*, 2007 WL 2681795 at *6-8. Defendants' arguments to the contrary go to the credibility of Dr. Feinstein's testimony, not to its admissibility.

Accordingly,

**IT IS THEREFORE ORDERED** that Defendants' Motion in Limine No. 18: To Exclude the Testimony of Douglas Branson (Doc. # 305) is **GRANTED**;

**IT IS FURTHER ORDERED** that Defendants' Motions in Limine No. 17: To Exclude the Testimony of Steven Feinstein (Doc. # 304), No. 19: To Exclude the Testimony of Allan Ingraham (Doc. # 306), and No. 20: To Exclude the Testimony of Jay Finkelman (Doc. # 307) are **DENIED**.

DATED this 9th day of November, 2007.

*[signature]*
James A. Teilborg
United States District Judge

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- 11 -