1                UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF ARIZONA

2                   _____

3

In re Apollo Group, Inc.   |
4 Securities Litigation     |  Master File No.
                   |  CV 04-2147-PHX-JAT
5 _____|
                   |  <u>Class Action</u>
6 This Document Relates to:  |
                   |
7     All Actions        |
                   |  Phoenix, Arizona
8                   |  August 4, 2008
                   |  10:01 a.m.
9                   |
                   |
10 _____|

11

12

13          REPORTER'S TRANSCRIPT OF PROCEEDINGS

14             (<u>**Post-Trial Motion Hearing**</u>)

15

16     **BEFORE:**  THE HONORABLE **JAMES A. TEILBORG**, JUDGE

17

18

19

20

21 Official Court Reporter:

22 David C. German, RMR, CRR
   Official U.S. Court Reporter
23 Sandra Day O'Connor U.S. Courthouse, Suite 312
   401 West Washington Street, SPC-39
24 Phoenix, Arizona 85003-2151
   (602) 322-7251

25 PROCEEDINGS TAKEN BY STENOGRAPHIC COURT REPORTER
   TRANSCRIPT PREPARED BY COMPUTER-AIDED TRANSCRIPTION

```
1   APPEARANCES:

2   FOR PLAINTIFF
    POLICEMEN'S ANNUITY and BENEFIT FUND OF CHICAGO:
3
              Barrack, Rodos & Bacine
4             402 West Broadway, Suite 850
              San Diego, California 92101
5             By:  Stephen R. Basser, Esq.
                   Samuel M. Ward, Esq.
6                  Jeffrey A. Barrack, Esq.

7             Bonnett, Fairbourn, Friedman & Balint, P.C.
              2901 North Central Avenue, Suite 1000
8             Phoenix, Arizona 85012
              By:  William G. Fairbourn, Esq.
9                  Francis J. Balint, Jr., Esq.
                   Kathryn A. Jann, Esq.
10

11  FOR THE DEFENDANT
    APOLLO GROUP and DEFENDANTS NELSON, GONZALES, BACHUS:
12

13            Gibson, Dunn & Crutcher, LLP
              4 Park Plaza, Suite 1400
14            Irvine, California 92614
              By:  Wayne W. Smith, Esq.
15                 Jared M. Toffer, Esq.
                   Kristopher P. Diulio, Esq.
16

17            Osborn Maledon, P.A.
              The Phoenix Plaza 21st Floor
18            2929 North Central Avenue
              Phoenix, Arizona 85012-3311
19            By:  David B. Rosenbaum, Esq.

20

21

22

23

24

25
```

**Phoenix, Arizona**
**August 4, 2008**

1

2

3          (Proceedings convened at 10:01 a.m.)

4          THE COURT:  Thank you.  Please be seated.

5          I'll ask the clerk to call the next matter, please.          10:01:59

6          THE DEPUTY CLERK:  Civil Case 04-2147, Sekuk Global

7   versus Apollo Group.  Time for a motion hearing.  Please

8   announce your presence for the record.

9          MR. BASSER:  May it please the Court.  Good morning,

10  Your Honor.  Stephen R. Basser, Barrack, Rodos & Bacine, lead          10:02:18

11  counsel for plaintiff Policemen's Annuity and Benefit Fund of

12  Chicago.

13          THE COURT:  Good morning.

14          MR. FAIRBOURN:  Greg Fairbourn, Your Honor, for the

15  plaintiffs.          10:02:29

16          MR. WARD:  Samuel M. Ward on behalf of plaintiffs.

17          THE COURT:  All right.  Good morning.

18          MR. BALINT:  Frank Balint for plaintiffs.

19          THE COURT:  Good morning.

20          MR. BARRACK:  Good morning, Your Honor.  Jeffrey          10:02:37

21  Barrack on behalf of Policemen's Annuity and Benefit Fund of

22  Chicago and the class.

23          MS. JANN:  Good morning, Your Honor.  Kathryn Jann on

24  behalf of the plaintiffs.

25          THE COURT:  Good morning to all of you.          10:02:45

UNITED STATES DISTRICT COURT

1            MR. SMITH:  Good morning, Your Honor.  Wayne Smith on

2    behalf of the defendants.

3            I'll play master of ceremonies.

4            This is Jared Toffer, also on behalf of all

5    defendants, David Rosenbaum and Kris Diulio, all of us on          10:02:55

6    behalf of all of the defendants.

7            THE COURT:  All right.  Good morning.

8            MR. ROSENBAUM:  Good morning.

9            THE COURT:  This is the time set for various

10   post-trial motions, and I am going to allot 40 minutes to each     10:03:07

11   side, and the movant can reserve whatever is left for rebuttal

12   and you can cover your motions in whatever order you would

13   like.

14           Let me first, though -- before the clock starts

15   ticking, I will add, let me first deal with the defendants'       10:03:37

16   motion for correction of trial transcript and tell you that I

17   will grant that in part and deny it in part.

18           I will grant it only with respect to that part which

19   seeks to correct the transcript with respect to what would

20   appear to be transcriptional errors.  I will deny it in terms     10:04:07

21   of the other portions that might be a slip of the tongue or a

22   Freudian slip or some other type of slip where otherwise the

23   slip is concededly accurately transcribed.

24           And my take on this, based on the plaintiff's

25   response, is that there are ten items noted on page 1 of the      10:04:39

1  response which the plaintiffs would contend, and I'm inclined

2  to agree, are in the latter category and are not

3  transcriptional errors.

4          So all of that is to say -- and I believe the

5  plaintiffs are -- I believe the plaintiffs, then, are conceding          10:05:06

6  that other than those ten the rest would fall into that

7  category of transcriptional errors.

8          Is that correct?

9          MR. WARD:  Yes, Your Honor.

10         THE COURT:  So the Court, then, will grant the motion          10:05:19

11  with respect to all but the ten items listed on page 1 that

12  will constitute correcting the record.

13         Now, I think in 40-some years in doing what you do and

14  now doing what I do I have not had to deal with this.  Mr.

15  German -- let me say to counsel I'm prepared, then, to instruct          10:05:44

16  Mr. German to correct the transcript in the particulars set

17  forth in the motion except for the ten that I have denied

18  relief on.

19         Anybody have a better idea?

20         MR. SMITH:  That's fine, Your Honor.  We have no          10:06:02

21  further comments or argument.

22         THE COURT:  All right.

23         Mr. German, then, you'll need to reference what is

24  Docket Number 550 that contains the list of items on pages 1, 2

25  and 3 that will be corrected, except for -- except for the ten          10:06:26

1    items that appear on page 1 of the plaintiff's response.

2           All right.  That having been said, then the movants

3    may proceed.

4           MR. SMITH:  Thank you, Your Honor.

5           I'll first say to Mr. German I'm sure that those          10:06:52

6    errors all occurred on the times when you weren't in the

7    courtroom.  Always hate to point the finger at the reporter.

8           Your Honor, would you like us to --

9           THE COURT:  I would say I'm impressed -- I guess I'm

10   impressed in the length of time that this trial took --        10:07:07

11          MR. SMITH:  So few.

12          THE COURT:  -- that there would be that few, a tribute

13   to Mr. German.

14          You may continue.

15          MR. SMITH:  Thank you, Your Honor.                       10:07:15

16          Would you like us to make our initial argument on all

17   four --

18          THE COURT:  Yes.

19          MR. SMITH:  -- motions and then -- thank you, Your

20   Honor.                                                          10:07:22

21          I'll start with the motion for judgment as a matter of

22   law.

23          And in that regard, I will note that we're going to

24   argue based upon uncontroverted evidence and the law.  In those

25   areas where there was a disagreement or controverted evidence,  10:07:36

1    we'll accept the plaintiff's version of the evidence and show

2    how the law would apply to that.

3         We will not, of course, accept as fact some of

4    Dr. Feinstein's speculations or areas where we believe that he

5    said things that were contradicted by the clear evidence.     10:07:58

6    Where he expresses an opinion or states a fact but the evidence

7    is directly contrary, we'll rely on the evidence.

8         I'd point out that the jury says -- the plaintiff says

9    the jury decided and that's all it takes, but as pointed out in

10   the numerous cases we've cited in our briefs and in the        10:08:17

11   supplemental authority, courts routinely grant these types of

12   motions on motions to dismiss and on motions for summary

13   judgment where as a matter of law they can conclude that the

14   facts applied to the legal arguments we're making bar any

15   recovery by plaintiffs.                                        10:08:37

16        Plaintiffs also mischaracterize our motion as simply

17   challenging a battle of experts, that Dr. Lehn admitted that

18   Dr. Feinstein's calculations were correct so it's just a matter

19   of checking or disagreeing over the event window, and actually,

20   we believe nothing could be further from the truth.            10:08:57

21        All Dr. Lehn said was that Dr. Feinstein knew how to

22   do math but that his methodology, beyond having done an event

23   study, was completely unscientific.

24        We believe that the plaintiff's damage calculations

25   fail to meet the legal standards for admission in a securities  10:09:13

1    class action for a number of reasons.

2            Specifically, Dr. Feinstein's damage calculations

3    relied on a noncorrective disclosure for its very foundation,

4    because the September 20 Flynn report contained nothing new,

5    and as a separate point, did not correct any prior            10:09:37

6    misrepresentation or omission.

7            Also, the plaintiffs purported to disaggregate

8    nonfraud factors from the damage calculation by eliminating

9    market and industry trends.  We've seen repeatedly they keep

10   showing a chart that shows, gee, the event study took out the   10:10:01

11   market and industry trends, but that's not sufficient to

12   disaggregate the nonfraud factors.

13           Dr. Feinstein said, well, I disregarded those factors

14   that I found to be old news, but he did not disaggregate --

15   very importantly, he made no effort to disaggregate the impact   10:10:18

16   on the price of Flynn's basic downgrade.

17           It's well-established that a downgrade or upgrade by

18   an analyst can in and of itself impact the price of a stock.

19   Dr. Feinstein simply ignored that Kelly Flynn had downgraded

20   the stock and that might have been the cause of the price      10:10:39

21   reaction, separate and apart from any consideration of the

22   reasons that she gave for her downgrade.

23           When she turned to her downgrade she said, well, I

24   based it on all six factors because I believe they weigh on the

25   multiple.  Dr. Feinstein dismissed several of those as being   10:10:58

1   old news, but then he said that he was relying on a number of

2   other factors we'll discuss and show that he failed to

3   disaggregate factors that were nonfraud factors that he

4   admitted were included.  Then he misapplied the economic

5   principles of the very event study that he purported to be      10:11:16

6   using.

7           After finding that the market was efficient, which, of

8   course, he had to find or the plaintiffs could not have a class

9   action, he then ignored one of the fundamental premises of the

10  efficient market hypothesis that the market responds almost      10:11:33

11  immediately to new news.  He conceded that when you have a

12  disclosure that the market responds immediately to the news,

13  and we'll discuss this in a little more detail, but he ignored

14  that fundamental premise.

15          He then used an event study which relied on -- which      10:11:53

16  is the appropriate tool to determine if two events, one that

17  follows the other, if there's any causal relationship, but

18  after applying the statistical test and finding that there was

19  no statistical significance between price movement on all but

20  one day, he then incorporated into his damage calculation       10:12:13

21  damage numbers that the very methodology that he relied on said

22  did not have statistical significance.

23          So, finally, absent a general overarching duty to

24  disclose the contents of the Program Review Report, the

25  September 20 Flynn reports, even if they did have new           10:12:36

1  information, as I said, just did not correct anything.

2       Now, I'll try to cover each of those as quickly as I

3  can because we have a couple more motions to get to, but, as I

4  said, the Flynn report said nothing new that could be a

5  corrective disclosure.                                              10:12:55

6       One of the difficulties in parsing through

7  Dr. Feinstein's testimony is he kind of changes at different

8  places what it is that he says, but he -- he concedes or argues

9  that the price was caused -- the price decline was caused by

10  these factors:                                                     10:13:13

11       Flynn disclosing that there was enrollment counselor

12  turnover, increase in enrollment turnover; that targets were

13  getting harder to hit, causing slowing enrollment growth;

14  thirdly, that there was a call for corrective action; and

15  fourthly, that there was now more regulatory risk.                 10:13:30

16       He said that each of these was a factor that was

17  included -- I'm sorry.  I left one out.  He also said bad

18  publicity was another factor.  That the value of the stock

19  could be hurt by bad publicity was the fifth factor that he

20  included in calculating his 5.55 damage calculation.               10:13:49

21       The uncontroverted evidence was that enrollment

22  counselor turnover improved, did not decline -- excuse me --

23  did not get worse after the new compensation plan was

24  adopted.  Miss Thompson's testimony was unequivocal that the

25  fallout or the results of the change in the compensation plan      10:14:13

1  was to decrease or improve enrollment counselor turnover.

2          Plaintiffs have two interesting arguments to try to

3  get over that hurdle.

4          The first one that they use is that they say, well,

5  Kelly Flynn's report says that the enrollment counselor          10:14:31

6  turnover increased, but then in the very next paragraph they

7  point out that her report was not admitted for the truth of the

8  matter asserted.

9          And, of course, what she has in her hearsay report is

10 double hearsay.                                                   10:14:49

11         Then they say, well, even if it's not true, it's still

12 news, it's still a disclosure.

13         It's a really interesting concept that an analyst

14 putting out false information is corrective by disclosing to

15 the market the truth.                                             10:15:05

16         And so we believe quite firmly that Dr. Feinstein

17 erred when he concluded in his 5.55 damage calculation any

18 decline in the price of the stock from Kelly Flynn

19 misrepresenting that enrollment counselor turnover was

20 increasing.                                                       10:15:23

21         He said that he included slowing enrollment growth but

22 then he conceded that Greg Cappelli had been talking about

23 slowing enrollment growth six months earlier and that the

24 company itself, in particular Todd Nelson, had been repeatedly

25 warning the investment community that enrollment growth would    10:15:40

1   be slowing.

2          So that was clearly an old factor that was -- that

3   Kelly Flynn did not provide anything new on.

4          He says that the call for corrective action, that that

5   was new news, that Apollo had hidden the fact that the Program          10:15:56

6   Review Report called for corrective action, but the

7   The Arizona Republic article on September 14 loud and clear

8   says the report ordered changes.

9          That again was old news.  The call for corrective

10  action was not new.  It could not be a cause of a decline in          10:16:15

11  the price through the revelation of any misrepresentation or

12  fraudulent statement.

13         Bad publicity.

14         Obviously, anybody that read the articles on the 14th

15  or 15th knew that Apollo could be hurt by bad publicity just by          10:16:32

16  reading those articles.

17         And that brings us to regulatory risk.

18         The plaintiff says that the company omitted the risk

19  materializing and that, in fact, what Flynn did was connect the

20  dots and tell the market for the first time that as a result of          10:16:56

21  this Program Review Report there could be increased regulatory

22  risk.

23         Now, I would point out that until the program review

24  was resolved it would be hard for Apollo to determine what

25  would or would not be the fallout from the program review          10:17:11

1    process in its entirety, but more importantly, the newspaper

2    articles on the 14th and 15th thoroughly disclosed the fact

3    that the industry generally and Apollo specifically, as a

4    result of this report, could be subjected to increased

5    regulatory risk.                                              10:17:32

6          The *Wall Street Journal* talked about the increased

7    risk that the company faced, that its bad report card might

8    ground its shares.

9          The *Chicago Tribune* article of September 15 said the

10   investigations may lead to stricter regulatory control.       10:17:49

11         And then, interestingly, they quote two industry

12   sources, Todd Nelson and the CEO of Devry, as telling an

13   investors' conference that they were concerned that the

14   investigation might stimulate the regulators to take a more

15   aggressive role.                                              10:18:08

16         So not only was it in the marketplace but the

17   marketplace had been informed by Mr. Nelson, the CEO of Apollo

18   himself, that this risk of increased reg -- the risk of

19   increased regulatory scrutiny existed.

20         I would also point out that both of the parties have    10:18:28

21   called the Court's attention to the recent Ninth Circuit

22   decision in *Metzler* on page 9268 of that decision.  The Court

23   points out -- excuse me.  I may have the wrong page.

24         9269.

25         The court points out that neither *Dow* nor *Dura* support  10:18:51

1    the notion that loss causation is pled where a defendant's

2    disclosure reveals a risk or potential for widespread

3    fraudulent conduct.  Where cases have found risk being

4    sufficient to show causation is where the defendants have

5    failed to disclose a risk and it has subsequently materialized

6    and the materialization of the risk has caused the stock price

7    to decline.

8          An analyst simply stating that in her opinion there

9    may be more risk does not satisfy the test for a corrective

10   disclosure.  We have cited numerous cases in our briefing that

11   support this.  I don't have time to refer the Court to all of

12   them.

13         But I would point out that one of the decisions in our

14   new authorities, the *Omnicom Group* decision, specifically

15   recognizes that a recharacterization of previously disclosed

16   facts cannot qualify as a corrective disclosure.

17         As I say, the many cases we've cited show that a

18   corrective disclosure must be the disclosure of facts, not

19   simply somebody reanalyzing them.

20         We had previously cited to the Court, I believe it

21   was, a Merrill Lynch case where the Wall Street Journal

22   reporter had reanalyzed the facts, come out with a new report,

23   done the math, in the court's words, to show that these facts

24   were really quite Draconian, and the court said that's not

25   enough, the facts aren't new, analysis is not a corrective

10:19:15

10:19:36

10:19:57

10:20:16

10:20:36

1   disclosure.

2          So, as we've shown, each of the items that

3   Dr. Feinstein and plaintiffs argued were the corrective

4   disclosure in the Flynn report were old news, and not only was

5   the regulatory risk old news, it was simply Flynn's opinion,          10:21:00

6   and an analyst's opinion is not a corrective disclosure.

7          Now, I think it's also important to point out that the

8   Flynn report, even if you accepted that anything it said was

9   new, didn't correct anything.

10          And in that regard, I would point out that plaintiffs          10:21:21

11   kept arguing that they never disclosed the full report, they

12   never disclosed the full Program Review Report, they never told

13   the market everything that was in the Program Review Report,

14   but the case was not tried -- and I'll get to this when I get

15   to the jury instructions.  The case was not tried on the basis          10:21:41

16   that there was an overarching, preexisting duty to disclose the

17   Program Review Report.  The theory is, the case is, they said

18   comments about the Program Review Report were misleading.

19          In the *Glenbrook Capital* case that is in our

20   supplemental authorities, the court points out that, "While          10:22:01

21   plaintiff argues that once defendants made a public statement

22   regarding the plan's sale they had a duty to speak truthfully

23   and completely, there is no such rule of completeness in this

24   circuit."

25          This case is in the Ninth Circuit, although it's a          10:22:20

1    District Court case.

2         "A party charged with failing to disclose material

3    information may be under a duty to disclose it -- must be under

4    a duty to disclose it in order to be held liable.  The Ninth

5    Circuit has held, however, there is no rule of completeness in          10:22:36

6    this circuit."

7         The point being that we have to look at the specific

8    statements and determine what it is that may have been

9    misleading about those statements.  And I recognize that the

10   jury found that each of those statements was misleading, but if         10:22:51

11   we look at them we can see what possibly could have been

12   misleading and then see if Flynn corrected that.

13        Because simply -- let's start with a February 27,

14   2004.  Apollo released a press release that said the Qui Tam

15   litigation has been dismissed and the government did not                10:23:11

16   intervene.

17        Now, under the rule of completeness, even if they had

18   gone over to say, "However, we have a Program Review Report,"

19   and even if they'd said, "And it's negative," they had no duty

20   to then say, "And by the way, market, here's the entire Program         10:23:28

21   Review Report."

22        What plaintiffs complained about on the February 27

23   press release was that it misled the market into thinking that

24   the government was no longer interested in the incentive

25   compensation issue, that since the government had not                   10:23:46

1  intervened in the Qui Tam litigation and the court had then

2  dismissed it, the government had no lingering interest.

3          Well, that was fully disspelled on September 7, 2004

4  when the settlement agreement was announced and the existence

5  of the Program Review Report was disclosed and it was described          10:24:06

6  as having been a negative report.

7          If that wasn't enough disclosure, the reports on the

8  14th and 15th fully ventilated what was in the Program Review

9  Report.  All of the findings and conclusions that were in the

10 Program Review Report were stated in one of the newspaper                10:24:21

11 articles.

12         So while the entire report wasn't out there, there

13 wasn't anything concealed.

14         So let's put ourselves back in February 27.  If Apollo

15 had said the Qui Tam litigation has been dismissed and the               10:24:36

16 Government declined to intervene but the Government is still

17 looking at incentive compensation regulation violations and has

18 issued a report that says we violated the law, I don't see how

19 anyone could argue that that would have misled anyone.  If that

20 was a misstatement, as the jury found, it was unequivocally              10:24:56

21 corrected on September 7 and September 14.  It did not await

22 the Flynn report.

23         Similarly, the April 13th, '04 10-Q.

24         I'm not sure the plaintiff's position, because they

25 had been arguing that the problem was that the IPD audit was             10:25:14

1    disclosed in that Q without disclosing the Program Review

2    Report.  Your Honor took the 10-Q out of the verdict form.  And

3    the plaintiff then argued, well, it should be in there because

4    it repeats the same statements that are in the February 27

5    press release and those are still false.  Your Honor put it       10:25:35

6    back in the verdict form, but then at argument they didn't --

7    at closing argument they didn't argue that.  They went back and

8    argued that it had the IPD audit in it.

9            So let's deal with the IPD audit.

10           All that was disclosed with respect to the IPD audit       10:25:52

11   was that the OIG of the Department of Education in an audit

12   report had found violations of the law dealing with incentive

13   compensation and the 12-hour rule.  They said that violations

14   had been found with respect to these subject matters, period.

15           So as a parallel with that, if that was misleading not    10:26:12

16   to talk about the Program Review Report, Apollo could have said

17   that the Department of Education had issued a Program Review

18   Report which found the University of Phoenix to be in violation

19   of the incentive compensation regulations, and that would have

20   paralleled everything in the IPD audit disclosure.                 10:26:36

21           Again, if that was misleading, and Your Honor knows we

22   argued long and hard and do not believe there was anything

23   misleading there, but I'm accepting the jury's finding that

24   that was misleading.  If that was misleading, it was fully

25   corrected on September 7th when the settlement was disclosed       10:26:53

1 and Apollo reported that it had gotten the report, it was

2 surprised by the negative tone, and had found violations of

3 incentive compensation.

4      Again, September 14th, even more falsum disclosures,

5 but nothing awaited Kelly Flynn.                        10:27:11

6      The 3/12/04 conference call.

7      We've had a lot of discussion and argument what was

8 the question Todd Nelson was answering?  The question was,

9 "When will the process be over or any type of report issued?"

10 And we argued that Todd Nelson's answer was not misleading  10:27:28

11 because he answered the first part of the question.  "It's hard

12 to say.  It could take six months or a year for this to be

13 completed."  But the jury found it was misleading.

14      So accepting that, the question that the jury

15 apparently found that Mr. Nelson evaded was, "When will any  10:27:44

16 type of report be issued?"  He could have said, "No comment."

17 That would have been appropriate.  He could have said, "One has

18 issued but I won't tell you about it."  That would not be

19 misleading.  He could have said, "One has issued and it's

20 really negative."  He could have said, "One issued and it found  10:28:03

21 that there weren't violations of the incentive compensation

22 rules."  All of those would have been an adequate disclosure

23 under any argument that he somehow misanswered that question.

24      All of those disclosures were made loud and clear on

25 September 7, September 14, September 15.  Nothing awaited Kelly  10:28:23

1    Flynn's report as a corrective disclosure.

2           That brings us to the June 24th conference call.

3           Mr. Nelson, in discussing the Program Review Report,

4    said, "Things are going smoothly."

5           Now, if the existence of the Program Review Report          10:28:43

6    four months earlier is sufficient to indicate that things

7    aren't going smoothly, ignoring all of the interim events, and

8    the jury did find that it was misleading, then the fact -- if

9    what made it not be going smoothly the fact that it settled for

10   $9.8 million, that was disclosed on September 7th.  If what      10:29:06

11   made it not going smoothly was the existence of the

12   four-month-old report finding them in violation of the

13   incentive comp regulations, that is fully disclosed on

14   September 14 and 15.

15          Again, nothing awaited Kelly Flynn to correct            10:29:23

16   anything.

17          And that brings us to the last supposedly misleading

18   representation, and that was the September 7 announcement of

19   the settlement agreement.  Mr. Nelson basically said this

20   resolves all of the issues of the program review, it's behind   10:29:38

21   us and removes lingering clouds of regulatory concern.

22          Now, I've indicated why that didn't await Kelly Flynn,

23   because it was in the Wall Street Journal and it was in the

24   Chicago Tribune, but even if one assumed that that had to await

25   Kelly Flynn to correct that, we don't have a class action       10:30:01

UNITED STATES DISTRICT COURT

1   starting on February 27, 2004.  We have a class action that

2   starts on September 7, 2004.

3        So there's no way that you can get to the analysis

4   that the plaintiffs had that all of these statements were false

5   and misleading.  They were corrected by Kelly Flynn and then      10:30:28

6   they ended up causing damage on September 21st, the day after

7   the Kelly Flynn report.

8        I'm going to have to hurry through these remaining

9   points.

10       Talked about disaggregation.                                 10:30:45

11       I do need to distinguish two cases that plaintiffs

12   cited in their supplemental authority.  They cited *Thane versus*

13   *Miller*, which is interesting because the court in *Thane versus*

14   *Miller* said what it said because it found the market was not

15   efficient.  The principal finding of *Thane versus Miller* was it  10:31:06

16   was not an efficient market and therefore you couldn't draw the

17   types of conclusions that we believe are required.

18       Secondly, they cite the *Iridium* case, but that was a

19   Section 11 case, and the court on summary judgment said,

20   Section 11, the defendant has the burden on loss causation, not   10:31:25

21   the plaintiff, and the defendant had not been able to carry

22   that burden on summary judgment.

23       So just going through this real quickly, because I

24   touched upon it, Dr. Feinstein says that his 5.55 damage

25   calculation includes the call for corrective disclosure,          10:31:43

slowing growth, EC turnover, bad publicity, and there may be

more regulatory risk.  He did not disaggregate any of the

decline in price that might have been caused by Kelly Flynn's

downgrade.

The entire decline may have been simply because they    10:32:03

downgraded having nothing to do with the specific reasons, or

it may have been all the reasons for her downgrade.  Often,

downgrades are based upon an analyst's opinion based upon old

news.

Under Reg FD, analysts should not have inside    10:32:18

information, and so generally what they will be doing in an

upgrade or a downgrade is simply analyzing publicly-available

information, and indeed, we know that's what she did here.

Because, as we previously discussed, the call for

corrective action was in The Arizona Republic article on    10:32:37

September 14.

Slowing growth had been discussed by the company for

months.  Analyst Greg Cappelli six months earlier.

EC turnover.  Simply not true.  Wasn't happening.

Bad publicity.  That couldn't be hidden after the 14th    10:32:51

and 15th.

And there may be more regulatory risk was also

discussed very specifically and expressly by the Chicago

Tribune on September 14th.

So, yes, Feinstein disaggregated market and industry    10:33:08

1    effects but he did not disaggregate nonfraud factors.

2            And again, I don't have time to refer to all the cases

3    that are cited in our brief and the supplemental authority, but

4    *Omnicom*, *Williams* are a couple of very good cases discussing

5    the fact that an analyst's damage calculation is inadmissible          10:33:27

6    and fails if it has not disaggregated the nonfraud factors.

7            Quickly on the efficient market hypothesis.

8            Plaintiff says, well, in *Basic versus Levinson* the

9    court declined to adopt any specific test.

10           Not surprising.  The case is 20 years ago.  The court       10:33:46

11   is for the first time recognizing the efficient market

12   hypothesis as being a legitimate basis to support a class

13   action.  The court, as it often does, didn't do any more,

14   didn't go any further than it had to; simply said we're going

15   to recognize the efficient market hypothesis and that will          10:34:04

16   satisfy the reliance requirement.

17           In *America West*, the court said we're not going to

18   adopt a bright line because there may be distortions.

19           In *America West,* it's important to remember that when

20   the event occurred that disclosed the report the company said,       10:34:18

21   "We're not going to have to change our maintenance techniques

22   in a fashion which will have any material impact on the costs

23   of providing our maintenance."  Later, there was a disclosure

24   that said, oops, we had to modify our maintenance procedures,

25   and it had a huge impact on the costs.                               10:34:46

1          And so the plaintiffs showed -- or alleged -- I don't

2     know if they were ever able to prove it, but they alleged what

3     the basis of the distortion was, that there was a statement

4     which was subsequently corrected and caused a decline.

5          And what did the Court in the Ninth Circuit say?          10:35:03

6          It said when that corrective disclosure was made to

7     remove the distortion we know it was material because the price

8     immediately declined.

9          All of the academic literature that was presented, and

10    indeed, in Exhibit R to Mr. Ward's declaration, they submit one   10:35:18

11    of the pieces of academia and remember the efficient market

12    hypothesis comes out of academia, and they submit as part of

13    the support for it an article by Scheifler which says about six

14    times that when new news hits the market it reacts immediately.

15         And that's critical, because the foundation of the        10:35:40

16    efficient market hypothesis is traders can't profit by using

17    information in their hands that's also in the market.  Because

18    the market will have assimilated that information, repriced the

19    stock immediately upon the receipt of that information.

20         And I, you know, won't go back through the arguments       10:36:01

21    because I know Your Honor is well familiar with what that does

22    to plaintiff's damage analysis.

23         The information was in the market the night of

24    September 19th.  It was on the wire service the morning of the

25    20th before the market opened.  It was on the blogs during the   10:36:17

1    day of the 20th.  If the market was going to react on the

2    20th -- if the market was going to react to that analyst

3    report at all, it was going to react on the 20th, not the

4    21st.

5            The last point that I had on Dr. Feinstein's          10:36:43

6    opinion and his unscientific methodology was that after

7    determining that the market was efficient, the very methodology

8    of an event study is to say we can't determine that there's a

9    causal relation between temporally-related events unless it's

10   statistically significant.                                    10:37:05

11           The, you know, fallacy that is at play here in a logic

12   class is called post hoc, ergo propter hoc.  After this,

13   because of this.  That is a classic logical fallacy.  Because

14   one event follows another, you cannot conclude it caused it.

15           What the statistical analysis of an event study does   10:37:26

16   is it says unless you meet statistical significance you cannot

17   draw any cause and effect relationship.  If it reaches a

18   certain level of confidence, then you, as the econometric

19   expert, can say I conclude there's a causal relationship.

20           Now, you're going to be wrong.  I mean, out of a       10:37:46

21   hundred or a thousand instances, you're not going to be right

22   every time because it's not a certainty.  It may still be

23   random.  And the science of it recognizes that it may still be

24   random but it also absolutely says if the statistical

25   significance isn't there you can't include it.                10:38:05

1       So what does Dr. Feinstein say?

2       He says, well, the price decline on the 14th, 15th,

3  16th, 17th, none of those are statistically significant, but

4  I'm still going to conclude that they flowed from the

5  disclosures on the 14th and 15th and therefore need to be added          10:38:21

6  in to the damage calculation.

7       Mr. Toffer will address that as it affects the

8  remittitur motion, but the point here is, having adopted a

9  scientific test he cannot then support his damage calculation

10  by ignoring the results of his own scientific test, which is          10:38:38

11  why Dr. Lehn had characterized his opinions as being

12  unscientific.

13       I'm going to have to move really quickly through the

14  new trial motion.

15       If Your Honor is not inclined to grant the judgment as          10:38:54

16  a matter of law motion on the grounds I've just argued, I think

17  those grounds cry out for a new trial.  Our brief has many

18  points, and I'm just going to have to fly through these.

19       We felt that it was a significant error not to allow

20  Kelly Flynn to testify.  Dr. Feinstein, we believe, should not          10:39:16

21  have been allowed to testify what Kelly Flynn meant.  He said

22  several places that, no, she doesn't say this but it's implied.

23  She had the report in front of her.  This is an argument that

24  counsel argues.  She had the report in front of her, she's read

25  it, she's drawn these conclusions, and this is what she has          10:39:38

 1  said.

 2          Well, we have her testimony.  We know what she did.

 3  We know what she thought.  But instead, we got Dr. Feinstein's

 4  version of what she thought, and we were not allowed to put on

 5  Kelly Flynn's testimony as to what she really did and really

 6  thought and we were also not allowed to use it to impeach

 7  Dr. Feinstein, which, under the cases we cited in our brief,

 8  clearly would have been appropriate impeachment.

 9          With respect to the jury instructions, we think that

10  the substantial factor instruction in the causation instruction

11  caused a serious problem.  When you go to the damages

12  instruction, it says, well, they can recover whatever was

13  caused by the misrepresentations, but then you go to the

14  causation instruction and it says it only has to be a

15  substantial factor.

16          But *Dow*, which says at the pleading stage it is

17  sufficient to plead that the defendants' conduct was a

18  substantial factor in the loss, says just a few sentences

19  later, "However, it must be taken into account in calculating

20  damages."

21          And that is where we go awry, because the -- the

22  whole -- that ties back to the whole disaggregation point.  We

23  didn't have an instruction that told the jury, well, if you

24  find this is a misrepresentation, it may have been a

25  substantial factor in causing that loss, but that's not enough;

10:39:56
10:40:13
10:40:36
10:40:53
10:41:10

UNITED STATES DISTRICT COURT

1  you have to find that the part that was misrepresented and in

2  the corrective disclosure that has multiple pieces of news, you

3  have to find that the corrective part of that disclosure is

4  what caused the loss, and that's what we didn't have.

5          Duty to disclose, also, we think very important.          10:41:30

6          Plaintiff said over and over and over again the fraud

7  was not disclosing the contents of the Program Review Report.

8  Dr. Feinstein said the fraud was not revealing the contents of

9  the Program Review Report.

10         By saying that, by counsel continually arguing it --     10:41:49

11 we had the argument on the golden rule.  He said, "Put yourself

12 in the investors' position and think if you had wanted to know

13 about that Program Review Report when you were making an

14 investment."

15         What that says is that there was some duty to disclose   10:42:05

16 the Program Review Report, and as we have seen by looking at

17 the specific disclosures, all of those could have been correct,

18 in any view, without disclosure of the complete Program Review

19 Report.

20         And when you tie that in with the Ninth Circuit has no    10:42:22

21 rule of correctness, allowing the jury to be misled down the

22 path that somehow there was a burden or a duty to disclose the

23 entire Program Review Report, we think is partially responsible

24 for the faulty verdict.

25         Advice of professional advisors and the failure to        10:42:39

1  give the instruction on it, again, we think is a critical

2  error.

3          Think about this.  You're the CEO of a company.  You

4  get a government report and you want to decide do I need to

5  disclose this.  Who do you ask?  Your disclosure counsel.  Then          10:42:56

6  you try to find out what the consequences are going to be.  Who

7  do you ask?  You ask some professionals who are expert in

8  Department of Education affairs.  And they tell you, "We've got

9  a lot of experience with these.  Don't worry.  We'll get this

10  resolved without a material effect on the company."  And you          10:43:14

11  act in accordance.

12          Your disclosure counsel monitors every one of your

13  disclosures.  He looks at your Q.  He looks at your press

14  releases.  He listens to the conference calls or reads the

15  transcripts.  He acknowledges that he has to advise you if          10:43:26

16  there's an error.

17          That is a responsible thing to do and an important

18  element of scienter.  This company is a creature of the

19  entity -- the University of Phoenix or Apollo Corporation is a

20  creature of the State of Arizona, which allows corporations to          10:43:42

21  incorporate, and by statute the legislature of Arizona has told

22  directors and officers of a corporation if you rely on expert

23  advisors in good faith you're not going to be liable.

24          We never told the jury that these executives were

25  within their prerogative to talk to experts and rely on those          10:44:03

1  experts.  We never told them -- we never gave them that

2  instruction.

3       Then when the advisors' credibility was attacked, we

4  didn't allow the advisors to say, "This is why I gave the

5  advice I gave."  They could say, "Well, I've been practicing

6  for 30 years and I'm a qualified lawyer and here's the advice I

7  gave."  But they weren't allowed to say, "And here's why I gave

8  it."

9       When they were attacked as being hired guns -- and I

10  have to read this.  Read the -- well, I was going to read it

11  but I have the wrong clip right here.  But the one I wanted to

12  read, and I'll just have to characterize it, was what they said

13  is there's -- I have it.  They're zealous advocates, but the

14  fact of the matter is, what the client wanted, that what he was

15  paying these attorneys to deliver, he wanted out, and the way

16  out he wanted was not the way of truth.

17       So plaintiffs took advantage of the lack of the

18  instruction by saying you won't hear an instruction that says

19  that relying on the advice of your attorneys gives you a way

20  out, and then they argued that the attorneys were just giving

21  the client what the client was paying for, which is a way out

22  which was not the truth.

23       The jury never was allowed to hear either the jury

24  instruction or the advisors' testimony to show that the

25  defendants were acting in good faith.

10:44:19

10:44:32

10:44:50

10:45:11

10:45:29

1          THE COURT:  You're down to about three minutes now.

2          MR. SMITH:  How much, Your Honor?

3          THE COURT:  About three.

4          MR. SMITH:  Three minutes?  I'm going to turn it over

5     to Mr. Toffer to talk about remittitur.                    10:45:37

6          MR. TOFFER:  Good morning, Your Honor.

7          Real briefly, I just want to talk about remittitur,

8     and Mr. Smith has explained some of the general background so I

9     won't go into that in too much depth, but to the extent you're

10    inclined to grant our motion for judgment as a matter of law    10:46:06

11    then I'd just sit down now, but if you're not inclined to do so

12    then we would ask that any denial of the motion for new trial

13    be conditioned on plaintiffs accepting remitted damages to

14    $3.49 a share.

15         As plaintiffs themselves have admitted in their          10:46:25

16    briefing, the Court can and should eliminate certain

17    identifiable sums that should not and cannot be included in the

18    award of damages.

19         And here, we believe that 3.49 is the only amount, and

20    assuming for purposes of this remittitur motion that the Flynn   10:46:43

21    reports are corrective disclosures, which we disagree with, the

22    only amount that can be included as damages is 3.49 because

23    that's the only amount that is used to show a statistically

24    significant drop in share value.  All the other drops are not

25    statistically significant.                                  10:47:02

1          And as Mr. Smith explained, the event study

2    methodology is used to establish a causal link between

3    information released into the market and a movement in stock

4    price, and as we've seen in this case, there was no

5    statistically significant movement in response to the news on          10:47:18

6    the 14th, on the 15th, 16th, 17th, 18th, or on the 20th.  The

7    only movement was on the 21st that was statistically

8    significant.  Therefore, that's the only amount that could be

9    caused by any news and show the causal link that's required

10   under the law.          10:47:39

11         We've cited numerous cases, and I won't go into those

12   because of the time, that establish that in a case like this an

13   event study with statistical significance is what needs to be

14   shown, but I'll just refer you to our brief on that.

15         What's really happened here is plaintiffs have taken          10:47:56

16   one statistically significant drop on the 21st and have

17   essentially proved causation backwards, scooping in all these

18   other insignificant drops where there is no causal relationship

19   between the information released and the movement in the stock

20   price.          10:48:16

21         And what this would allow is a slippery slope where an

22   individual can show a big statistically significant drop and

23   scoop in all these other drops that aren't caused by the news,

24   and that's why we believe that the damages need to be remitted

25   here.          10:48:30

1        And I believe that the Court's instruction to the jury

2   supports this fact, because it says in the causation

3   instruction, referring to the Flynn reports, "If you conclude

4   that the Flynn reports were not corrective disclosures, then

5   you cannot find that a misrepresentation or omission caused the        10:48:46

6   plaintiff to suffer damages."

7        In other words, the news on the 14th and 15th couldn't

8   cause damages, and that's the point of the remittitur motion

9   and that's why we believe it needs to be remitted by $2.06 to

10  3.49 a share.        10:49:06

11       THE COURT:  Thank you.

12       MR. SMITH:  Your Honor, could I humbly make one

13  request, and that's that you give Mr. Basser 45 minutes so I

14  can have five to respond?

15       THE COURT:  I will grant that.        10:49:13

16       MR. SMITH:  Thank you, Your Honor.

17       MR. BASSER:  May it please the Court.  Stephen Basser

18  for the plaintiffs.  Good morning, Your Honor.

19       I'm reminded of the Yogi Berra line.  I think this is

20  déjà vu all over again.        10:49:33

21       THE COURT:  You what?

22       MR. BASSER:  I said I'm reminded of the Yogi Berra

23  line.  I think I'm having déjà vu all over again.

24       THE COURT:  Grab that little button over to your right

25  and raise that podium up and that will bring that microphone --        10:49:45

1    there's a button on the right-hand edge, I believe, of the

2    podium.  It will raise it.  I've never tried it myself either.

3    I just take it by faith that it is there and that it works.

4    And then just pick one of those two mics, as you remember from

5    the past.                                              10:50:05

6          MR. BASSER:  Thank you.

7          THE COURT:  Just pick one of them.

8          MR. BASSER:  I'll pick this one, then.  Thank you.

9          There was a lot that was covered by Mr. Smith, and I

10   think again we have to return to the overarching theme of the   10:50:14

11   case, what this case was about and what the economic analysis

12   was also about and what Dr. Lehn himself failed to consider.

13         With regard to the overarching theme of this case,

14   Your Honor, this was a case in which the defendants made a

15   number of false and misleading statements that misled the   10:50:36

16   market, and the jury unanimously so found that it misled the

17   market by virtue of the fact that they did not disclose the

18   Program Review Report.

19         And had they disclosed that Program Review Report, a

20   single, unified, solitary, unequivocal, clear, crisp   10:50:46

21   announcement, Dr. Feinstein opined that had they done that the

22   stock price would have dropped at least $5.55 per share, if not

23   more, because that was the amount of the inflation that was

24   imbedded in the stock price.

25         There was distortion in the stock price from the time   10:51:05

1  they first started to speak to the market.  At no time did we

2  ever try to convince the jury or say to the jury that they had

3  an affirmative duty, even when they remained silent, to

4  disclose the report.

5      It's repeatedly noted in the record, there's comments

6  throughout the record where we talk about when you spoke to the

7  market -- there was cross-examination of Mr. Nelson -- you had

8  a duty to tell the truth when you spoke to the market.  It was

9  in the opening and closing statements.  In fact, we were

10 struggling to make sure that the jury understood that this was

11 something that arose from their purposeful concealment of the

12 report.

13     But the reason why they were liable is because in

14 addition to purposely concealing the report, which was their

15 plan all along because they didn't want the stock price to

16 move, and they admitted that, that once they spoke to the

17 market on related matters and topics, and here they

18 specifically did, matters of regulatory compliance, matters of

19 the program review, they even went so far as to fail to respond

20 accurately to a question as to when any report would issue from

21 the program review.  In each of those occasions they gave a

22 mischaracterization of the review.  They failed to alert the

23 market to what the true depth of the risk was as an investor.

24     We know from *Basic* and *America West*, those two cases,

25 that when we are looking at stock price fluctuation as

1  significant to the issue in those cases of materiality, but

2  it's also significant to what you can glean from the stock

3  price fluctuation, we know that it's a functional test, it's

4  not a formulaic test, there is no bright line standard, and the

5  agitation here or the conflict here has always been about the          10:52:43

6  defendants trying to create a bright line standard that fits

7  every single case, and that is to say if you make a revelation

8  of the truth -- they call it a corrective disclosure.  Please

9  be mindful that *Dura* doesn't use the phrase "corrective

10 disclosure".  It talks about disclosures that reveal the truth          10:53:02

11 for why the statements were fraudulent and that moves the stock

12 price.

13          *Dura*, though it's a pleading case, is still a Supreme

14 Court case, and we need to be mindful that the Supreme Court

15 never in *Dura* and never in *Basic* established a bright line           10:53:17

16 standard.  It never said it has to move in one day.  It never

17 said it has to move in any particular period of time, five

18 minutes, ten minutes, like Dr. Lehn opined.

19          So getting back to the basic themes here, we know that

20 *Dura* -- we know that *Basic,* which really is where it all             10:53:36

21 starts, is concerned about fundamentally full disclosure.  That

22 is what drives the securities laws.  That's what supposedly

23 helps to preserve and maintain the integrity of our capital

24 markets.

25          It talks about any approach that designates a single           10:53:50

1  fact or occurrence as always determinative of an intensely

2  fact-specific finding, such as materiality, must necessarily be

3  overinclusive or underinclusive.

4        And we know from reading *Basic* that the advisory

5  committee on corporate disclosure advised the SEC against        10:54:11

6  administratively confining materiality to a rigid formula.

7  Quote:  Courts would also do well to heed that advice.

8        What we learned from the Supreme Court's decision in

9  *Basic* is that absolute certainty is illusory and unscientific.

10  That's the absolute certainty that Dr. Lehn is espousing and    10:54:30

11  the absolute certainty that the defendants here are asking this

12  Court embrace.

13        It's not possible to translate these things into

14  numerical formulas.  Instead, you have to question these issues

15  as it relates to price movement and how it relates to issues of  10:54:46

16  materiality, and I suggest as well this applies to proximate

17  cause or loss causation.  You question it on a case-by-case

18  basis.

19        And *Basic* then says, and this has specific application

20  here to the issue of proximate cause, which is really what loss  10:55:01

21  causation is, proximate cause, it says, "Actual causes of stock

22  decline are all matters for the fact finder on a fully

23  developed record.  We do not intend to conclusively adopt any

24  particular theory of how quickly and completely publicly

25  available information is reflected in market price."            10:55:21

1        There is no bright line.  There is no formula.  It is

2    fact specific, it's intensely fact specific, due to the

3    peculiar facts and circumstances of every case.

4        And we see that thread all throughout the case law.

5    We see that thread even when it comes to defenses that are the          10:55:38

6    defendants' burden.  For example, the truth-on-the-market

7    defense, which wasn't asserted here, but it shows you, both the

8    Supreme Court and Ninth Circuit and other jurisprudence, that

9    when you're talking about whether the truth is in the market

10   you look at a very fact-specific analysis.                              10:55:56

11       It's a jury issue.  It's a question of whether the

12   information reached the market with such credibility and

13   intensity that it overcame any of the prior fraud such that the

14   market is no longer misled.  It's analogous, it's actually the

15   corollary to the fraud-in-the-market doctrine, the                     10:56:12

16   truth-in-the-market doctrine.

17       And just like the truth-in-the-market doctrine is fact

18   intensive and fact specific and you look at the whole range of

19   facts, you don't parse it out with formulaic notions of let's

20   splinter out the facts.  This is a new fact here.  This is a           10:56:27

21   new fact there.  Okay.  Therefore, if it's repeated three days

22   later it can't possibly move the market.

23       That's not how it works.  It's simply fact specific

24   and intensive.

25       And that's exactly what Dr. Feinstein did.  He did not            10:56:41

1  parse out different facts and review them in isolation or in a

2  vacuum, as the defendants are trying to do, but instead he

3  looked at the whole panoply of facts and ultimately concluded

4  that when you look at the whole panoply of facts there is

5  information that's old information that came out on the 7th,         10:56:58

6  that came out on the 14th, that came out on the 15th, that came

7  out in the Chicago Tribune article.

8       That information was then -- those dots were then

9  connected by Kelly Flynn, and Kelly Flynn, in connecting those

10  dots, also was able to connect them and impound in that            10:57:14

11  analysis new information, information that had previously been

12  concealed and specifically linked to the Program Review Report.

13  That new information is, there's a new compensation plan, it's

14  now linked to the report.

15       Mr. Nelson never linked it.  On September 7th he never     10:57:31

16  linked it.  He says -- all he said was that, oh, by the way, we

17  also did a new compensation plan to make things clearer.

18       Well, it was a lot more than that, and the evidence

19  showed that it was a lot more than that at trial.  Defendants

20  tried to run away from that linkage through the testimony of      10:57:47

21  Miss Thompson and others, but they could not, because the

22  evidence was clear from the letters, from the statements, from

23  the e-mails that clearly that new compensation plan did have a

24  linkage to the report.

25       And the report was specific about it.  Neither the          10:58:02

1  September 14th or the September 15th articles specifically said

2  what that new compensation plan said and neither one of them

3  disclosed what the report actually required in terms of fixing

4  their compensation system.

5         So what you have is with Kelly Flynn's report you have   10:58:19

6  her now, having had the benefit of that report in hand, which

7  no other analyst apparently had, there's no testimony that any

8  of the other analysts actually had it, you have an analyst now

9  looking at this, a market specialist, and she's basically

10  saying to the market I'm looking at all these facts and I know   10:58:38

11  that I've spoken now to enrollment counselors and the

12  enrollment counselors that I've spoken to are telling me things

13  that are troubling and it relates to this new compensation

14  plan.  I'm taking this into account.  This new compensation

15  plan evidently made some changes.  That's what you can get out   10:59:00

16  of this report.

17         And in addition to that, whereas before there was

18  discussion about more regulatory scrutiny or stricter controls

19  or perhaps even agitating Congress by virtue of these various

20  investigations of different companies, as the Chicago Tribune   10:59:17

21  article talks about, and whereas previously on September 8th

22  Kelly Flynn herself said that the near-term risk appears to be

23  reduced and she thought it was very favorable that they

24  concluded this situation with the DOE.

25         She specifically comes out and she says there's more   10:59:35

1   concerns of regulatory risk specifically as to Apollo by virtue

2   of the contents of the report.  She actually says contents of

3   the program review but it's clear she means the report and

4   everybody acknowledges that.

5          She is identifying -- and this is classic loss               10:59:56

6   causation.  This is classic investment analysis.  From the very

7   beginning of the class period, there was far more risk in this

8   stock than what investors realized, as a consequence of which

9   there was inflation that was imbedded in the stock or otherwise

10  you could call it distortion in the stock price of that stock,    11:00:13

11  from the very beginning of the class.

12         What she now does is she connects the dots and she

13  provides additional new information, which is the risk, the

14  depth of that risk of regulatory scrutiny is deeper now that

15  I've read this report than what we previously had discussed,      11:00:32

16  what had previously been revealed.

17         Remember, Mr. Nelson had tried to put a positive spin

18  on all this.  On September 7th, they bundled the information.

19  This is a case where the defendants did not make a clear,

20  single, clear, crisp disclosure but instead a case where they     11:00:49

21  tried to walk the stock down.

22         In the context of walking the stock down, what they

23  were trying to do is insulate themselves from being liable or

24  responsible for the very falsity or false and misleading

25  statements that they had disseminated to the market.              11:01:05

1        That is totally antithetical to the whole notion of

2   our federal securities laws.  We cannot embrace or adopt a rule

3   of law, as the defendants are trying to ask this Court to

4   embrace, that would allow defendants to use economic --

5   econometric analyses to skirt or avoid the obligation to tell        11:01:25

6   the truth when they speak to the market.

7        And that's what Dr. Lehn tried to do.  He was trying

8   to fit a square peg into a round hole.  This was a case where

9   the defendants tried to walk the stock down through a series of

10  partial disclosures or by simply not giving anybody the report      11:01:42

11  and making the market go out and find it themselves.  Make the

12  market go out and connect the dots.  Make the market go out and

13  figure out just what is this all about; what does this mean to

14  this company in terms of forward risk; what does it mean in

15  terms of current risk; what is the risk of my investment.          11:01:56

16       Kelly Flynn does that and that's what her downgrade

17  relates to, because her downgrade is basically saying to the

18  market, given that I've got this information regarding

19  turnover, that we know that there's a new comp plan -- that, by

20  the way, is linked to the fact that they did make changes in       11:02:11

21  response to the report -- given the fact that I have this

22  report and mindful of the other things that are already out

23  there, which Dr. Feinstein says in themselves did not move the

24  stock price on the 20th or 21st, what you see is a company that

25  had a flight-to-quality premium, and Dr. Feinstein specifically    11:02:30

1    talks about the flight-to-quality premium, a flight-to-quality

2    premium that was imbedded in the stock price, because Apollo

3    stood up ahead of the pack, so to speak, they were the golden

4    boy, they were as pure as the driven snow, they weren't part of

5    the herd, like Corinthian, ITT, Career Education, but now, now    11:02:46

6    I've read the report, I've seen it, I've seen the depth of it,

7    I've seen the risk, and the flight-to-quality premium is not

8    justifiable anymore because of this additional information.

9         Had that information been made, had that clear

10   statement been made by the defendants or anyone else on          11:03:08

11   February 27th when they had the report in hand, the report

12   calling for corrective action, a report that clearly had the

13   possibility of sanctions, that ultimately resulted in

14   sanctions, if it had been disclosed at that time in a single,

15   unified, solitary statement you would have seen the movement of  11:03:26

16   the stock price, just as you saw it when after the news

17   dribbled out into the marketplace and the market had to

18   understand that news, then the stock price moved.

19        And what the case law all says is that you look at

20   whether the stock price moved.  Statistical significance is a    11:03:43

21   barometer of that for sure, but the cases don't say that it has

22   to be a statistically significant decline in only one day.

23        Also, the cases don't say that it has to be the sole

24   reason that the fraud-related disclosure has to be the sole

25   reason for the decline, as opposed to a substantial factor in    11:04:05

1  causing the economic loss to the plaintiff.

2       We know from the *Corinthian* case that was just

3  recently decided, I think the Ninth Circuit is giving some very

4  good indication as to where it goes on that issue, because it

5  uses that very same language, the substantial factor language.      11:04:22

6  Defendants are arguing sole cause language as opposed to

7  substantial factor.  That is not the law.

8       And here, the jurors were not prejudiced and the

9  damages result is in line with the law because what the jurors

10  were told is that the fraud-related amount of the decline is     11:04:41

11  $5.55 per share on a cumulative basis from the 14th through the

12  21st.

13       That is not the whole decline.  The whole decline was

14  $8.63.  But as Dr. Feinstein said, but as it relates to the

15  fraud-related decline, i.e., that which relates to the contents    11:05:01

16  of the report, the failure to disclose the report, the reasons

17  why the market was misled, that is $5.55 a share.  Also, with

18  regard to the period of September 20th to the 21st, that

19  decline is $5.00 a share.

20       So what the defendants are trying to do with their     11:05:21

21  motion for remittitur and their motion for judgment is

22  basically say forget the law, just apply a single statistically

23  significant standard, single-day-decline standard, and forget

24  the fact that this was a case dealing with a series of partial

25  disclosures, a series of partial disclosures that ultimately,     11:05:39

1    ultimately, enabled the market to assess the risk and

2    understand the truth and why the various statements previously

3    were fraudulent and misleading.

4         And what the defendants are asking this Court to do is

5    basically say you have to have some formulaic, golden rule,      11:05:55

6    bright line standard that means that you have to show that the

7    cause -- the damages that were caused is solely caused by the

8    fraud-related factors when in point of fact the law doesn't say

9    that.  The law says a substantial factor in the economic loss

10   suffered by plaintiff.  That's the loss causation standard.      11:06:16

11        Here, the jurors heard what the damages were as a

12   consequence of that, and Dr. Feinstein parsed out those damages

13   specific to the fraud.  Your Honor instructed the jury on

14   damages and Your Honor instructed the jury on the event study

15   and Dr. Feinstein used an event study that isolated that         11:06:33

16   specific fraud-related portion of the damages.

17        So with regard to the overarching law, it's a flexible

18   and functional approach, it's a fact-specific inquiry, and the

19   jurors were allowed to make that fact-specific finding and they

20   did so.                                                          11:06:55

21        In the context of doing so, they rejected Dr. Lehn.

22   Dr. Lehn was impeached.  Dr. Lehn was shown not to be that

23   credible when it came to certain issues.  He can say anything

24   he wants about Dr. Feinstein, but as it relates to this

25   particular proceeding, it is Dr. Feinstein's analysis, I think,  11:07:08

1    that is to be taken in the light most favorable to the

2    plaintiffs, not Dr. Lehn's.

3         And you can't say that based on the facts when taking

4    them in the light most favorable to the plaintiffs that you can

5    only reach one reasonable conclusion here, and that is there

6    was no causation and no damages or that the damages were not

7    $5.55 but some other amount which is less than that.

8         With regard to the cases that were cited by Mr. Smith,

9    the *Omnicom* case which they rely on significantly really

10   doesn't get them anywhere.  In fact, *Omnicom* specifically talks

11   about ascribing some rough proportion when you're talking about

12   a tangle of fraud with nonfraud-related factors.

13        Here again, this is a case where the court, not in

14   this jurisdiction, not in this circuit, it's not -- it doesn't

15   have precedential value in that regard, but it's a case that

16   says you ascribe some rough proportion when you're talking

17   about how you apportion the fraud-related from the

18   nonfraud-related.

19        Dr. Feinstein did far more than that.  Dr. Feinstein

20   came out with a specific fraud-related damages figure as it

21   relates to the reasons why the statements were false or

22   misleading, and that figure was $5.55 a share.

23        We go on to the *Merck* case which Mr. Smith mentioned.

24   *Merck* is actually another case out of New York, I believe, it

25   doesn't have precedential value but it does show, at least,

1  that the courts are not embracing the single-day statistical

2  significant drop or rapid means five minutes or ten minutes or

3  instantaneously.  Quite the opposite.

4          In *Merck*, *Merck* said immediately does not mean

5  instantaneously.                                              11:08:56

6          And in *Merck*, it even went so far to talk about

7  whether the facts that were disclosed in an S-1 registration

8  statement, which ultimately was determined that everything that

9  was disclosed in an S-1 statement there, was enough to inform

10  the market, and all somebody else did later on, a reporter or   11:09:10

11  an analyst later on came out several months later -- I think

12  the S-1 was in April and the analyst statement was in July --

13  and what the analyst said was basically by reading the S-1

14  statement and all the mathematical information in that

15  statement about co-payments from Medco to Merck -- it's a      11:09:31

16  somewhat more complex case but it's a financial case in that

17  regard -- if you look at the S-1 you can see what the

18  co-payments are.  You can actually see how much of the

19  co-payments then are being recognized by Medco and therefore

20  you can calculate what the problem would be if the company is  11:09:47

21  recognizing revenue or if Medco is recognizing revenue from

22  co-payments.

23          That's a purely mathematical function.  That's a

24  financial type case, financial fraud case, on the spectrum of

25  loss causation, which is a very factually-intensive analysis.  11:10:05

1    That would be the case that probably would be much clearer

2    because it is a financial case and the financial fraud cases

3    where you have fraudulent financials and you have a disclosure

4    that they overstated their financials or they didn't properly

5    report their financials.  That usually does have an immediate      11:10:23

6    effect.

7            Surely, you can have an immediate effect that's

8    statistically significant.  We're not saying that.  You cannot.

9    We're not saying that that's not probative.  It is probative.

10   But that is not talismanic.  There is no law that says -- in       11:10:37

11   the Ninth Circuit and certainly in the Supreme Court that says

12   that it has to be instantaneous, has to be within five or ten

13   minutes.  You look at the various facts.  And that's what we

14   had here.

15           And that's why it seems like sometimes they're talking    11:10:51

16   about a different case than what we're talking about, and when

17   they try and talk about new information versus old information,

18   Dr. Feinstein clearly parsed out the information that moved the

19   stock price.  He clearly supports the jury's finding with his

20   testimony that the stock price moved after the Flynn reports by    11:11:09

21   virtue of the fraud-related information.  That would include

22   the fact of the nondisclosure of the contents of the Program

23   Review Report and the related compensation plan changes and

24   issues and sequelae of that.

25           The *Merck* case further goes on to say there's no         11:11:26

1  bright line rule and we do not award opaqueness.  We do not

2  award opaqueness.

3       And again, here we have a situation where the

4  defendants made a lot of false and misleading statements.  They

5  were at best opaque.  I think, frankly, they were out and out       11:11:42

6  fraudulent because they had a plan to conceal this report

7  because they knew the stock would fall.  They admitted at trial

8  that if they disclosed this report they knew the stock would

9  fall.

10       So what they did was they tried to walk the stock down       11:11:56

11  and they made it much more difficult to detect how much of the

12  inflation, how much of the distortion had now been dissipated

13  as the news started to leak out.

14       We have *Home Solutions* which the defendants recently

15  cited to.  *Home Solutions* says loss causation can exist even       11:12:11

16  without instantaneous response.  Quote, they talk about

17  effectively disclose to the market, close quote.

18       These are terms that clearly indicate that it's not

19  formulaic and bright line.  You want to look to see whether

20  it's been effectively disclosed to the market.  As *Merck* said,       11:12:29

21  prominently and candidly.

22       And in *Home Solutions*, there was a disclosure that was

23  many months later, but the interesting thing about *Home*

24  *Solutions* is what it's basically saying is that you may have a

25  disclosure that is later than an initial corrective disclosure       11:12:46

1   and it may be that that disclosure suddenly alerts the market

2   to things they didn't realize before or puts it in the context

3   or analyzes it, et cetera.

4          The fact that it's later doesn't necessarily mean it

5   can't be a corrective disclosure.  There may be some temporal         11:13:06

6   time period.  It doesn't necessarily all have to be

7   instantaneous.  Loss caution can exist even without an

8   instantaneous response.

9          We saw that in *America West*.  There was a disclosure,

10  there was no instantaneous response, and then several days            11:13:19

11  later or so there was another disclosure and there was a

12  response.

13         We saw that in *Control Data*.  *Control Data* is, I

14  believe, a Sixth Circuit decision in which there was financial

15  information that was disclosed.  That's an appellate decision.         11:13:32

16  The financial information was disclosed and the market didn't

17  respond.  About six days later, coincidentally, there was a

18  media reporter who was able to connect the dots, who was able

19  to determine from looking at the financial disclosure and

20  looking at certain lease covenants that the company had, that         11:13:56

21  by virtue of the fact that they had now suffered financially

22  and their net worth had declined that they were now in default

23  or could be determined to be in default under their lease

24  obligations, and the stock price declined.

25         This is not unlike what we find here with Kelly Flynn,         11:14:11

1   who comes in, starts to put the pieces together, a slow leak,

2   so to speak, a walking down of the stock price is now being

3   investigated, so to speak, and she finds that indeed this

4   company is far riskier an investment than it was previously.

5            And she specifically relies as factors on the contents

6   of the Program Review Report, more regulatory scrutiny for

7   Apollo, obviously "more" meaning more than what we thought

8   before, and the compensation plan changes.

9            And both the defendants and the plaintiffs agree that

10  there was previous information, old information in the

11  marketplace that did not move the stock, so therefore when you

12  had a downgrade, the downgrade and the relationship of that

13  downgrade to the new information related specifically to the

14  report, which is all fraudulent-related news, or fraud-related

15  factors.  It is that combination that then moves the stock

16  downward.

17           And that's what the law requires:  Does the stock move

18  upon revelation of the truthful information that reveals the

19  fraud?  That is the barometer.

20           *Take-Two* is another case cited by the defendants

21  recently in their notice of recent authority, and *Take-Two*

22  specifically says loss causation can be predicated on analyst

23  reports.

24           It's not true that Kelly Flynn as an analyst cannot

25  render a report and constitute a corrective disclosure, and

1   indeed whether it's a corrective disclosure, or we use that

2   phrase, it's really a euphemism for is it a disclosure that

3   revealed the truth, demonstrating the statements as fraudulent

4   or misleading, and did it therefore move the stock price, i.e.,

5   a corrective disclosure.                                    11:16:05

6          That's an intensely factual issue for the jury, and

7   the jury decided that fact in favor of the plaintiffs.  And

8   they were specifically instructed on that fact.  They were

9   specifically instructed that they had to find that.

10         It didn't mean that only the time period from the 20th   11:16:19

11  to the 21st could then be counted as damages, as defendants

12  argue, or the time only on the 20th could be counted as

13  damages.

14         What it meant was if all you had was a series of days

15  with no stock price movement and the jury determined that Kelly   11:16:35

16  Flynn was not a stock-price-moving disclosure related to the

17  fraud, or corrective disclosure, what it meant was that you

18  wouldn't have any statistical significance that you could

19  attach on a cumulative basis or individually to the prior

20  statements.                                                11:16:56

21         And consequently, if you carve that out then you don't

22  have -- you don't have something that you can award damages on

23  for the 15th through the pre-September 20th report, but here

24  you did, and the jury so found.

25         Third-party analysts of financials can support loss   11:17:12

1   causation.  A third-party analysis by an analyst can support

2   loss causation.  That's exactly what we had here.  That's the

3   *Take-Two* case.  Loss causation can be grounded in disclosures

4   couched as opinion.

5          So defendants are wrong when they say you can't do

6   that.

7          *Take-Two*.  Premised on partial revelations that did

8   not uncover the complete extent of the falsity of the prior

9   statements.  That's pretty much what we have here.  Partial

10  revelations.

11         So it goes on and on.  *Take-Two* is a very good case.

12  Talks about loss causation, the truth slowly emerged through a

13  series of partial disclosures, leaking disclosures theory.

14  That's what they called their theory here.  Here we call it

15  walking the stock down.  Because we know that the defendants

16  purposely didn't want to disclose this report and then they

17  used disclosure techniques to make sure it didn't get to the

18  market immediately in one crisp disclosure.

19         Leaking disclosures, quote, a plausible theory.

20         So everything they're arguing is really arguing a law

21  or a theory what the law should be that, A, doesn't fit this

22  particular case and, B, isn't really the law.

23         And what it boils down to is that we had demonstrated

24  clearly through Dr. Feinstein how the revelations of the truth

25  moved the stock price, and he did it with a fair amount of

11:17:28

11:17:43

11:17:59

11:18:16

11:18:30

1  finite precision.  He even went so far as to specifically

2  quantify it, $5.55 a share from the 14th through the 21st,

3  $5.00 a share from the 20th to the 21st.  All that mathematics

4  was provided to the jurors.

5        The *Corinthian* case is really very helpful as well                11:18:51

6  because it talks about two different disclosures, one before

7  and one after the class period.  Defendants made a big deal

8  through trial about that.  It's in their motion for new trial,

9  I believe.  You can't have a disclosure that's after the class

10  period.  You can't consider Kelly Flynn because she's after the        11:19:10

11  class period.

12        That's not true.  It's never been the law, it's not

13  the law, and the Ninth Circuit now clearly indicates.  They

14  considered a disclosure that was after the class period.  That

15  the class period in that case ended July 24th and the                  11:19:23

16  disclosure was August the 2nd.

17        There's no prohibition, according to the *Corinthian*

18  case, no prohibition of alleging loss causation through a

19  series of disclosures by the defendant.

20        Did the price fall significantly after the truth                 11:19:38

21  became known?  It doesn't say instantaneously, within five or

22  ten minutes, or immediately that very day.  It's all because

23  these are fact-intensive inquiries.

24        And that is countenant with our effort to try and

25  preserve the integrity of the capital markets.  That is              11:19:55

1  countenant with our effort to make sure that defendants tell

2  the truth when they speak to the market, that they can't abide

3  by some notion that, I'll tell you what, I won't tell the truth

4  but, then again, what I'm going to do is I'm going to figure

5  out a really neat way to make the disclosures in such a way          11:20:10

6  that I never have a statistically significant drop on any one

7  day.

8            That is not consistent with the theory and fundamental

9  philosophy of the federal securities laws.

10           Dr. Lehn was himself impeached.  It was ultimately        11:20:26

11 shown that he himself uses multi-day-event windows.  He used

12 them even in a case that was so clear, the postulation that if

13 Ronald Reagan is elected, I think, and he wants to spend more

14 money in defense, therefore defense industry stocks will go up,

15 I mean, that's basic.  That's clear.  And yet he used a          11:20:44

16 three-day event window.

17           So he even agreed that $5.55 a share was, on a

18 cumulative event study basis, the amount of the loss.  He's

19 disagreeing that Dr. Feinstein should have applied the

20 cumulative event study, but he himself acknowledges academic       11:21:06

21 literature that supports such a multi-day-event window type

22 analysis, he himself has used it, and he turns around and he

23 says to the jury it's unscientific.

24           He says to the jury, "I'm impartial."  He's not

25 impartial.  Every witness that they called, including          11:21:22

Miss Thompson, and this is an important point, every one of

them was impeached and demonstrated to be -- the basis was

given for the jury to reject their testimony as not true or not

fair and impartial.

       Miss Thompson is important because Mr. Smith relies on    11:21:37

her, the defendants rely on her to say that because there was a

comment about increased turnover in the Kelly Flynn reports and

because later on somebody else said there wasn't increased

turnover, that somebody is talking to the company, by the way,

they're not themselves aware of whether there is or isn't        11:21:53

increased turnover, therefore that comment is not true, and if

it's not true, you can't base loss causation on it.  That is

also not the law.

       Dr. Feinstein said it doesn't matter if the comment's

true or not true.  You have a disclosure of a risk and you're    11:22:07

answering a question in the market does the new compensation

plan increase the risk of turnover, and there is comment by

enrollment counselors that have been investigated that they

see it already.  That's temporal related.  That's temporal in

time.                                                            11:22:36

       The testimony by Miss Thompson is not disinterested

and impartial testimony.  She is not a disinterested and

impartial witness.  Therefore, the Court may not embrace her

testimony as gospel for the purpose of this proceeding, I don't

believe.                                                         11:22:48

1          Indeed, Miss Thompson was impeached.  Miss Thompson

2     tried to de-link the compensation plan.  We know from the

3     evidence that it was clearly linked.  Miss Thompson tried to

4     say that Mr. Collins -- she didn't know that there was a bad

5     exit interview, but we know that she had a discussion with

6     Mr. Collins around that time where clearly he said, "They think

7     that we're violating the incentive compensation ban."

8          Miss Thompson, on top of that, says, without any

9     evidentiary support, "Oh, well, I looked at the reports and the

10    reports showed that the turnover hasn't increased."  No comment

11    about what period they're reporting.  No comment about how the

12    reports are structured, their reliability, their integrity,

13    nothing like that.

14          They have the reports, I assume, and they don't even

15    produce it to the jurors.  The jurors obviously didn't want to

16    abide by this one-sided type of approach.  We see that

17    throughout this entire case.  There's a great exit interview or

18    it's favorable or there's a great discussion or it's favorable

19    or had a discussion with Mr. Hickock, Deputy Secretary Hickock,

20    and it was favorable, we're going to get out of this for -- you

21    know, unscathed, basically, for just a few hundred thousand

22    dollars like ITT.

23          Not a single one of those conversations is in a memo.

24    Miss Thompson's review of the reports isn't in a memo.  The

25    reports aren't produced.  None of the witnesses that they

11:23:06

11:23:22

11:23:41

11:23:59

11:24:13

1   produced, none of them, apparently, were viewed as credible by

2   this jury.

3          And consequently, Mr. Smith's whole argument that the

4   turnover really wasn't true, that indeed there wasn't increased

5   turnover has no relevance to begin with, but even if it did,          11:24:29

6   there's no proof that it's not true, there's no proof that it

7   was contradicted by evidence that you have to embrace for the

8   purpose of this proceeding.

9          I don't know how much time I have left so I'm going to

10  have to, unfortunately, speak faster, which is a problem for         11:24:42

11  me.

12         THE COURT:  You've got about ten minutes.

13         MR. BASSER:  About ten minutes?

14         I will endeavor, then, to go through the new trial

15  motion with some speed, Your Honor, and again, thank you very        11:24:49

16  much for your time and for the opportunity, given all this, to

17  address you.

18         The substantial cause instruction.  There's nothing

19  wrong with the substantial cause instruction.  That was based

20  on Ninth Circuit law.  It's a Ninth Circuit model instruction.      11:25:06

21  It is the *Dow* case, basically.  It's now been recited in the

22  *Corinthian* case.  It's fine.  They attack that causation

23  instruction.  It is simply not attackable and is not a basis

24  for error.

25         Secondly, they talk about rapid.  Rapid means five or         11:25:23

```
 1   ten minutes and the jury should have been told that.  The jury

 2   should have been told that rapid means some period of time,

 3   finite period of time, and they weren't told that.

 4        The fact of the matter is that the case law doesn't

 5   say that.  The case law doesn't say immediately means          11:25:37

 6   instantaneously and it doesn't define bright line formulaic

 7   standards.  There was nothing wrong in that instruction.

 8        Indeed, my recollection is that when we did discuss

 9   and debate that particular instruction I think defendants

10   pretty much conceded that as long as it stopped after a certain  11:25:55

11   point in time on the sentence they didn't have a problem with

12   the instructions.

13        So the five or ten minute part, while they would have

14   liked it, ultimately when we had our dialogue it didn't get

15   included.  And I think, frankly, they've waived it.  But it's   11:26:08

16   not the law, in any event, and is certainly not a basis for

17   error.

18        And they certainly had every opportunity to espouse

19   their theory of whether or not if it didn't occur -- if the

20   statistically significant drop didn't occur within five or ten  11:26:22

21   minutes or one day, they certainly were able to proffer that to

22   the jury as their economic theory in this battle of the

23   experts, between two experts who basically used the same

24   econometric analyses, but they differed on the multi-day-event

25   window.                                                         11:26:39
```

1    And that was the basic point of disagreement between

2    each of them.  I think each of them even acknowledge that --

3    especially Dr. Lehn -- that, you know, how you pick a

4    multi-day-event window or how you pick the event window is

5    really dependent on the facts of each case.

6    We say that Dr. Feinstein picked a window that is

7    appropriate for the facts of this case given the peculiar facts

8    and circumstances in this case and the fact that the defendants

9    walked the stock down and there was a series of partial

10   disclosures.  Dr. Lehn says only a one-day event window is      11:27:06

11   appropriate, and the jurors obviously did not embrace his view

12   and they did embrace Dr. Feinstein.  It's a jury determination

13   amply supported by the evidence, not deprived of any

14   information or inflammatory remarks by counsel.

15   Duty.  We, throughout this case, spoke of a duty to           11:27:25

16   speak truthfully when you speak to the market.  It is all over

17   the opening statement.  It is all over the closing statement.

18   It is even in the cross-examination of Mr. Nelson.  It's in the

19   cross-examination of Dr. -- pardon me -- Mr. Cohen.  There was

20   never any time when we took the position before the jury, and,   11:27:50

21   in fact, there was never any time that we took the position in

22   our dialogue with the Court that this is a case where we're

23   saying or we're arguing that if they remained silent they

24   nevertheless still had a duty.

25   So that contention on their part simply doesn't hold         11:28:07

1  water and it doesn't match anything that occurred before the

2  jury in this case.

3       With regard to the issue of materiality and in

4  particular the comments that somehow there was a golden rule

5  argument that was evoked in this case, I respectfully disagree                11:28:29

6  with Mr. Smith in that regard.  There was no golden rule

7  argument that was evoked in this case.

8       The golden rule, do unto others as you would have them

9  do unto you, is something that, in my experience, classically

10  has been an argument that it might be objectionable in, for             11:28:47

11  example, a personal injury case somebody has horrific injuries

12  and you're basically saying to the jury put yourself in this

13  person's position and if you were sitting there with these

14  horrific injuries wouldn't you want to be awarded compensation

15  for them, et cetera, et cetera.  It is that type of                     11:29:01

16  inflammatory or potentially prejudicial remark that the

17  jurisprudence seeks to avoid.

18       What's interesting here is the defendants know full

19  well nothing like that even came close in this case.  I

20  repeatedly in closing argument referred to the reasonable              11:29:16

21  investor standard.  The jurors were specifically, specifically

22  instructed with regard to that standard.

23       To the extent that there was a remark about you would

24  want to know about this report, it was all in connection with

25  that reasonable investor standard, what a reasonable investor          11:29:36

 1   would want to know.  It was a rhetorical you.  It wasn't a

 2   golden rule type of argument.

 3        And even if it was, even if it was, there was

 4   absolutely no objection to it, there was no effort to ask the

 5   Court to either admonish counsel or give any curative          11:29:50

 6   instruction, and that's because they know that in the context

 7   in which that argument was made it was not a golden rule

 8   argument and it certainly was not inflammatory.  It related to

 9   the issue of materiality, and materiality itself talks about a

10   reasonable investor, what would a reasonable investor do?      11:30:05

11        So, in essence, you are asking the jurors to look at

12   it and say what would a reasonable investor do?  And that's

13   more or less how it came down at the trial.

14        With regard to the Flynn deposition issue, I disagree

15   again with Mr. Smith about his interpretation of the events.  I 11:30:21

16   think the record is clear that Your Honor was even-handed.

17   Neither party could call Miss Flynn but both parties' experts

18   could divine from the report what she was saying to the market.

19   Not what's in her mind two years later, not what she wants to

20   now suddenly revisit two years later, but what is she saying to 11:30:49

21   the market.

22        And they had the opportunity to cross-examine

23   Dr. Feinstein.  It's not true when Mr. Smith says they were not

24   permitted to cross-examine Dr. Feinstein on the Flynn

25   testimony.  That is simply not true, and the record clearly    11:31:00

1   shows that.

2          But the record also clearly shows that the Court

3   indicated that Dr. Lehn was permitted to divine what Flynn

4   said, what Flynn was saying to the market from the report.  So

5   they had an opportunity to make that same -- to engage in that          11:31:18

6   same divining effort as Dr. Feinstein did.  It was very fair.

7          The issue of rationale.  I don't even understand that

8   argument.  Both Mr. Hatch and Mr. Cohen, when they testified,

9   testified as to what they told Mr. Nelson, and that was their

10  state-of-mind defense.  We challenged that as to whether that's          11:31:41

11  even an appropriate defense, but nevertheless, they were given

12  wide latitude, wide latitude throughout the trial to posit that

13  defense, to argue to the jury that he had a pure heart or he

14  didn't have a bad state of mind or he wasn't really trying to

15  defraud anybody.                                                         11:31:58

16         It's what he had in his mind and what he was told by

17  his advisors that is what was relevant, and the Court made that

18  clear and we made that clear, and I think the one time that I

19  may have tried to deviate from that in cross-examination there

20  was an objection and I believe that at that juncture the                 11:32:13

21  objection was if you want to start getting into the whys and

22  wherefores of why he said what he said, you know, we're happy

23  to open that door, and I withdrew the question or the objection

24  was sustained.

25         The Court was very good in terms of trying to confine            11:32:27

1  the parties to the relevant evidence and very good in terms of

2  trying to make sure the case was balanced and didn't go off on

3  tangents and to the extent it may have gone off on a tangent or

4  two bring us back to keep us focused.

5      But Mr. Cohen's comments -- the rationale argument                    11:32:49

6  makes no sense in terms of Mr. Cohen's comments because

7  Mr. Cohen said what he said to Mr. Nelson was based on what

8  Mr. Nelson said to him.  He's relying on Mr. Nelson.

9  Mr. Nelson says the report is wrong through and through,

10 Mr. Nelson says it's a false report, and he is relying on        11:33:04

11 that to then say to Mr. Nelson, well, based upon what you're

12 telling me, you have a reasonable basis not to make the

13 disclosure.

14      What he never told him is you can lie to the market.

15 What he never told him is that if you speak about the subject    11:33:18

16 matter you can still conceal it.  He never told him that.  He

17 admitted on cross-examination that he never told him that and

18 Mr. Nelson admitted that he was never told he could lie to the

19 market.

20      So that's a red herring.                                    11:33:31

21      THE COURT:  You have about two minutes left.

22      MR. BASSER:  Okay.

23      And with regard to Mr. Hatch, he gave his rationale

24 for just about everything while he testified.  I even think I

25 remember hearing him say after he was told about parentheticals  11:33:41

1  that he added to his testimony he even used the phrase

2  "parentheticals included" in response to a question.

3        Everything he did, once he realized that he could only

4  testify as to what it is he told Mr. Nelson, he went on and on

5  about what he told Mr. Nelson.  He gave his rationale to          11:33:58

6  Mr. Nelson, as he testified.

7        To the extent he was impeached, he was impeached on

8  his own evidence, on his own testimony, his own documents.  To

9  the extent that any of them were impeached, Messrs. Cohen or

10  Mr. Hatch, let's be mindful.  They did have an expert.  They     11:34:13

11  called an expert.  How many experts do they need?

12        But in addition to that, they were impeached because

13  the issue was materiality and they were advocates and they were

14  hired guns, but that doesn't open the door for them to go far

15  afield and add all their additional expertise, especially when  11:34:29

16  Mr. Cohen's relying simply on Mr. Nelson to give him the facts,

17  and that's the basis of his advice.  And Mr. Hatch is

18  throughout the testimony giving his rationale to Mr. Nelson.

19  So I don't see how they were possibly prejudiced, nor is there

20  any error in that regard.                                       11:34:50

21        Finally, they challenged the report.  They challenged

22  this report, from day one, even from the first day we were here

23  on a motion to dismiss.

24        And in my last 30 seconds or so, the record is replete

25  with how many times they challenged the accuracy of it, its     11:35:03

1  professionalism, whether it was biased.  They even tried to

2  de-link the compensation because they didn't want anyone to

3  think the report had any validity.  Everything they could do to

4  attack that report was done.

5      And we walked into trial believing that if we knew

6  that they were going to raise a defense we therefore had to put

7  on our testimony in our case in chief rather than wait for

8  rebuttal.  We followed that protocol.  We were able to get in

9  some testimony.  There was a lot of objections and they were

10  successful in our not getting in some testimony, primarily from

11  enrollment counselors, even though they themselves in their own

12  defense challenged the enrollment counselors either as to their

13  veracity or about their accuracy in terms how they were paid,

14  even though they took the position through Miss Thompson that

15  at the field level they used weighted percentages and the

16  enrollment counselors therefore were paid based on various

17  different factors.

18      They could get all that evidence in.  We were, I

19  think, limited in our ability to do so and now they want to

20  create a star chamber proceeding and they raise the position

21  that where they are successful in objecting to evidence that

22  we're trying to get in that we tried to get in to respond to

23  their anticipated defenses, and it's a major part of their

24  defense, that because they are successful in limiting our

25  ability to get that evidence in, therefore they are entitled to

11:35:16

11:35:30

11:35:49

11:36:02

11:36:19

1  a new trial.

2        They're not entitled to a guarantee here.  They're not

3  entitled to an insurance policy from this Court.  I think the

4  Court should be commended and I do think that the evidence more

5  than substantially demonstrates that the jurors made the                    11:36:36

6  correct decision.

7        Thank you, Your Honor.

8        THE COURT:  Thank you, Mr. Basser.

9        MR. SMITH:  Thank you, Your Honor, for letting me have

10 this additional five minutes.  I appreciate it.                             11:36:56

11       There's a number of problems with some of the things

12 that have just been said in terms of matching up with the

13 record and with the *Corinthian College* case that was referred

14 to a number of times.

15       First, walking the stock down.  It's fun to talk about    11:37:09

16 it, except they never offered any evidence that the defendants

17 were walking the stock down.  The defendants made an

18 announcement on September 7 that they had settled the Program

19 Review Report, the terms of the settlement, and they knew that

20 the Department was going to be releasing the Program Review      11:37:25

21 Report once it had determined the appropriate redactions.

22       The *Williams* decision is terrific on this.  If you

23 want to say they're walking the stock down, show us when they

24 walked it down, show us what they said, and show us the effect.

25 We challenged the plaintiffs to do that in our brief and they   11:37:42

1  did exactly what they did today.  They said, well, they walked

2  the stock down, without telling you how they did it.

3       And when the report came out on the 14th in the

4  newspaper, Dr. Feinstein in his testimony said that was a bomb

5  shell.  They never described how you walk the stock down when        11:38:02

6  the media releases the substance of the Program Review Report

7  in a bomb shell.

8       Counsel kept saying that they never argued anything

9  other than you had a duty to tell the truth when you speak.

10 They did say that repeatedly.  When you speak you have to tell      11:38:17

11 the truth.  But they made numerous arguments today as well that

12 suggests there's an overarching duty to disclose the report.

13      Counsel said they didn't give the market the Program

14 Review Report.  They made them go get it.  Dr. Feinstein parsed

15 out the nonfraud factors and relied on as the fraud that they      11:38:33

16 did not disclose the contents of the Program Review Report.

17      But we walked through the prior disclosures earlier

18 and none of those needed the Program Review Report itself to be

19 disclosed.  None of those needed anything more than the fact we

20 have a Program Review Report, it's negative, it says we          11:38:52

21 violated the law, but yet they continued to argue that the

22 defendants somehow had this duty to disclose the full Program

23 Review Report.

24      I cited earlier the *Glenbrook Capital* case that held

25 there is no such rule of completeness in the Ninth Circuit.        11:39:09

1          Flynn, we heard repeatedly, she specifically linked

2    the new compensation plan to the Program Review Report, she

3    specifically did this, she specifically attributed this to the

4    Program Review Report.

5          But that's simply not true.  She made one passing          11:39:26

6    reference to the fact that the contents of the Program Review

7    Report caused her some concern.

8          When Dr. Feinstein was questioned he was asked:

9          "She did not attribute increasing enrollment advisor

10   turnover to any corrective action plan, did she?"          11:39:42

11         "It's implied in the report."

12         "It's implied?"

13         "Yes."

14         "What about enrollment growth that may be hurt by bad

15   publicity?"

16         "Well, that's in there."

17         "She doesn't, however, tie any of these reasons to the

18   Program Review Report, does she?  They're just simply reasons

19   she states."

20         "Answer:  It's implied."          11:40:00

21         Look at the *Corinthian* case that counsel has referred

22   to so often today, *Metzler versus Corinthian*.  In that case,

23   the court deals very expressly with this kind of a situation.

24         By the way, we never said that it was impossible for

25   an analyst's comments to be a disclosure or it was impossible          11:40:18

1    that there could be more than one day on which a disclosure was

2    made.  We just were applying the facts of this case.

3         The court here says, "In dealing with an article in

4    the Financial Times, they say that the complaint contends a

5    reference in the August 2nd announcement to the higher than

6    anticipated attrition was understood by the market."

7         Understood by the market is Corinthian's euphemism for

8    an admission that they had enrolled students that should not

9    have been signed up.

10        The court unequivocally rejects that and says so long

11   as there's a drop in a stock's price, a plaintiff will always

12   be able to contend that the market, in quotes, understood a

13   defendant's statement precipitating a loss as a coded message

14   revealing the fraud.  Enabling a plaintiff to proceed on such a

15   theory would effectively resurrect what Dura discredited.

16        And you heard that here.  The stock was inflated from

17   the beginning and instead of using the word euphemism, although

18   counsel used it in argument, Dr. Flynn used the word implied.

19   His implications are no different from the euphemism thoroughly

20   rejected in Metzler versus Corinthian.

21        With respect to the golden rule, I think that that is

22   such a universally recognized -- so universally recognized

23   improper practice and I don't think that there is any need to

24   stand up and object and highlight it.  What do you do?  You

25   stand up and say, "Counsel just asked the plaintiff to put

1    their" -- "put themselves in the shoes" -- excuse me.  "The

2    plaintiff just asked the jury to put themselves in the shoes of

3    the plaintiff class.  Would you tell them not to do that?"

4    That is about as meaningless as an objection can get.

5           And he says it's rhetoric.  Let me read it again, Your          11:42:16

6    Honor.

7           Here's what he told the jury:

8           "Read the Program Review Report and sit down and say

9    to yourself honestly if I was going to invest in this company

10   would this give me a reason to pause?  Would I find that this          11:42:28

11   altered -- significantly altered the total mix of information?

12   Would I find this to be important?  I think your answer, all of

13   your answers, is going to be yeah.  I'd want to know about this

14   before I figure out how much money I'm going to pay this

15   company because they're in a heap of trouble and I have no idea       11:42:47

16   whether they're getting out of it."

17          Not only did he say put yourselves, jury, in the shoes

18   of the plaintiffs, he suggested there was some duty to disclose

19   the full Program Review Report to the market and that it was

20   fraud not to do so.                                                    11:43:03

21          THE COURT:  I gave you an extra minute but your time

22   is up.

23          MR. SMITH:  Thank you, Your Honor.

24          I will mention only the Flynn testimony.  Again,

25   divining from reports what's in the market is the exact same          11:43:15

1  thing that I just talked about in *Metzler*, that divining what

2  Miss Flynn meant is inappropriate in the first instance.

3          We only said that allowing plaintiffs and an expert to

4  divine what she really meant was inappropriate, and that was

5  exacerbated by then not allowing us to say that that is not at          11:43:38

6  all what she was telling the market.

7          And I guess with that, I've used up my last minute,

8  Your Honor, and I thank you for the extra time.

9          THE COURT:  Thank you.

10         Mr. Basser?                                                      11:43:52

11         MR. BASSER:  I was just wondering if you would allow

12  me just 30 seconds to comment on something that was never in

13  the papers.  About the *Corinthian* case.

14         THE COURT:  You may.

15         MR. BASSER:  Thank you.                                          11:44:02

16         The *Corinthian* case did not say that you can't imply

17  certain understandings that the market would take from a

18  corrective disclosure, and what the *Corinthian* case was really

19  doing is looking at a pleading.  You're allowed to take

20  reasonable inferences from a pleading.  They found that the         11:44:20

21  inference that the plaintiffs were trying to convey here to

22  support that pleading was an unwarranted inference, and they

23  even say, "It's further unwarranted to infer that the reference

24  to attrition was understood by the market to mean that

25  Corinthian had revealed widespread misrepresentation of student       11:44:35

1   enrollment, fraudulently procure excess federal funding."

2           So again, it's a very fact specific inquiry, and what

3   Dr. Feinstein was doing is he's saying that you're linking --

4   there is a link here in this report, and she doesn't have to

5   say I'm linking it and you don't need a statement to be a          11:44:52

6   word-for-word match to the fraudulent omission or

7   misrepresentation.

8           Thank you again for your time, Your Honor.

9           THE COURT:  All right.  Thank you, counsel.

10          Once again, your briefing and your presentations were      11:45:06

11  excellent, as I had come to experience and appreciate in this

12  case.

13          I have -- Ms. Bengtson, that is Docket Number 550, the

14  motion which I granted in part and denied in part with respect

15  to correcting the transcript.                                      11:45:30

16          With respect to the lead plaintiff's motion to amend

17  the judgment, which is Docket Number 521, the issue presented

18  is whether class members who sold their Apollo stock before

19  September 22nd, 2004 are entitled to any recovery under the

20  jury verdict.  The Court decided this issue in the negative       11:45:53

21  when it considered the parties' proposed forms of judgment.

22          The Court concludes that there is no logical basis, no

23  legal basis, and no evidentiary basis to allow recovery for

24  shares not held through September 21, 2004, and accordingly,

25  that motion, Docket Number 521, is denied.                        11:46:22

1          Turning our attention to the motion for judgment as a

2    matter of law and the motion for new trial, we are taught in

3    *Dura* that securities fraud actions are, quote, available not to

4    provide investors with broad insurance against market losses

5    but to protect them against those economic losses that                11:47:06

6    misrepresentations actually cause, end quote.

7          The Court concludes that the evidence in this trial

8    undercut all bases on which plaintiffs claim that the Flynn

9    reports were corrective.  Although plaintiffs demonstrated that

10   Apollo misled the market in various ways concerning the DEO       11:47:38

11   program review, the plaintiffs failed to prove that Apollo's

12   actions caused investors to suffer any harm.

13         Therefore, Apollo is entitled to judgment as a matter

14   of law.

15         That's Docket Number 524.                                    11:48:00

16         Apollo has moved in the alternative for a new trial

17   under Federal Rule of Civil Procedure Number 59.  The Court is

18   required to conditionally rule on this motion in the event that

19   the Appellate Court reverses the grant of judgment as a matter

20   of law.  The Court has considered the various challenged           11:48:25

21   evidentiary rulings, the jury instructions, the claims of

22   attorney misconduct, and the claim of miscarriage of justice,

23   and the Court concludes that none of the reasons cited by

24   Apollo would warrant a new trial in this case.

25         Therefore, pursuant to Federal Rule of Civil Procedure       11:48:55

UNITED STATES DISTRICT COURT

1  50(c)(1), the Court will conditionally deny Apollo's motion for

2  new trial.

3          That's Docket Number 523.

4          Accordingly, the Court's rulings on the motion for

5  judgment as a matter of law and for new trial will be the                    11:49:18

6  subject of a formal order to follow which will further detail

7  the Court's reasoning.

8          In light of the Court's two rulings referenced, the

9  motion for remittitur is denied as moot.

10          That is Docket Number 529.                                           11:49:47

11          525.  Docket Number 525.  The motion for remittitur is

12  denied as moot.

13          We're in recess.

14          MR. SMITH:  Thank you, Your Honor.

15          (Proceedings recessed at 11:50 a.m.)                                 11:50:06

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4       I, DAVID C. GERMAN, Official Court Reporter, do hereby

5   certify that I am duly appointed and qualified to act as

6   Official Court Reporter for the United States District Court

7   for the District of Arizona.

8       I FURTHER CERTIFY that the proceedings and testimony

9   reported by me on the date specified herein regarding the

10  afore-captioned matter are contained fully and accurately in

11  the notes taken by me upon said matter; that the same were

12  transcribed by me with the aid of a computer; and that the

13  foregoing is a true and correct transcript of the same, all

14  done to the best of my skill and ability.

15

16

17      DATED at Phoenix, Arizona, this 11th day of August, 2008.

18

19

20              s/David C. German
                DAVID C. GERMAN, RMR, CRR
21

22

23

24

25